UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re THE RESERVE FUND SECURITIES AND DERIVATIVE LITIGATION<br><br>This document relates to *Securities and Exchange Commission v. Reserve Management Company, Inc.*, *et al.*, 09-cv-4346 (PGG) | MDL No. 09-md-2011(PGG) |
| SECURITIES AND EXCHANGE COMMISSION,<br><br>           Plaintiff,<br><br>     v.<br><br>RESERVE MANAGEMENT COMPANY, INC., *et al.*,<br><br>           Defendants. | Civil Action No. 09-cv-4346 (PGG) |
| AMERIPRISE FINANCIAL SERVICES, INC., and SECURITIES AMERICA, INC.,<br><br>           Plaintiffs,<br><br>     v.<br><br>THE RESERVE FUND et al.,<br><br>           Defendants. | Civil Action No. 09-cv-1288 (PGG) |

**[REVISED] RESPONSE OF AMERIPRISE FINANCIAL SERVICES, INC. AND SECURITIES AMERICA, INC. IN SUPPORT OF THE SECURITIES AND EXCHANGE COMMISSION'S PROPOSED PLAN OF DISTRIBUTION**

Plaintiffs Ameriprise Financial Services, Inc. and Securities America, Inc. (collectively "Ameriprise") hereby submit this response, pursuant to the Court's Order of June 8, 2009, in support of the application of the Securities and Exchange Commission ("SEC") for an Order

12143741_1.DOC

enjoining the plan of distribution previously announced by the Reserve Primary Fund (the "Fund") and compelling a *pro rata* distribution of the Fund's remaining assets. The SEC's Memorandum of Law in support of its proposed Order sets forth compelling evidence and arguments as to why a *pro rata* distribution is the only outcome that is fair and equitable to all the Fund's shareholders, in light of the defendants' egregious misconduct. Ameriprise wholeheartedly endorses and joins in the SEC's arguments for *pro rata* distribution.

Further, Ameriprise respectfully submits that *pro rata* distribution should be applied broadly to *all* redemptions submitted by Fund investors after Lehman Brothers Holdings, Inc. declared its intention to file for Chapter 11 bankruptcy at 1:30 a.m. on September 15, 2008. As the SEC's Memorandum describes, approximately $10.83 billion of selected redemptions received on September 15 were funded that day at a full $1.00 Net Asset Value, before redemptions were halted altogether later in the day. There is evidence that defendants paid those whom they deemed most important, and left the rest of the shareholders out in the cold. *See* pp. 8-9, *infra*. The SEC's proposed plan of distribution would leave these full-value redemptions undisturbed, with the effect of diminishing the assets available for distribution to the remaining shareholders. However, the principles of fairness that require *pro rata* distribution of the Fund's *remaining* assets apply with equal force to the redemptions that defendants selected during the day for full funding.

Finally, Ameriprise also supports the SEC's request for appointment of a monitor to oversee the distribution of the Fund's remaining assets and payment of Fund expenses. Prior to the transfer of Ameriprise's action to this multidistrict litigation by the JPML, Judge Paul A. Magnuson of the District of Minnesota granted Ameriprise's similar request for an Order appointing a special master to oversee the payment of Fund expenses out of the so-called

"Special Reserve" established by the defendants.  *See Ameriprise Financial Services Inc. and Securities America, Inc. v. The Reserve Fund*, No. 08-cv-5219 (D. Minn.), Memorandum and Order dated January 5, 2009 (copy attached as Wolkoff Decl. Exhibit A).  The need for Court oversight of the handling of Fund assets has in no way diminished in the intervening months, and may even have increased.

## ARGUMENT

I.   **AN IMMEDIATE *PRO RATA* DISTRIBUTION OF THE REMAINING ASSETS OF THE PRIMARY FUND IS APPROPRIATE AND NECESSARY**

The evidence offered by the SEC in support of its proposed plan provides compelling support for immediate *pro rata* distribution of the Fund's remaining assets.  Additionally, the Administrative Complaint filed against the Reserve by the Massachusetts Securities Division ("MSD") dovetails with the positions of the SEC and Ameriprise, in further support of the Commission's proposal.  These documents expose the defendants' blatant attempts on September 15, 2008 and thereafter to preserve their management fees and otherwise protect themselves from financial exposure and liability, to the substantial detriment of the Fund's investors.  These misdeeds fatally infected the striking of the Fund's NAV and the redemption process beginning at the open of business on September 15, 2008.  The only equitable way to protect investors from further unfairness is to distribute the Fund's remaining assets on a *pro rata* basis without regard to when investors submitted their redemption requests.

The SEC's papers confirm that, from the very beginning, The Reserve "manifested a brazen disregard for the truth in their attempts to keep investors from fleeing the Primary Fund," as the MSD separately alleged. (MSD's Compl. 10, copy attached as Wolkoff Decl. Ex. B.)  The SEC's evidence shows that the Fund's Board of Trustees' valuation of Lehman Holdings on September 15 was infected by the provision by the Bents and Reserve Management Company,

Inc. of incomplete and inaccurate information to the Board concerning the market's valuation of Lehman Holdings and other news bearing on the Fund and the valuation of Lehman securities, even after the Trustees emphasized that they were relying on RMCI to provide such accurate information. (SEC's Mem. 9-10.)

The Bents, in particular, were opposed to marking down the Lehman paper – obviously because they were focused first and foremost on the legal implications such a markdown would have on the Fund (and thus themselves), rather than reaching an accurate or realistic value for the securities. (Osnato Decl. Ex. 26 at 11:10-13:22; 29 at 9:23-10:09.) Even after receiving market data indicating that Lehman Holdings was worth as little as 30%-40% of par, the Bents continued to recommend valuing the securities at par. (Osnato Decl. Ex. 26 at 3:09-4:25.)

Further, RMCI failed to inform the Trustees of the Fund's liquidity problems at any time on September 15 (SEC's Mem. 9-12) – even though RMCI was aware on September 15 that there was not enough cash in the portfolio to meet redemptions, that the Reserve was unable to raise sufficient liquidity to fund the redemptions, and that the Primary Fund's custodian bank had stopped funding redemptions from the Fund because the Reserve had exhausted its overdraft limits. (SEC's Mem. 17.)

Indeed, as the SEC asserts, defendants also understated redemption totals and hid from the Board the severity of the run on the Primary Fund on September 15, (SEC's Mem. at 11-12) informing the independent trustees at 1:30 p.m. on September 15 that redemptions were $5 billion, when the actual amount of redemptions was $16.5 billion. (Osnato Decl. Ex. 8 at 149:25-150:20; Ex. 11 at TRES_SEC 0000107; Ex. 3 at RF-SEC 00178718.)

The Trustees ultimately marked down Lehman securities to $0.80 on the dollar, but with a view to the fact that arithmetically, that would still allow them to avoid "breaking the buck."

(See SEC's Mem. 9-10; Osnato Decl. Ex. 26 at 12:12-22; Def's. Mem. in Support of Mtn. to Dismiss at 5 ("[T]he Board valued the Lehman paper at 80% (Compl. ¶ 58), and persuaded Bent Sr. that this was the right decision."))  In fact, Bruce Bent Senior admitted in testimony that he had calculated that the Fund would not break the buck if the Lehman paper was valued at $0.80. (Osnato Decl. Ex. 7 at 34 n.114.)

However, the Trustees' 20% markdown of Lehman debt on September 15 was clearly inadequate. "The World's Most Experienced Money Manager" cannot credibly deny that it was in a position to collect information on the value of Lehman securities from other members of the investment community, and as the Commission observed, it did so. (SEC's Mem. 10-11; Osnato Decl. Ex. 33.)

Indeed, Defendants do *not* deny that they had knowledge of indicative pricing of Lehman at $0.30 to $0.40 on September 15. (See Def's. Mem. in Support of Mtn. to Dismiss at 23.) Objective evidence from respected third-party pricing sources confirms these facts. Reuters and Interactive Data Corporation ("IDC") report that the September 15 bid prices for comparable unsecured Lehman bonds were $0.34-$0.35. (Wolkoff Decl. Exs. C-D.)  In fact, bid prices for those bonds on Thursday, September 11, 2008, days *before* the bankruptcy announcement, were already as low as $0.799.  (See id.)  Notably, RMCI's Chief Investment Officer Patrick Ledford testified to the MSD that he was aware of the fact that Lehman's stock dropped 43.7% on September 11 (MSD Compl. ¶ 47), and others at RMCI also noted the September 11 decline in Lehman securities.  (Id. at ¶ 48.)

As memorialized in The Reserve's own "Reserve Insights" announcement, which was reviewed by Bruce Bent II (MSD's Compl. ¶ 122) and distributed to selected Fund investors late in the day on September 15 and continuing on September 16, as well as in other documents cited

by the MSD (Compl. ¶¶ 104-23), RMCI brashly continued to tell investors that they expected to recover par value for Lehman debt even after the board valued it at $0.80.

Perhaps worst of all, the Reserve made selective and inconsistent disclosures to some investors – but not others – on September 15, in breach of its fiduciary duties and in furtherance of its own interests. As Ameriprise has long maintained, and as information uncovered by the MSD confirms, institutional salesmen at RMCI contacted certain clients and provided them with selective information. (<u>See</u>, <u>e.g.</u> MSD's Compl. ¶¶ 157-66.) Transcripts of RMCI telephone calls on September 15 demonstrate that the Reserve sales team advertised to certain investors that the Fund would support the $1.00 NAV (which of course, it did not do) (<u>id.</u> at ¶ 162) and falsely assured certain investors that the Fund did not have a liquidity problem (<u>id.</u> at ¶ 149-56). Additionally, RMCI told certain investors throughout the day on September 15 that Lehman securities were being valued at full par value. (<u>Id. at</u> ¶ 116.)

These disclosures were improper and illegal. These selective disclosures may have persuaded some clients to hold off on redeeming their shares (as RMCI no doubt intended), while other investors, understandably alarmed by the Reserve's behavior and gross overvaluation of the Lehman paper, submitted redemption requests.

Certain investors have submitted objections to the SEC's plan, arguing that they are entitled to redeem their shares at the full $1.00 NAV because they submitted their redemption requests while the stated NAV was still pegged at $1.00 – <i>i.e.</i>, before The Reserve announced the breaking of the buck on September 16. (<u>See</u> Objections filed by Russell Investment Company, Autodesk, Inc., and Financial Guaranty Insurance Co. on July 22, 2009.) But the evidence and arguments above and in the SEC's memorandum demonstrate why these objections are unfounded. The pattern of dishonest, unfair and disparate treatment of investors and brash

disregard for the true value of the securities held by the Fund fatally infected the striking of the NAV and the share redemption process. Thus, at no point in time on September 15 or 16 was the true NAV in fact $1.00, including when the objecting parties submitted their redemption requests. The only fair and equitable way to unwind the effects of the defendants' misdeeds is a *pro rata* distribution of the Fund without regard to when investors submitted their redemption requests on and after September 15th.

## II.   THE FUND SHOULD BE MADE WHOLE FOR REDEMPTIONS IMPROPERLY FUNDED TO SELECTED CLIENTS AT A $1.00 NET ASSET VALUE

The SEC's distribution plan will go a long way toward ensuring the fairest and most equitable result possible for investors, by preventing arbitrary distinctions among remaining investors based upon the timing of their redemption requests on or after September 15. However, there is no reason why the same reasoning should not be applied to the $10.83 billion worth of redemptions that were funded at a full $1.00 NAV to selected clients on September 15. These full-value redemptions, which reflect no discount for the decline in value of the Lehman holdings that occurred first thing on the morning of the 15th, have the effect of improperly diminishing the assets available for *pro rata* distribution to the remaining shareholders. This inequitable outcome should not be allowed to stand. The SEC's distribution plan should accordingly be modified to ensure that the Fund is made whole for the portion of the full-value redemptions that exceeded the true NAV on September 15, 2008, which amounts to more than $140 million.[1]

---

[1] Based an estimated recovery of $.984 per share (SEC's Mem. 3), the total losses borne by holders of the 53.17 billion shares currently outstanding represent approximately $850.72 million ($53.17B * 1.6 cents). Reserve Management's actions allowed 10.83 billion shares to be redeemed at a full $1.00 on September 15, causing approximately $140 million in losses attributable to such shares ($850.72 million / 64 billion [shares outstanding as of the close of business Friday, September 12, 2008] * 10.83 billion) to be borne by the current shareholders.

As discussed above, the evidence marshaled by the SEC and the MSD demonstrates that the negative impact of the Lehman holdings on the Fund's NAV was clear to the defendants by the open of business on September 15, as they began their efforts to protect themselves and mislead investors and the Trustees immediately that morning. Nevertheless, the defendants elected to honor selected redemption requests at the full $1.00 NAV – despite their knowledge of its invalidity – apparently until the Fund's available liquidity ran dry. As the defendants later conceded, the $1.00 NAV they continued to advocate throughout the day on September 15 and into September 16 was a pure fiction. The Lehman pricing data for September 15 makes clear that the die was cast as of Lehman's bankruptcy announcement, and the defendants' false protestations to the contrary only served to delay the announcement that the Fund had "broken the buck," and to allow certain shareholders to be paid a full $1.00 per share, at the expense of other investors. There is simply no basis to conclude that the selected redemptions honored on September 15 were properly paid at full value, and thus that the other investors should suffer a disproportionate negative impact of Lehman's collapse.

Further, RMCI's selective and inconsistent disclosures to some investors on the morning of September 15 compound the unfairness of paying a few investors at full value, because the Reserve's disclosures influenced the timing of investors' redemption requests. *See* p. 6, *supra*.

Additionally, it appears from the evidence that the redemptions received on September 15 were not honored in the order in which they were received, despite The Reserve's representations to the contrary. (MSD's Compl. ¶¶ 129-145.) According to the MSD's Complaint, RMCI stated on multiple occasions that large redemptions, including requests by banks and brokers, received priority over others. (Id.) Emails sent by RMCI to State Street

show this very clearly. At 8:33 a.m. on September 15, RMCI sent an email to State Street that read in part:

> Bear Stearns has first priority with a redemption of 1,000,000,000.00.
> Farmer Mac has 2nd priority of 50,000,000
> Pershing with a 3rd priority of 800,000,000.00 and 405mm and 27mm.

(MSD's Compl. Ex. L.) A later email sent by RMCI to State Street at 10:13 a.m. confirmed that the Bear Stearns' $1 billion redemption "ha[d] gone out" and that Farmer Mac and Pershing were next in line. (Id. at Ex. M.) However, a table (attached to the 8:33 a.m. email) listing each redemption request from 7:51 a.m. to 8:30 a.m. on September 15, shows that 21 redemption requests were placed ahead of Bear Stearns', including those submitted by Farmer Mac and Pershing. Further, Farmer Mac was the 13th shareholder to place its redemption, and Pershing LLC was 19th. (Id. at Ex. L.)

Indeed, RMCI institutional salesman Mark Rothwell informed Time Warner that "it's all about priority and size and everything and we understand that the big ones are the most important ones" and "we are obviously going to prioritize the large redemptions." (MSD's Compl. ¶ 140.) Thus, in addition to being paid at an inflated NAV, the selected investors whose redemptions were honored on September 15 may also have benefited from improper selective treatment by the defendants.

The SEC correctly has recognized that there is no real distinction between "early" and "late" redeemers and that "[a]ny effort to distinguish among the claims of Unpaid Shareholders would require embracing arbitrary distinctions that would result in an unfair and inequitable distribution of Fund assets to shareholders." (SEC's Mem. 6.) Similarly, there is no meaningful difference between "unpaid shareholders" and shareholders who were allowed to redeem at

$1.00.  The SEC's stated goal is to "avoid forcing any particular group of redeemers to bear the brunt of all Primary Fund losses" (id.), and this goal can only be achieved if the impact of the early over-payments made to selected investors is undone.

This Court has ample authority to make this modification to the SEC's proposed plan of distribution under Sections 25(c) and 21(d)(5) of the Exchange Act, because it is "appropriate" and "necessary" for the benefit of investors.  See 15 U.S.C. § 78u(d)(5).  Ameriprise takes no position on whether the Fund should be made whole by "clawing back" the over-paid amounts from the selected investors themselves, or by compelling the defendants to compensate the Fund for this consequence of their own misdeeds, or by some other mechanism.  In any event, the return of these additional amounts to the Fund should not delay the distribution of the assets currently in the Fund.  There is no reason that the *pro rata* distribution of the assets remaining in the Fund, as urged by the SEC, should not go forward immediately.

## CONCLUSION

For the reasons stated above, Ameriprise respectfully requests that this Court order the relief sought by the SEC and institute a *pro rata* distribution of assets as set forth in the SEC's Memorandum and Term Sheet.  Additionally, Ameriprise respectfully requests that the Court modify the SEC's plan of distribution to require that the Fund also be made whole for the extent to which the redemptions honored at $1.00 NAV on September 15 exceeded the true NAV that day.

        Respectfully submitted:

        _/s/ Harvey J. Wolkoff_____
        Harvey J. Wolkoff
        Robert A. Skinner
        Lara A. Oravec
        ROPES & GRAY LLP
        One International Place
        Boston, MA  02110
        (617) 951-7000

        *Counsel for Ameriprise Financial, Inc. and Securities America, Inc.*

Dated:  July 27, 2009