UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re THE RESERVE FUND SECURITIES AND DERIVATIVE LITIGATION | 09 MD. 2011 (PGG) |
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>RESERVE MANAGEMENT COMPANY, INC., RESRV PARTNERS, INC., BRUCE BENT SR., and BRUCE BENT II,<br><br>Defendants,<br><br>and<br><br>THE RESERVE PRIMARY FUND,<br><br>Relief Defendant. | **ECF CASE**<br><br>09 Civ. 4346 (PGG)<br><br>**<u>MEMORANDUM OPINION</u>** |

PAUL G. GARDEPHE, U.S.D.J.:

      The Securities and Exchange Commission filed this action on May 5, 2009.

Pursuant to the Complaint's Eighth Claim for Relief, which names Relief Defendant The

Reserve Primary Fund ("Primary Fund"), the Commission seeks an order that <u>inter</u> <u>alia</u> (1)

provides for a <u>pro</u> <u>rata</u> distribution of the remaining assets of the Primary Fund; and (2) enjoins

all claims against (a) Primary Fund assets, including shareholder claims against the Primary

Fund, and (b) any of the Defendants or their officers, directors, trustees, representatives, agents

or employees to the extent that such claims are subject to indemnification by the Primary Fund.

The Commission also requests that the Court appoint a monitor to oversee the distribution of

Primary Fund assets and to review any claims by the Primary Fund's adviser and distributor for

management fees and expenses, and any claims by Primary Fund indemnitees for indemnification expenses, among other duties.

On June 8, 2009, this Court ordered the Commission and the Primary Fund to provide notice of this proceeding and the Commission's application to all record owners of shares of the Primary Fund, and directed all claimants against the assets of the Primary Fund, the Defendants, or any of their respective officers, directors, trustees, representatives, agents or employees to file any objections to the entry of the relief sought by the Commission by July 22, 2009.  (Dkt. No.11, June 8, 2009 Order)

The Primary Fund and its Board of Trustees – including the Independent Trustees – support the Commission's application.  (Relief Def. Aug. 21 Br. 9-10; Independent Trustees Aug. 21 Br. 1)  While the Defendants do not concede the truth of all of the Commission's factual allegations, they also support the SEC's application.[1]  (Def. Aug. 21 Br. 2)  Similarly, investors holding shares representing over 75% of the Primary Fund's remaining assets have filed submissions supporting the SEC's application or have not objected to it.  See Relief Def. Aug. 21 Br. 4-5.

Based on the hearings held in this matter and on the written submissions of the parties and of claimants against the Fund, and for the reasons set forth below, this Court will issue an Order with this Memorandum Opinion providing for, inter alia, the pro rata distribution of the remaining assets of the Primary Fund and enjoining all claims against (1) Primary Fund assets, including shareholder claims against the Primary Fund; and (2) any of the Defendants and

---

[1]  The Commission's current application is based solely on the Complaint's Eighth Claim for Relief, which does not name the Defendants and is brought solely against the Primary Fund.  See Cmplt. ¶¶ 149-150.  The Defendants have reserved their rights to challenge the SEC's factual allegations as this litigation proceeds on the other claims in the Complaint, but they support the Commission's current application.

any of the Defendants' officers, directors, trustees, representatives, agents or employees to the extent that such claims are subject to indemnification by the Primary Fund.  As discussed below, the Court will refer to a monitor or a United States Magistrate Judge the responsibility of overseeing the distribution of Primary Fund assets and reviewing claims by the Primary Fund's adviser and distributor for management fees and expenses, and claims by Primary Fund indemnitees for indemnification expenses.

## **BACKGROUND**

This action arises from the unprecedented collapse of the Reserve Primary Fund,[2] a money market fund that, as of September 14, 2008, held debt securities issued by Lehman Bros. Holdings, Inc. ("Lehman") with a face value of $785 million, amid total assets under management of $62.5 billion.[3]  (Osnato Decl. Ex. 3)[4]

On Sunday, September 14, 2008, Lehman announced that it would file for bankruptcy protection the following day.  In response to this announcement, on Monday morning, September 15, 2008, the Primary Fund faced a tidal wave of redemption requests.  By

---

[2]  The Reserve Fund was established by Defendant Bent Sr. in 1971 and was the first money market fund in the United States.  See Karen Damato and Greg Ip, Money-Market Funds Face Expense Crunch, WALL STREET J., June 13, 2003 at C1.

[3]  The collapse of the Primary Fund, a unique event in and of itself, must be viewed in the context of the Lehman bankruptcy and the chaos that event produced, which one commentator called a period of "some of the most cataclysmic failures in our economic history."  Andrew Ross Sorkin, A Breakdown on Handling Big Failures, N.Y. TIMES, Sept. 8, 2009, DealBook. Indeed, Frederick Mishkin, a former governor of the Federal Reserve and Columbia University economics professor has said that he views "the shock after Lehman to be worse and more complicated than the one that caused the Great Depression."  Id.

[4]  Exhibit 3 to the May 4, 2009 Declaration of Michael J. Osnato, Jr. ("Osnato Declaration"), is the "Minutes of the Joint Meeting of the Boards of Trustees of the Reserve Fund," dated September 15, 2008.

8:40 a.m., redemption requests totaled more than $5 billion.  (Osnato Decl. Ex. 6)[5]  At 10:10

a.m., State Street Bank and Trust Company, the Primary Fund's custodial bank, stopped funding

redemption requests and suspended the Fund's overdraft privileges.  (Osnato Decl. at 7)

Although redemptions were no longer being paid out, requests continued to pour in.  By 10:30

a.m., redemption requests had doubled, totaling more than $10 billion.  (Osnato Decl. Ex. 6)[6]  By

1:00 p.m., redemption requests had grown to approximately $16.5 billion.  (Osnato Decl. Ex. 3)[7]

The run on the Primary Fund continued throughout the day and into Tuesday, September 16.  By

3:45 Tuesday afternoon, redemption requests totaled a staggering $40 billion (Osnato Decl. Ex.

15),[8] or roughly two-thirds of the total assets under Fund management.  The run on the Primary

Fund coincided with a period of enormous turmoil in the credit markets that resulted in a near

freeze of trading.[9]

   At the first meeting of the Primary Fund's Trustees – conducted at 8:00 a.m. on

September 15 – the Trustees tasked Reserve Management Company, Inc. ("RMCI"), the Fund's

investment advisor, to "review market events and pricing activity" in an effort to reach a

---

[5]  Exhibit 6 to the Osnato Declaration is a Reserve Management Company, Inc. spreadsheet
reflecting Primary Fund redemption requests for the period from September 15, 2008 through
September 19, 2008.

[6]  See id.

[7]  See supra note 4 (describing Osnato Decl. Ex. 3)

[8]  Exhibit 15 to the Osnato Declaration is the "Minutes of the Meeting of the Boards of Trustees
of the Reserve Fund" dated September 16, 2008.

[9]  See, e.g., Joe Nocera, 36 Hours of Alarm and Action as Crisis Spiraled, N.Y. TIMES, Oct. 2,
2008, A1 (describing the days following the Lehman bankruptcy, in which "the credit markets
had almost completely frozen up.  Banks were refusing to lend to other banks, and spreads on
credit default swaps on financial stocks – the price of insuring against bankruptcy – veered into
uncharted waters."); Utilizing Technology to Improve TARP and Financial Oversight: Hearing
Before the Subcomm. on Oversight and Investigations of the H. Comm. on Financial Services,
111th Cong. (Sept. 17, 2009) (statement of Thomas Quaadman, Executive Director for Financial
Reporting Policy, U.S. Chamber of Commerce) ("In the days and weeks following the Lehman
collapse, the United States and the global economy stood on the precipice of an outright collapse.
The credit markets were frozen, consumers stopped spending, businesses started to contract, and
we saw the first electronic run on financial institutions.").

valuation for the Primary Fund's Lehman holdings.  (Osnato Decl. Ex. 3; Ex. 7 at 15)[10]  When

the Trustees met next at 9:30 a.m., Defendant Bent Sr.[11] advised the Board that the Lehman

holdings should be valued at par.  There is evidence in the record, however, that Lehman debt

was trading well below par at that time.[12]  See Osnato Decl. Ex. 26.[13]  At the 9:30 a.m. meeting,

the Trustees ultimately settled on a valuation of 80% of par (Osnato Decl. Ex. 27),[14] a

determination that preserved the Primary Fund's $1.00 net asset value ("NAV").  As one Trustee

stated at the time, however, choosing that valuation was akin to "throwing a dart on the wall."

Id. at 14:11-15:37.

        The Trustees met once more on September 15, at 1:00 p.m.  (Osnato Decl. Ex.

3)[15]  Although the record is not entirely clear, there is substantial evidence that the Trustees were

told that redemption requests at that time totaled $8 billion.  The correct figure was $16.5

billion.[16]  See Osnato Decl. Ex. 8, Ex. 9 at 62-65.[17]  The minutes indicate that the Trustees were

---

[10]  See supra note 4 (describing Osnato Decl. Ex. 3); Exhibit 7 to Osnato Declaration is the January 23, 2009 Wells Submission made on behalf of the Bents.

[11]  Bent Sr. is the chairman of RMCI and the chairman, president and treasurer of the Primary Fund, in addition to serving as a trustee of the Primary Fund.  Primary Fund, ANNUAL REPORT, May 31, 2008 at 1, 44.

[12]  "Early trading quotes" on Sunday, September 14, 2008,valued senior unsecured Lehman debt at 32 to 35 cents on the dollar.  (TD Ameritrade Berger Decl. Ex. 2 at 2)

[13]  Exhibit 26 to Osnato Declaration is an audio file reflecting a recording of the Primary Fund Board Board of Trustees' 9:30 a.m. meeting on September 15, 2008.

[14]  Exhibit 27 to the Osnato Declaration is an audio file reflecting a recording of the Primary Fund Board of Trustees' 9:30 a.m. meeting on September 15, 2008.

[15]  See supra note 4 (describing Osnato Decl. Ex. 3)

[16]  A draft of the board meeting's minutes indicates that redemptions requests were approximately $8 billion; that figure is in brackets.  Another draft of the minutes substitutes $16.5 billion for the $8 billion figure.  See Osnato Decl. Ex. 8, Ex. 9 at 62-65.  William Montgoris, an Independent Trustee, has testified that he was told on September 15 that redemption requests totaled $8 billion. (Osnato Decl. Ex. 9 at 62-65)  Catherine Crowley, the General Counsel of RMCI, has testified that she does not recall what number the Board was given at the 1:00 p.m. meeting.  (Osnato Decl. Ex. 8 at 150)

[17]  Exhibit 8 to the Osnato Declaration is a copy of excerpts from the February 5, 2009 testimony of RMCI General Counsel Catherine Crowley before the Commission.  Exhibit 9 is a transcript

not told that State Street had stopped funding redemptions and had suspended the Fund's overdraft privileges, both of which had occurred some three hours earlier.  <u>See</u> Osnato Decl. Ex. 3; Ex. 9 at 68-70.[18]

The Trustees did not alter their valuation of the Lehman debt at the 1:00 p.m. meeting, although evidence in the record indicates that trading prices were between 29 and 36 cents on the dollar for Lehman debt throughout September 15.  <u>See</u> Powell Decl. Exs. B-E.[19] The minutes of the 1:00 p.m. meeting indicate that the Trustees discussed the possibility of the Primary Fund entering into a credit support agreement with RMCI aimed at preserving the $1.00 NAV.  (Osnato Decl. Ex. 3)[20]  The minutes further reflect that, under questioning by the Trustees, RMCI represented that sufficient capital would be made available to support the Primary Fund and preserve the $1.00 NAV.  <u>Id.</u>

During the afternoon of September 15, RMCI issued a press release addressing the effect of Lehman's bankruptcy on the Primary Fund.  (Osnato Decl. Ex. 16)[21]  The release states that RMCI "intends to enter into support agreements with the Primary Fund to support the value of Lehman credit held in the Fund," and that these "support agreements ensure the integrity of a $1.00 NAV."  <u>Id.</u>  The release further states that RMCI has "discussed with the SEC that our intent is to mitigate any decline in value of the Lehman debt so that it will not result in a decrease

---

of the February 10, 2009 testimony of Primary Fund Independent Trustee William Montgoris before the Commission.

[18]  <u>See</u> <u>supra</u> note 4 (describing Osnato Decl. Ex. 3); <u>see</u> <u>supra</u> note 17 (describing Osnato Decl. Ex. 9).

[19]  Exhibits B, D, and E to the July 27, 2009 Declaration of James A. Powell, submitted on behalf of TD Ameritrade, are copies of trading price data for Lehman debt published by Bloomberg Finance.

[20]  <u>See</u> <u>supra</u> note 4 (describing Osnato Decl. Ex. 3).

[21]  Exhibit 16 to the Osnato Declaration is a copy of an e-mail sent by a member of RMCI's sales force to multiple Primary Fund investors.  Attached to the email is a September 15, 2008 press release entitled "The Reserve Insights."

to the NAV of the Fund," and that RMCI would submit "appropriate documentation to the SEC today, September 15, 2008," to put those support agreements in place.  Id.  RMCI did not enter into such support agreements, however, and by the following morning the Bents had concluded that "RMCI could not support the Primary Fund's NAV."  (Osnato Decl. Ex. 7 at 18)[22]

The full Board of Trustees next met at 10:00 a.m. on September 16.  At that meeting, Defendant Bent II informed the Board that RMCI would not be able to provide the level of credit support necessary to preserve the $1.00 NAV.  Bent II further reported that redemption requests through 9:00 a.m. on Tuesday totaled $24.6 billion.  (Osnato Decl. Ex. 15)

At 10:30 a.m., immediately following the meeting of the full board, the Independent Trustees convened an Executive Session by telephone.  (Osnato Decl. Ex. 11)[23]  The Independent Trustees discussed "how shocked they were by the information relayed to them by Reserve Management during the morning's earlier call," including the amount of the redemption requests on September 15 and RMCI's announcement that it could not support the $1.00 NAV. Id.

The Independent Trustees then engaged in "extensive discussion as to how to value the Lehman commercial paper held by the Primary Fund."  (Osnato Decl. Ex. 11 at 1)[24]  In response to RMCI's representation that there had been "indications of interest" in the Primary Fund's Lehman paper, "[t]he Trustees determined that in light of the fact that there were no actual trades or bids in the markets, these indications of interest were more a reflection of a bankruptcy type valuation than an estimate of value that could be realized on a current sale."

---

[22]  See supra note 10 (describing Osnato Decl. Ex. 7).
[23]  Exhibit 11 to the Osnato Declaration is the "Minutes of Executive Session of The Independent Trustees of the Reserve Funds," dated September 16, 2008.
[24]  Id.

(Osnato Decl. Ex. 11 at 1-2)[25]  The Independent Trustees resolved to focus on "the value that could be realized on an immediate sale of the entire Lehman position" in light of "the huge amounts of redemptions and the likelihood that more will follow."  (Osnato Decl. Ex. 11 at 2)[26]

At the close of this meeting, the Independent Trustees determined that RMCI should be directed to "immediately seek firm bids on the entire Lehman position" and, if RMCI "was unable to obtain such firm bids, then it should value the Lehman paper at zero."  (Osnato Decl. Ex. 11 at 2)[27]  Efforts to find a buyer for the Lehman paper were unsuccessful.  See Osnato Decl. Ex. 9 at 91-93.[28]  Accordingly, the full Board of Trustees reduced its valuation of the Lehman debt to zero as of 4:00 p.m. on September 16, 2008, which caused the Primary Fund's NAV to drop to $0.97 per share.  (Osnato Decl. Ex. 14)[29]  The Primary Fund announced that all redemption requests received prior to 3:00 p.m. would be redeemed at a NAV of $1.00 per share. Id.  Redemption requests received after 3:00 p.m. would be redeemed at a NAV that attributed a zero value to the Lehman holdings, yielding a NAV of $0.97 per share.  See id.  The Primary Fund had thus "broken the buck," becoming the first retail money market fund ever to do so.[30]

The Primary Fund also announced a "seven day redemption delay" on September 16, in place "until further notice."[31]  (Osnato Decl. Ex. 14)[32]  On September 22, 2008, the

---

[25]  Id.
[26]  Id.
[27]  Id.
[28]  See supra note 17 (describing Osnato Decl. Ex. 9)
[29]  Exhibit 14 to the Osnato Declaration is a press release issued by RMCI on September 16, 2008.
[30]  Community Bankers U.S. Government Money Market Fund, a small fund for institutional investors, "broke the buck" in 1994.  Because this fund was not a retail money market fund, individual investors were not directly affected.  John Waggoner, Money Market Fund Breaks a Buck: Reserve Primary Fund Had IOUs From Lehman, USA TODAY, Sept. 17, 2008 at 4B.
[31]  As noted above, redemption requests had not been honored since approximately 10:00 the previous morning.
[32]  See supra note 29 (describing Osnato Decl. Ex. 14).

Commission entered an order suspending redemptions based on RMCI's representation on behalf of the Primary Fund that it would "create a plan for the orderly liquidation" of the Fund.[33]

On November 26, 2008, RMCI issued a press release stating that the Primary Fund had "broken the buck" not as of 4:00 p.m. on September 16, 2008 – as previously announced – but instead had dropped below a $1.00 NAV as of 11:00 a.m. on September 16. (Osnato Decl. Ex. 13)[34]  The November 26 press release disclosed "an administrative error in computing the Fund's NAV."  Id.  In computing the hourly NAV[35] on September 15, 2008, RMCI's Fund Accounting Group valued the Lehman holdings at 80% of par, as directed by the Board of Trustees.  Id.  On September 16, however, the Fund Accounting Group "inadvertently left out" the write-down of the Lehman paper in calculating the NAV, causing the NAV to be overstated.  Id.  Had the Lehman paper been valued at 80% of par throughout the morning of September 16 as the Trustees had instructed, the Primary Fund's NAV would have fallen to $0.99 per share at 11:00 a.m. and remained at $0.99 per share until the Trustees reduced their valuation of the Lehman holdings to zero that afternoon.  See id.

The drop in the NAV of the Primary Fund, and the suspension of redemptions, led to the filing of numerous class and individual actions, most of which have been consolidated for pre-trial purposes before this Court.  See In Re: The Reserve Fund Securities and Derivative Litigation, 09 MD 2011.  In light of this litigation, the Board announced on February 26, 2009, that it had created a special reserve of $3.5 billion to satisfy "(a) anticipated costs and expenses

---

[33]  Order Temporarily Suspending Redemption of Investment Company Shares and Postponing Payment for Investment Company Shares, Investment Company Act Release No. 28,386, 73 Fed. Reg. 55,572 ("Sept. 22, 2008 SEC Order")

[34]  Exhibit 13 to the Osnato Declaration is a press release issued by RMCI on November 26, 2008.

[35]  The Primary Fund prospectus provides that the Fund will calculate the NAV on an hourly basis.  (Osnato Decl. Ex. 2 Nov. 30, 2007 Supplement, 16)

of the Fund, including legal and accounting fees; (b) pending and threatened claims against the Fund, its officers and Trustees; and (c) claims, including but not limited to claims for indemnification that could be made against Fund assets." (Osnato Decl. Ex. 1)[36]

During the past year, the Primary Fund has, under Commission supervision,[37] distributed $47.1 billion in Fund assets. An estimated $3.5 billion remains to be distributed.[38] To date, Primary Fund assets have been paid out on a pro rata basis to those shareholders who were not fully paid for shares they beneficially owned on or after September 15, 2008. The Commission and the Independent Trustees estimate that if all remaining Primary Fund assets are distributed on a pro rata basis to all shareholders, investors will recover approximately 99 cents per share.[39] (Sept. 23, 2009 Oral Arg. Tr. 18, 28)

## PROCEDURAL HISTORY

## I.    THE NOTICE PERIOD

The Commission filed this action on May 5, 2009, and on June 8, 2009, this Court ordered the Commission and the Primary Fund to provide notice of this proceeding to all record owners of shares of the Primary Fund and directed all claimants against the assets of the Primary

---

[36] Exhibit 1 to the Osnato Declaration is a press release issued by RMCI on February 26, 2009, entitled "The Primary Fund: A Statement Regarding Special Reserve Under the Plan of Liquidation."

[37] See Sept. 22, 2008 SEC Order (granting request for exemption from section 22(e) of the Investment Company Act with respect to The Reserve Primary and Government Funds, based on the Reserve Fund's representation that it would "create a plan for the orderly liquidation of each Fund's assets to meet redemption requests and for the appropriate payments to each Fund's shareholders, including those whose redemption orders have been received but not yet paid, which plan is subject to Commission supervision").

[38] Press Release, The Reserve, Reserve Primary Fund Distributes $1 Billion (Oct. 2, 2009) ("Including this fifth distribution, $47.1 billion . . . has been returned to investors . . . approximately 3.5 billion remains in the Fund, which includes the Lehman Brothers Holdings Inc. securities held in the Fund, which are valued at zero.").

[39] The 99 cent per share estimate assumes that the Lehman holdings will be sold for 17% of face value, which the Independent Trustees and the Primary Fund earlier indicated is a price at which the holdings might be sold. (Sept. 23, 2009 Oral Arg. Tr. 28; Relief Def. Aug. 21 Br. 1-2)

Fund, the Defendants, or any of their respective officers, directors, trustees, representatives, agents or employees, to file any objections to the entry of the relief sought by the Commission by July 22, 2009.  (Dkt. No. 11, June 8, 2009 Order)

The Court's June 8, 2009 Order required that the Commission and the Primary Fund provide notice to potentially interested parties in a variety of ways, including:  (1) posting copies of the order and the Commission's application on the Commission's web site, www.sec.gov; (2) serving copies of the order and the Commission's application by overnight courier on the Defendants and all parties in the actions consolidated for pre-trial proceedings pursuant to 28 U.S.C. § 1407 in the multi-district litigation captioned <u>In Re: The Reserve Fund Securities and Derivative Litigation</u>, 09 MD 2011; (3) posting copies of the order and the Commission's application on the Primary Fund's website, www.ther.com, and requiring that both the Commission and the Primary Fund issue press releases announcing the entry of the order and directing investors to the SEC's website and the Reserve's website for additional information; and (4) requiring that the Primary Fund mail copies of the order and the Commission's application to all individuals and entities who were record owners of shares of the Primary Fund as of September 15-18, 2008.  (<u>Id</u>.)

## II.   <u>INVESTOR COMMENTS CONCERNING THE SEC'S APPLICATION</u>

In response to this Court's June 8, 2009 Order, more than 75 investors submitted comments concerning the Commission's requested relief.  These investors hold shares representing approximately 47% of the assets remaining in the Fund.  (Relief Def. Aug. 21 Br. 5)

### A.   <u>Support for the SEC's Application</u>

Although the Court's June 8 Order required only those objecting to the SEC's requested relief to make submissions by July 22, 2009, many of the filings received by the Court

expressed support for the Commission's application.  See, e.g., BP Corp. North America July 24 Ltr. 1; Dyer Group July 27 Br. 1; Visa U.S.A. July 27 Br. 3.  Investors holding shares representing over 75% of the Primary Fund's remaining assets have filed submissions supporting the Commission's application or have not objected to it.  See Relief Def. Aug. 21 Br. 4-5. Support for the SEC's application is also strong among that group of investors who unsuccessfully sought to redeem their shares on September 15 and 16.  By the Primary Fund's estimate, investors holding $28 billion in Primary Fund shares unsuccessfully sought to redeem their shares between the morning of September 15, 2008 and 3:00 p.m. on September 16.  Of that $28 billion, investors who held approximately $13 billion in Primary Fund shares on September 15 have filed submissions supporting the SEC's application.  (Relief Def. Aug. 21 Br. 4) Holders of an additional $8.5 billion in Primary Fund shares that were not successfully redeemed have not objected to the SEC's requested relief.  Id.  Accordingly, within the group of unsuccessful redeemers – by share count – investors who support the SEC's application or who have not objected to it outnumber objectors by a 3 to 1 margin.  Id.

### B.    Objections to the SEC's Application

All of the investors who object to the SEC's application submitted unsuccessful redemption requests prior to 3:00 p.m. on September 16.  Many of the objectors argue that the Primary Fund has a contractual duty under the Fund prospectus to fulfill redemption requests at the NAV next determined after the redemption request, and that because the Board determined that the NAV was $1.00, they are entitled to redeem at that NAV.[40]  See, e.g., CellCo Partnership Br. 4; E*Trade Entities Br. 9-11; Verisign, Inc. Br. 5-8.  Several of the objectors likewise argue that Rule 22c-1(a) of the Investment Company Act requires that redemption

---

[40]  The Primary Fund prospectus provides that "[s]hares will be redeemed at the next NAV determined after a proper redemption request. . . ."  (Osnato Decl. Ex. 2 at 20)

requests be filled at the next calculated NAV, which as to all objectors was $1.00.[41]  See, e.g., Bank of America Securities Br. 2; Colorado Surplus Asset Fund Trust Br. 3.

In arguing that this Court should give effect to the $1.00 NAVs struck on September 15 and 16, 2008, certain objectors contend that these NAVs were calculated in good faith and according to generally accepted accounting principles.  See, e.g., Mount Vernon Securities et al. Br. 7-9 (citing 17 C.F.R. § 270.2(a)-7(c)).  These objectors note that the Trustees were consulting regularly with the Fund's auditor and legal counsel on September 15 and 16 and that on the morning of September 16 – after the Trustees understood how far the value of the Lehman paper had fallen – they allowed RMCI to seek additional liquidity before changing their valuation of the Lehman debt.  See Verisign Br. 7-8.

Other objectors argue that even if the NAVs struck on September 15 and 16 are unreliable, the Primary Fund's assets could and should be distributed based on a more accurate NAV calculated now, with the benefit of hindsight, rather than through a pro rata distribution as proposed by the Commission.  See Deutsche Bank Securities Br. 11-12; Russell Investment Co. Br. 13-14.  These investors point to the "widespread holdings of Lehman debt securities" as an indication that this Court could now retroactively calculate – presumably on an hourly basis – what the NAVs should have been on September 15 and 16.  Id.

Some objectors contend that the Primary Fund's acceptance of their requests to redeem changed their legal status from shareholders to creditors.  See E*Trade Entities Br. 11; Russell Investment Co. Br. 11.  Citing principles of bankruptcy law, these objectors claim that

---

[41]  Rule 22c-1(a) provides that "[n]o registered investment company issuing any redeemable security, no person designated in such issuer's prospectus as authorized to consummate transactions in any such security, and no principal underwriter of, or dealer in, any such security shall sell, redeem, or repurchase any such security except at a price based on the current net asset value of such security which is next computed after receipt of a tender of such security for redemption or of an order to purchase or sell such security. . . ." 17 C.F.R. § 270.22C-1(a).

their alleged creditor status dictates that they must be paid in the order they redeemed and before "equity holders" – i.e., those who failed to submit redemption requests.

Finally, many of the objectors oppose the SEC's request for an All Writs Act injunction, see, e.g., E*Trade Entities Br. 6-8; J.M. Huber Corp. Br. 5-6; Wal Mart Br. 2, particularly in connection with state law claims filed in state court, see id., arguing that cases supporting the issuance of such an injunction under the All Writs Act, 28 U.S.C. § 1651(a), are distinguishable.  E*Trade Entities Br. 6-8; J.M. Huber Corp. Br. 5-6.

### C.      Suggested Modifications to the SEC's Application

A number of investors submitted comments supporting the SEC's application but suggesting modifications to it.  The Commission adopted many of these proposed changes.  See SEC Aug. 21 Br. 21-24, App. 1-6.

One proposed modification concerns investors who were permitted to redeem their Primary Fund shares on the morning of September 15, 2008 – before State Street halted redemptions and terminated the Fund's overdraft privileges.  A number of investors – including both supporters of the SEC's application and objectors – argue that allowing those whose shares were redeemed at $1.00 on September 15 to keep their full $1.00 per share redemption is not fair to similarly situated investors who tried to redeem but who were not successful – through no fault of their own – and who will now receive a smaller, pro rata distribution.  See, e.g., Russell Investment Co. Br. 15-16; Unpaid Timely Redeemer Group Br. 17-18; Verisign Br. 9-10.  These investors set forth a variety of justifications and proposals for "clawing back" monies paid in excess of what the pro rata distribution would allot to each investor.  In response, the Commission proposed that this Court order that "[t]he Monitor shall investigate grounds to claw back payouts by the Primary Fund at any time after 8:00 a.m. on September 15, 2008 in excess

of amounts to be paid [per share] pursuant to [a pro rata distribution]" and recommend whether those claims should be pursued.  The Commission's proposed order then envisions the Court appointing the monitor as a receiver to pursue such claims on a contingency fee basis.  (SEC Oct. 13, 2009 Proposed Order)

A number of investors who filed a joint brief and designated themselves the "Unpaid Timely Redeemer Group" propose separate treatment of "straddler" investors – i.e., investors who successfully redeemed part of their Primary Fund holdings on September 15, 2008, but who still hold shares in the Fund.  The Unpaid Timely Redeemer Group proposes that the amounts paid to "straddler" investors in the pro rata distribution be reduced such that their total recovery – including the shares for which they already received payment at a $1.00 NAV – does not exceed the amount per share paid in the pro rata distribution.  (Unpaid Timely Redeemer Group Br. 15)  The Commission has not taken a position on the merits of this suggested modification.[42]

In response to other suggestions from investors, the Commission made the following three changes to its requested relief:  First, the Commission agreed that "all investors redeeming shares purchased for an amount less than that which this Court may determine shall be distributed to investors pro rata should receive no more than the purchase price for those shares."  (SEC Aug. 21 Br. 21)  In other words, no investor should receive as part of the pro rata distribution more than that investor paid for Fund shares.

Second, the Commission adopted a proposed mechanism for final adjudication of the appropriate amount to be withheld from distribution as an Expense Fund.  (SEC Aug. 21 Br.

---

[42]  The Commission states only that it understands the Unpaid Timely Redeemer Groups' proposal as to "straddlers" to be "substantively the same" as the "claw back" proposal.  (SEC Aug. 21 Br. 22 n. 16; Sept. 23, 2009 Oral Arg. Tr. 15, 75)

23)  Under this proposal, the Court would set a bar date for the assertion of all non-indemnifiable

claims and provide that indemnitees must submit good faith estimates of their costs fifteen days

after that bar date.  Id.  Defendants RMCI and Resrv Partners would be directed to submit claims

for management fees and expenses within 45 days after the SEC's application is approved.  (SEC

Aug. 21 Br. 24)  The monitor would then be charged with recommending to the Court which of

the indemnitees' claims should be honored and what portion of the management fees and

expenses should be paid.  Id.

 Third, the Commission altered its requested relief to provide that any recovery

obtained by the Commission in this litigation will be turned over to the monitor for pro rata

distribution to investors, and that any investor "who pursues claims against Defendants, or any of

their respective officers, directors, trustees, representatives, agents, or employees" for non-

indemnifiable conduct and recovers an amount in excess of his pro rata share in the distribution

will be required to "turn over such excess recoveries" to the monitor for pro rata distribution to

all shareholders.  (SEC Aug. 21 Br. App. 6)

## III. THE PUBLIC HEARINGS

 On September 23, 2009, this Court held a hearing concerning the Commission's

requested relief.  The Court heard from the Commission, the Relief Defendant, the Independent

Trustees of the Fund, and the Defendants, as well as from all claimants who wished to make

statements in favor of, or in opposition to, the SEC's application.

 Later that day, the Court issued an order inviting additional briefing concerning

(1) the treatment of "straddler" investors; and (2) the Commission's proposal that the monitor

should be tasked with investigating and making a recommendation concerning possible "claw

back" claims against investors who were permitted to redeem their Primary Fund shares during

the morning of September 15, 2008 at a $1.00 NAV.  (Dkt. No. 168, Sept. 23, 2009 Order)

      A number of Primary Fund investors submitted additional comments concerning these issues.  The submissions were split, with some investors supporting the Commission's "claw back" proposal and an off-set for "straddler" investors, see e.g., Deutsche Bank Securities Oct. 6 Br. at 2, 4; E*Trade Entities Oct. 6 Br. 2-3, while others opposed these measures.  See Univision Communications Oct. 6 Br. 2.  Notably, the Secretary of the Commonwealth of Massachusetts, the state's chief securities regulator, filed a brief amicus curiae expressing strong opposition to any form of "claw back" proposal as having "no basis in law or in equity" and as "penaliz[ing] innocent investors."  (MA Securities Division Oct. 6 Br. 2)

      On November 5, 2009, this Court issued an Order giving notice that it was considering referring to a magistrate judge the duties that would have been assigned to a monitor under the Commission's plan.  On November 9, 2009, this Court held a hearing to allow any interested parties to comment on this approach.  No party or claimant objected.  (Nov. 9, 2009 Oral Arg. Tr. 4)  The Commission stated that it had "no objection to the Court's proposal to refer to a magistrate judge the monitor duties," but recommended that the Court name the magistrate judge a Special Master pursuant to Federal Rule of Civil Procedure 53(h) to facilitate ex parte communications concerning administrative matters.  See Nov. 9, 2009 Oral Arg. Tr. 5-6.

## DISCUSSION

## I. THIS COURT IS AUTHORIZED TO ENJOIN THE PRIMARY FUND'S PLAN OF REORGANIZATION

      Section 25(c) of the Investment Company Act of 1940 authorizes district courts to "enjoin the consummation of any plan of reorganization of [a] registered investment company . . . if such court shall determine that any such plan is not fair and equitable to all security holders."  15 U.S.C. § 80a-25(c).  Section 2(a)(33)(E) of the Investment Company Act defines a

"plan of reorganization" as a "voluntary dissolution or liquidation of a company."  15 U.S.C.

§ 80a-2(a)(33)(E).  The "fair and equitable" standard of Section 25(c) replaced a stricter standard

set forth in earlier versions of the law; in amending the Investment Company Act in 1970,

Congress explained that the "fair and equitable" standard would "place the courts in a better

position to carry out the congressional intent of protecting security holders of an investment

company when a plan of reorganization is filed."  S. Rep. No. 91-184, at 37 (1969).

       Here, the Primary Fund announced a "Plan of Liquidation" on February 26, 2009.

(Osnato Decl. Ex. 1)  That plan set aside $3.5 billion in a "special reserve" to be used

"to satisfy (a) anticipated costs and expenses of the Fund, including legal and accounting fees;

(b) pending or threatened claims against the Fund, its officers and Trustees; and (c) claims,

including but not limited to claims for indemnification that could be made against Fund assets."

Id.  The Fund's plan, which provides for the liquidation of the Primary Fund, constitutes a "plan

of reorganization" within the meaning of the Investment Company Act.  See 15 U.S.C. § 80a-

2(a)(33)(E).

       The Primary Fund's "Plan of Liquidation" treats investors neither fairly nor

equitably.  The special reserve constitutes a finite pool of assets.  Given the number of claims

that have been lodged against the Primary Fund, the special reserve is certain to be allocated not

according to equitable precepts but rather based on a race among investors to obtain favorable

judgments – judgments that might be decided based on conflicting principles.  To allow the

Primary Fund to liquidate according to this plan would ensure that the remaining assets are

allocated among investors arbitrarily.  Because such an outcome would be neither fair nor

equitable, this Court will enjoin the Primary Fund's proposed plan of reorganization, pursuant to

Section 25(c) of the Investment Company Act, 15 U.S.C. § 80a-25(c).

II.     **AN ORDER PROVIDING FOR A <u>PRO</u> <u>RATA</u> <u>DISTRIBUTION WILL BE ENTERED</u>**

     A.     **<u>Applicable Law</u>**

       Section 21(d)(5) of the Securities Exchange Act of 1934 provides:  "In any action or proceeding brought or initiated by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C. § 78u(d)(5).

       Although Congress issued this broad grant of equitable powers as part of the Sarbanes-Oxley Act of 2002, the Second Circuit has long acknowledged the "broad discretionary power" of district courts under the Exchange Act.  <u>See, e.g.</u>, <u>SEC v. Certain Unknown Purchasers of Common Stock etc.</u>, 817 F.2d 1018, 1020 (2d Cir. 1987) ("'[I]n shaping equity decrees, [a] trial court is vested with broad discretionary power; appellate review is correspondingly narrow.'") (quoting <u>Lemon v. Kurtzman</u>, 411 U.S. 192, 200 (1973)); <u>SEC v. Manor Nursing Ctr., Inc.</u>, 458 F.2d 1082, 1103 (2d Cir. 1972) ("Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy.").  Where courts have used their equitable powers to adopt distribution plans, the Second Circuit has required that the plans be "fair and reasonable."  <u>Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC</u>, 467 F.3d 73, 82 (2d Cir. 2006); <u>see</u> <u>also</u> <u>SEC v. Wang</u>, 944 F.2d 80, 81 (2d Cir. 1991).

       The Primary Fund is the first money market fund open to the general public ever to "break the buck."  That collapse was a product of the Lehman bankruptcy, an event that brought the financial markets to a standstill.  The circumstances of this case are thus unique.  A number of cases, however, offer guidance concerning the principles this Court should look to in crafting a remedy that provides "appropriate and necessary" equitable relief.

"An equitable plan is not necessarily a plan that everyone will like."  SEC v. Byers, No. 08 Civ. 7104 (DC), 2009 U.S. Dist. LEXIS 63741, 2009 WL 2185491, at *1 (S.D.N.Y. July 23, 2009) (quoting SEC v. Credit Bancorp, Ltd., No. 99 Civ. 11395 (RWS), 2000 U.S. Dist. LEXIS 17171, 2000 WL 1752979, at *29 (S.D.N.Y. Nov. 29, 2000)).  Indeed, "when funds are limited, hard choices must be made."  WorldCom, 467 F.3d at 82.

In considering distribution plans in securities cases, the Second Circuit has stated that the Commission's judgment is entitled to deference, in light of its "experience and expertise in determining how to distribute funds."  WorldCom, 467 F.3d at 82; see also Wang, 944 F.2d at 81.  The Second Circuit has also stated that a pro rata distribution of assets is "favored" where the funds of the investors are "commingled" and the investors are "similarly situated."  SEC v. Credit Bancorp, Ltd., 290 F.3d 80, 88 (2d Cir. 2002).  The approach is similar in other circuits. See, e.g., SEC v. Infinity Group Co., 226 Fed. Appx. 217, 218-19 (3d Cir. 2007); SEC v. Forex Asset Management, LLC , 242 F.3d 325, 331 (5th Cir. 2001); United States v. Durham, 86 F.3d 70, 73 (5th Cir. 1996).  The Credit Bancorp court noted that a pro rata distribution is particularly appropriate in providing equitable relief to the victims of a "Ponzi scheme."  290 F.3d at 89. While the Primary Fund was in no way a Ponzi scheme, the logic underlying the decision endorsing pro rata distribution is relevant here, because such a distribution is appropriate where any distinctions that might be drawn among parties receiving funds would be arbitrary or based on mere chance.  In such cases, pro rata treatment of the parties is most equitable.  See Credit Bancorp, 290 F.3d at 89-90; Durham, 86 F.3d at 73.

**B.    The Circumstances of the Primary Fund's Collapse Require a Pro Rata Distribution**

Those objecting to a pro rata distribution consist of some, but not all, of the investors who unsuccessfully sought to redeem their shares while an NAV of $1 per share was

still in effect – <u>i.e.</u>, prior to the Trustees' September 16, 2008 re-valuation of the Lehman

holdings to zero.  <u>See, e.g.</u>, Safeco Br. 2-3; Verisign Br. 7-8.  While some investors sought to

redeem earlier than others, in light of the confusion emanating from the Primary Fund and the

unreliability of the NAVs calculated on September 15 and 16, such a distinction is insufficient to

set those investors apart.  Furthermore, the NAVs at which earlier redeemers seek to be paid out

simply cannot be credited in crafting an equitable remedy.

### 1.     Misleading Information Concerning the Effects of the Lehman Bankruptcy

Primary Fund investors deciding whether or not to redeem following the collapse

of Lehman were unable to make informed decisions or operate on an equal playing field in light

of the chaotic circumstances and the actions of Fund managers and salespeople.  During the

afternoon of September 15, RMCI issued a press release addressing the effect of Lehman's

bankruptcy on Fund holdings.  (Osnato Decl. Ex. 16)  The release states that RMCI "intends to

enter into support agreements with the Primary Fund to support the value of Lehman credit held

in the Fund," and that these "support agreements ensure the integrity of a $1.00 NAV."  <u>Id</u>.  The

release further states that RMCI has "discussed with the SEC that our intent is to mitigate any

decline in value of the Lehman debt so that it will not result in a decrease to the NAV of the

Fund," and that RMCI would submit "appropriate documentation to the SEC today, September

15, 2008," to put those support agreements in place.  <u>Id</u>.  It does not appear that such documents

were ever submitted to the Commission, however (Compl. ¶ 8), and by the morning of

September 16, the Bents informed the Trustees that "RMCI could not support the Primary

Fund's NAV."  (Osnato Decl. Ex. 7 at 18)

In addition to the press release cited above – which received wide dissemination –

certain investors have claimed that they were misled by separate communications with Primary

Fund officials.  First Data Corporation and Integrated Payment Systems, Inc., for example, have

asserted that "they contacted the Fund on September 15, 2008 and were defrauded and prevented

from redeeming their shares by misrepresentations made specifically to them."  See Birnbaum

Decl. Ex. 16.  Similarly, Henry Ford Health Systems ("HFHS") has alleged that when it

contacted the Fund on September 15, 2008, it was told that the Primary Fund "was [at] no risk of

breaking the buck."  (Sept. 23, 2009 Oral Arg. Tr. 42)  In light of RMCI's press release and other

claimed misinformation emanating from the Primary Fund on September 15 and 16, it is

apparent that it would be difficult, if not impossible, to determine with certainty which additional

investors might have sought to redeem their shares (or to redeem them earlier) had they been

aware of the true state of affairs at the Fund.

### 2.    The Order in which Investors Redeemed Is Not Clear

Even for those investors who sought to redeem part or all of their investments, the

order in which they redeemed is far from clear.  A number of claimants contend that they

redeemed at an earlier time than that reflected in Fund records.  See SEC Aug. 21 Br. 14.  The

Commission, in its discussion of claimants' objections to the pro rata distribution, uses the

Cellco Partnership's[43] redemption request as an example.  Id.  Cellco has submitted a

communication from RMCI General Counsel Catherine Crowley indicating that it redeemed a

total of $554,840,067.86 in Fund shares at 9:10 a.m. on September 16, payable at the next

determined NAV.  (Cellco Br., Solum Decl. Ex. D)  The Fund's records, however, indicate that

Cellco's redemption requests were entered at 1:12 p.m. and 1:13 p.m – four hours after

Crowley's communication allegedly confirming the redemption.[44]  See Osnato Decl. Ex. 6.

---

[43]  The Cellco Partnership is composed of Verizon Wireless and Verizon Wireless Investments,
Inc. (CellCo Br. Solum Decl. 1)
[44]  Verizon Wireless's redemption request was entered at 1:12 p.m., and Verizon Wireless

Other investors have made claims similar to Cellco's, alleging that they submitted redemption requests at times earlier than those reflected in Primary Fund records.  (SEC Aug. 21 Br. 14 n. 11)

Were the Court to accept the objectors' arguments, the order in which investors redeemed would become critically important, because each redemption would leave fewer Fund shares to absorb losses, and thus would alter the Fund's hourly NAV calculations.  For example, if Cellco's 554 million shares were actually redeemed at 9:10 a.m. on September 16 rather than at 1:12 or 1:13 in the afternoon as Fund records indicate, any NAV calculation after 9:10 a.m. on September 16 would have to reflect the fact that the Fund held 554 million fewer shares to absorb losses.  Any attempt to prioritize investors' claims based on the order their redemption requests were submitted or entered, however, would require a fact intensive inquiry into the circumstances of each redemption.

As the Commission has argued, any attempt to "unravel the factual tangle" presented by the Primary Fund's interactions with investors on September 15 and 16, 2008, would necessarily involve the complex task of recalculating and reassessing the hourly NAV figures struck on those days.  (SEC Aug. 21 Br. 14-15)  Such an undertaking would require a difficult, time-consuming, fact-intensive and expensive inquiry in light of the discrepancies in redemption records and the fact that the NAV is based not just on the value of the Primary Fund's assets but on the number of shares remaining in the Fund at any given time.  See SEC Aug. 21 Br. 10-11, 14-15.  And at the end of that exercise, the issues concerning why certain investors chose not to redeem would remain.  Courts confronting similar circumstances have opted for a pro rata distribution.

---

Investments' redemption request was entered at 1:13 p.m.  (Osnato Decl. Ex. 6)

SEC v. Byers, No. 08 Civ. 7104 (DC), 2009 WL 2185491, at *1 (S.D.N.Y. July 23, 2009) is instructive.  In that case, the court appointed a receiver to propose a plan of distribution for the assets remaining in the Wextrust entities, which were controlled by Byers and other defendants accused of operating a Ponzi scheme.  The receiver, in cooperation with the Commission, determined that liquidation of the estate and a pro rata distribution of the proceeds was the most "prudent and equitable course of action."  Id.  As is the case here, certain investors objected to that plan because it failed to take into account a variety of factors that allegedly distinguished their claims from others made against the estate, including "level of risk, timing of investment, tracing analysis, or some other factor[s]."  Id. at 8-9.  The court held, however, that any alternative to a pro rata distribution would "reward[] certain investors over others based on arbitrary factors" and "would be difficult, time-consuming, and expensive."  Id. at 9 (citations omitted).  In doing so, the court noted that, when sitting in equity, it is important to "remember that each investor's recovery comes at the expense of the others."  Id. at 8.  Here, as in Byers, the circumstances surrounding the collapse of the Primary Fund make a pro rata distribution the fairest and most equitable approach.

### 3.    The NAVs Struck on September 15 and 16 Are Not Reliable

The claimants who argue that they have a contractual right to redemption at a NAV of $1.00 per share rely on the NAV determinations made by the Trustees before the afternoon of September 16, but the NAVs struck on September 15 and 16 are not reliable and cannot be credited if all investors are to be treated equitably.[45]

As the chronology of events on September 15 and 16 makes clear (see pp. 3-9

---

[45]  Claimants who emphasize their contractual right to redemption at a NAV of $1.00 per share, or the Primary Fund's statutory obligation to pay redemptions at the stated NAV, also disregard the fact that this Court is sitting in equity and is charged with crafting an equitable remedy that takes account of the competing claims of all unpaid investors to a finite res.

supra), there is abundant evidence that the Trustees – in setting NAVs on September 15 and 16 – relied on inaccurate or incomplete information about the value of the Lehman debt, the amount and timing of redemption requests, State Street's decision to halt redemptions and to suspend the Fund's overdraft privileges, and the ability of RMCI to obtain liquidity sufficient to preserve the Primary Fund's $1.00 NAV.  The confusion and chaos at the Primary Fund and the unreliability of the NAV calculations is exemplified by the Fund's announcement – more than two months after the Lehman bankruptcy – that the Fund had actually "broken the buck" as of 11:00 a.m. on September 16, 2008, and not at 4:00 p.m. as earlier announced.  (Osnato Decl. Ex. 13)

Accordingly, even if RMCI had not disseminated a press release that turned out to be unduly optimistic, and even if it was possible to reliably determine the order in which investors redeemed, there is no reason to conclude that the NAVs struck on September 15 and 16 are reliable and ample evidence exists that they are not.  The suggestion that this Court should now attempt to retroactively reconstruct what the true NAVs were each hour on September 15 and 16 is simply not possible or practical, would not address the other issues discussed above, and if attempted, would undoubtedly inordinately delay the distribution of funds investors have been awaiting for more than a year.

Case law supports the Court's determination that distributing the Primary Fund's limited assets on the basis of unreliable NAV calculations would not be equitable.  In SEC v. Alpine Mutual Fund Trust, 824 F. Supp. 987 (D. Colo. 1993), a mutual fund was put into liquidation as a result of investments in illiquid municipal leases, which had led the fund to suspend redemptions.  Id. at 989.  The receiver in Alpine urged the court not to distribute funds on the basis of NAVs that had been "erroneously computed."  Id. at 991-92.  To do so, he concluded, would give those investors "consideration in excess of the Funds' fair market value,

i.e., an undeserved windfall." Id. at 991.  The court agreed and accepted the receiver's

recommendation.  Id. at 994.

Here, as in Alpine, there is good reason to distrust the NAV calculations performed

on September 15 and 16.  The record before this Court indicates, as discussed above, that the

Trustees were not fully informed about the value of the Primary Fund's Lehman holdings or the

level of redemption requests, both of which affect the NAV calculation.  See Osnato Decl. Ex. 3,

9, 11.  Redemptions may also have been entered long after they were requested.  See, e.g., Cellco

Br., Solum Decl. Ex. D; Osnato Decl. Ex. 6  And months after the chaotic events of September

15 and 16, a critical "administrative error" in the NAV calculations for September 16 was

discovered, resulting in a determination that the Fund had "broken the buck" nearly five hours

earlier than previously reported.  (Osnato Decl. Ex. 13)  Under these circumstances, to allow the

NAVs struck by the Primary Fund in the midst of the nearly unprecedented chaos surrounding

the fall of Lehman to determine the distribution of assets would not be fair.  As in Alpine,

distributing funds to investors who redeemed at a $1.00 per share NAV – when the true NAV

was below that – would give such investors an "undeserved windfall" at the expense of the

Primary Fund's other investors.

In Alpine, the court chose to recalculate the NAV rather than implement a pro rata

distribution.  824 F. Supp. at 996.  In that case, however, the receiver was able to accurately

determine the fair value of the illiquid assets by looking to similar municipal leases, the

performance of the leases at issue, and other related factors.  Id. at 990.  The same cannot be said

of this case.  The Primary Fund's NAV on September 15 and 16 cannot be reliably determined

on an hour by hour basis given the difficulty in determining the value of the Lehman holdings

and conflicting evidence about when redemptions were entered.  Any attempt to restate the

hourly NAV calculations of September 15 and 16 would be arbitrary. Even if such an attempt

were made, it would no doubt be time-consuming and costly – an important equitable

consideration in a case such as this, in which investors have been waiting more than a year to

recover funds they had reasonably assumed would be liquid and easily accessible.

> While pro rata distribution is "not necessarily a plan that everyone will like," see
Byers, 2009 WL 2185491, at *1 (citations omitted), it is the most equitable means of distributing
the remaining assets of the Primary Fund in light of the unprecedented circumstances
surrounding its collapse. This Court is empowered under Section 21(d)(5) of the Exchange Act
to grant "any equitable relief that may be appropriate or necessary for the benefit of investors."
See 15 U.S.C. § 78u(d)(5). An order will be entered providing for a pro rata distribution of the
Primary Fund's remaining assets because such relief is both appropriate and necessary for the
fair and equitable treatment of all Fund investors.[46]

## III.   ANCILLARY PROVISIONS CONCERNING PRO RATA DISTRIBUTION

### A.   Treatment of September 16 Purchasers

> The Order accompanying this Opinion provides that investors who bought
Primary Fund shares after 3:00 p.m. on September 16, 2008 should receive no more than the
amount they paid for each such share purchased. On that day, the Primary Fund announced that
any redemption requests received after 3:00 p.m. would be redeemed at a NAV that included a

---

[46] Some investors have argued that the Primary Fund's acceptance of their requests to redeem changed their legal status from shareholders to creditors, dictating that they must be paid in the order they redeemed and before those who have not redeemed, who they claim are "equity holders." See E*Trade Entities Br. 11; Russell Investment Co. Br. 11. However, given that the Primary Fund is in liquidation, all of its current shareholders are "creditors" seeking the return of their investments. See In re Bayou Group, LLC, 372 B.R. 661, 665 (Bankr. S.D.N.Y. 2007) (holding that investors entitled to a contractual right of redemption are creditors of a debtor in bankruptcy because "a party with a contract claim against a debtor is a creditor of the debtor.") Furthermore, as set forth above, equitable principles control the distribution of all remaining Primary Fund assets. See 15 U.S.C. § 78u(d)(5); see also WorldCom, 467 F.3d at 82.

valuation of the Lehman holdings at zero.  (Osnato Decl. Ex. 14)  Investors who purchased their shares after this point paid less than $1.00 per share and should not realize a windfall by participating in the pro rata distribution.  Funds above the amount necessary to make these investors whole are more equitably distributed to investors who purchased their shares when the NAV was $1.00 and who expected to redeem their shares at that price.

> **B.**     **Treatment of "Straddler" Investors**

As discussed above, some investors in the Primary Fund successfully redeemed a portion of their shares on September 15, 2008, but chose not to redeem their remaining shares or submitted redemption requests that were not honored.  See Unpaid Timely Redeemer Group Br. 14 (citing Osnato Decl. Ex. 6).  To the extent these investors' shares were paid out at a $1.00 NAV on the morning of September 15, their redemption requests were honored under the confused circumstances discussed above, and at NAVs that are unreliable.  Having obtained a partial redemption at a $1.00 NAV, however, these same "straddler" investors now seek to participate in the equitable relief ordered by this Court.  Some investors have argued that any distributions made to "straddler" investors should be offset such that their overall per share recovery does not exceed that of any other investor participating in the pro rata distribution.  See, e.g., HFHS Oct. 6 Br. 2-3; Unpaid Timely Redeemers Group Oct. 6 Br. 15-17.

In SEC v. Wang, 944 F.2d 80 (2d Cir. 1991), the Second Circuit upheld a similar offset provision.  In that case, the district court approved a distribution of disgorged funds to wronged investors.  Id. at 81.  The distribution plan acknowledged that many of the claimants were options traders who hedged their risk with counter-balancing trades that reduced their net losses.  Id. at 82.  The District Court concluded that the distribution plan should offset for any recovery by these claimants to account for gains made on trades involving the same underlying

security.  Id. at 87.  Thus, these claimants collected only the amount of their net losses.  Id. at 87-88.  The Second Circuit upheld this aspect of the distribution plan, noting the limited funds available for distribution.[47]  Id.  Similarly, the Ninth Circuit has upheld offsets against court-ordered distributions based on claimants' recoveries in related litigation.  See SEC v. Capital Consultants, LLC, 397 F.3d 733 (9th Cir. 2005); In re Equity Funding Corp. of America Sec. Litig., 603 F.2d 1353 (9th Cir. 1979).

Here, as in Wang, there is a limited pool of funds to distribute to deserving claimants.  Given the circumstances surrounding redemptions paid out on September 15, including the unreliable calculation of the NAV and the misleading information that caused some investors not to redeem, it is not equitable to permit investors who received $1.00 NAV payments for some of their shares to participate in the pro rata distribution with no offset.  Accordingly, distributions made to these "straddler" investors will be offset in order to ensure that they do not obtain an overall recovery of more money per share than other investors participating in the pro rata distribution.[48]

C.     **Treatment of Funds Recovered by the Commission and by Investors**

The Commission's application provides that if it obtains a financial recovery against the Defendants – whether disgorgement or otherwise – the amounts recovered will be

---

[47]  The Second Circuit noted, however, that "[w]ere we drafting the Plan, we might well have decided – out of a desire for simplicity – to ignore [the factors on which the offset was based]." Id. at 88.

[48]  Some claimants are investment managers who may represent multiple funds or investing entities, not all of which were paid for redemption requests entered on September 15, 2008.  See Northern Trust Co. Oct. 6 Br. 3-4.  The offset of straddlers' recoveries under the pro rata distribution should not ignore the fact that the underlying funds or investors have distinct legal rights, even where they are represented by one investment manager.  Accordingly, the accompanying Order provides that the offset will be applied only where the specific party who received payment on September 15 is identical to the party participating in the court-ordered pro rata distribution.

turned over for distribution to Primary Fund shareholders on a pro rata basis to the extent such

relief is permitted under the Fair Fund provisions of the Sarbanes-Oxley Act of 2002, 15 U.S.C.

§ 7246.  Because this proposal would assist claimants in recovering more of the monies they

invested in the Primary Fund and furthers the Court's equitable goals, it is adopted in the

accompanying Order.

        The Commission has also proposed, however, that investors "who pursue[] claims

against Defendants, or any of their respective officers, directors, trustees, representatives, agents

or employees, for Non-Indemnifiable Conduct, and who recover[] an amount in excess of [their]

pro rata share" be required to "turn over such excess recoveries" to be distributed to all investors

on a pro rata basis.  "Non-Indemnifiable Conduct" is defined, in the Commission's application,

as "conduct relating to the Primary Fund that results from [a Defendant's] willful misfeasance,

bad faith, reckless disregard of his or its obligations or duties, or gross negligence."  (SEC Aug.

21 Br. App. ¶ 11)  This proposal, which substantially affects the rights of any investor who might

pursue litigation against the Defendants for Non-Indemnifiable Conduct, was not included in the

Commission's original proposal but was added after the deadline for objections.  See Dkt. No.

11, June 8, 2009 Order, App.; SEC Aug. 21 Br. App. 6.  The Commission did not discuss this

change in its submissions to the Court, nor has it provided any legal authority or factual support

from the record justifying this modification.  See SEC Aug. 21 Br. 21-24.

        Claimant commentary concerning this change has likewise been quite limited.

Henry Ford Health Systems' August 18, 2009 submission to the Court contains this proposal,

and HFHS also commented on it at the September 23, 2009 hearing.  (HFHS Br. 23-24; Sept. 23,

2009 Oral Arg. Tr. 43)  HFHS suggests that requiring investors to turn over any recoveries in

suits for Non-Indemnifiable conduct is a matter of fairness, with all investors participating in the

distribution "shar[ing] equally . . . even early redeemers who might not think they have fraud

claims."  (HFHS Br. 23)  No other claimant addressed this proposal.

On this record, this Court will not order that investors who recover against the

Defendants for Non-Indemnifiable Conduct will be required to turn over their recovery to the

Court for pro rata distribution to all investors.  An investor who pursues a fraud claim against the

Defendants, for example, may seek damages that go beyond recovering that party's Primary

Fund investment.[49]  While, as discussed below, this Court has determined that an injunction

barring claims for indemnifiable conduct is critical to successful implementation of the pro rata

distribution plan necessary to afford fair and equitable relief to all investors, the Commission has

not provided any legal authority or factual justification for the proposed injunction relating to

recoveries for Non-Indemnifiable Conduct.

## IV.  ENJOINING CLAIMS AGAINST THE PRIMARY FUND AND INDEMNIFIABLE CLAIMS AGAINST THE DEFENDANTS IS NECESSARY TO AFFORD APPROPRIATE EQUITABLE RELIEF AND IS AUTHORIZED BY THE ALL WRITS ACT

The All Writs Act provides that courts may "issue all writs necessary or

appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of

law."  28 U.S.C. § 1651(a).  This statute permits district courts to enjoin actions, including those

in state courts, which interfere with the "federal court's jurisdiction or authority over an

ongoing matter."  In re Baldwin-United Corp., 770 F.2d 328, 333 (2d Cir. 1985).

The Second Circuit has noted that an All Writs Act injunction is appropriate in

cases where "federal courts have jurisdiction over a res in an in rem action," because the

exercise of jurisdiction over the same res by state courts would necessarily impair the

---

[49]  A fraud plaintiff may, for example, "seek special damages that are caused by []
misrepresentation and [are] unrecoverable as contract damages."  Bridgestone/Firestone, Inc. v.
Recovery Credit Serv., Inc., 98 F.3d 13, 20 (2d Cir. 1996).

jurisdiction of the federal court.  Baldwin-United Corp., 770 F.2d at 336 (citing Kline v. Burke Constr. Co., 260 U.S. 226, 229 (1922)); see also In re Johns-Manville Corp., 27 F.3d 48, 49 (2d Cir. 1994).

Here, an injunction as to all claims against (1) Primary Fund assets, including shareholder claims against the Primary Fund, and (2) any of the Defendants and any of the Defendants' officers, directors, trustees, representatives, agents or employees to the extent that such claims are subject to indemnification by the Primary Fund,[50] is part and parcel of the

---

[50]  Defendant Bent Sr. claims that he is entitled to indemnification from the Fund pursuant to his status as a a trustee and his positions as chairman, president and treasurer of the Fund. Defendant Bent II claims that he is entitled to indemnification pursuant to his status as co-chief executive officer, senior vice president and assistant treasurer of the Fund.  (Def. Aug. 21 Br. 2)

The Reserve Fund Declaration of Trust defines "indemnitee" to include "any present or former Trustee or officer of the [Reserve Fund]."  (Osnato Decl. Ex. 23 at 13-15)  "Covered expenses" are defined as "expenses (including attorney's fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by an indemnitee in connection with a covered proceeding."  Id. at 13.  A "covered proceeding" is "any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, to which an indemnitee is or was a party or is threatened to be made a party by reason of the fact or facts under which he is an indemnitee. . . ."  Id.  The Fund is also obligated, under certain circumstances, to advance funds for "covered expenses" to an indemnitee "prior to the final disposition of a covered proceeding."  Id. at 14.

The Declaration of Trust further provides that the Fund "shall not indemnify any indemnitee for any covered expenses in any covered proceeding if there has been adjudication of liability . . . based on a finding of disabling conduct."  (Osnato Decl. Ex. 23 at 13)  "[D]isabling conduct" is defined as "willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of the office in question."  Id.  "[W]hether or not there is an adjudication of liability," the Fund is required to indemnify indemnitees "if a determination has been made that the indemnitee was not liable by reason of disabling conduct by [a court, by disinterested trustees, or by independent counsel]."  Id. at 14.

Defendant Resrv Partners asserts a contractual right of indemnification pursuant to a July 30, 2007 agreement between it and the Fund stating in part:

In the absence of willful misfeasance, bad faith, gross negligence or reckless disregard of obligations or duties hereunder on [Resrv Partners'] part, the [Fund] agrees to indemnify [Resrv Partners] against any and all claims, demands, liabilities and expenses which [it]

"appropriate or necessary" equitable relief this Court is authorized to grant under Section

21(d)(5) of the Exchange Act.  See 15 U.S.C. § 78u(d)(5).  As such, it is also necessary and

appropriate in aid of this Court's jurisdiction.[51]  See 28 U.S.C. § 1651(a).

  This Court has jurisdiction over a limited res:  the remaining assets of the Primary

Fund.  A state court adjudicating claims against the Primary Fund, or claims against the

Defendants for indemnifiable conduct for which the Primary Fund would be liable, would be

exercising jurisdiction over that same res.  A state court could grant relief to an individual

claimant and siphon assets away from the res without regard to any equitable concerns, thereby

undermining the implementation of the pro rata distribution this Court has deemed necessary to

treat all claimants fairly and equitably.  As the Second Circuit outlined in Baldwin-United, this

kind of inherent conflict justifies the issuance of an All Writs Act injunction.  See Baldwin-

United Corp., 770 F.2d at 336.

  As certain objectors have noted, the facts of Baldwin-United are somewhat

---

may incur under the Securities Act of 1933, or common law or otherwise, arising out of or based upon any alleged untrue statement of material fact contained in the registration statement, Prospectus or Statement of Additional Information of the Trust, or any omission to state a material fact therein. . . .  (Def. Aug. 21 Br. 3, Ex. B at ¶ 8(b))

Defendant RMCI asserts that it is entitled to indemnification from the Fund pursuant to an implied indemnity theory.  (Def. Aug. 21 Br. 4)

State Street contends that it is entitled to indemnification from the Fund, "except as may arise from [State Street's] own negligence or willful misconduct," pursuant to the Master Custodian Agreement governing the relationship between State Street and the Reserve Fund.  (Mar. 7, 2008 Master Custodian Agreement § 15; Apr. 22, 2008 Am. to the Master Custodian Agreement)

[51]  Certain of the state court actions currently pending against the Primary Fund and the Defendants were originally filed in state court, removed to federal court, and then remanded to state court because the complaints in those actions provided no basis for the exercise of federal jurisdiction.  See In Re: The Reserve Fund Securities and Derivative Litigation, 09 MD 2011, Sept. 30, 2009 Order.  The inquiry here, however, is a different one.  The question is not whether the state court complaints provide a basis for federal jurisdiction but whether it is appropriate to enjoin those actions as part of the appropriate and necessary equitable relief in this case.

distinct from this case.  See, e.g., E*Trade Entities Br. 6-7.  The facts here, however, more strongly support the issuance of an All Writs Act injunction.  In Baldwin-United, the Second Circuit – over the objection of 31 states – upheld an injunction against the commencement of any action or proceeding of any kind against any defendant named in a multi-district litigation pending before the district court.[52]  770 F.2d at 331.  The Circuit noted that "the district court had before it a class action proceeding so far advanced that it was the virtual equivalent of a res over which the district judge required full control."  Id. at 337.  The Court went on to find that the district court's extensive involvement in crafting settlements in the context of the federal multi-district litigation – many of which had already been entered – was an important factor in justifying the issuance of an All Writs Act injunction.  Id. at 336-38.  Here, this Court is not dealing with the "virtual equivalent of a res" over which it requires full control; instead, it is in fact dealing with a limited res that is likely to be dissipated absent an injunction.  The distribution plan that this Court has determined is necessary for the fair and equitable treatment of all claimants simply cannot succeed if suits brought in state court are allowed to proceed, depleting the res and interfering with the equitable principles underlying the pro rata distribution.

Some claimants have argued that an order prohibiting claims from proceeding against the Primary Fund in state court would violate the Anti-Injunction Act, 28 U.S.C. § 2283. See, e.g., Wal-Mart Br. 2.  The Anti-Injunction Act provides that federal courts may not enjoin actions in state court unless the injunction falls within one of three specific categories, including

---

[52]  The district court's injunction did not extend to proceedings seeking prospective injunctive relief as to any unlawful business practice of the defendants or which related to the exercise of "state law enforcement and regulatory powers, so long as any such action or proceeding . . . does not seek to in any way affect the rights of any plaintiff or purported class member in any proceeding under MDL 581."  770 F.2d at 342.

"where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."  28 U.S.C. § 2283.  Where "a court's 'injunction [is] in fact necessary in aid of its jurisdiction, [however,] the injunction [is] authorized by the All Writs Act, and [is] not barred by the Anti-Injunction Act.'"  SR Int'l Bus. Ins. Co. Ltd. v. World Trade Center Prop., LLC, 445 F. Supp. 2d 356, 360 n. 5 (S.D.N.Y. 2006) (quoting Retirement Sys. of Ala. v. J.P. Morgan Chase & Co., 386 F.3d 419, 425 (2d Cir. 2004)).  Because the injunction outlined above is in aid of this Court's jurisdiction over the Primary Fund res, is a necessary component of appropriate equitable relief, and is necessary "to protect or effectuate this Court's judgment," 28 U.S.C. § 2283, it does not violate the Anti-Injunction Act and will be a component of the accompanying Order.[53]

## V.   <u>CREATION OF EXPENSE FUND</u>

The accompanying Order permanently enjoins all claims against the Primary Fund and its indemnitees for indemnifiable conduct.  Even after this injunction is imposed, however, the Primary Fund's liability for certain expenses will have to be determined.  In particular, the Primary Fund's adviser and distributor will seek payment of management fees and expenses.  Moreover, Fund indemnitees facing claims not enjoined under the accompanying Order will likely seek to have their legal fees advanced.  In order to address such ongoing expenses, the accompanying Order establishes an Expense Fund and provides a procedure for making claims on the Expense Fund.

The Commission and the Primary Fund's Independent Trustees recommend that

---

[53] The accompanying Order also provides that the injunction shall not apply to any claim asserted by a state regulator other than those that are derivative of an unpaid shareholder's claim. As noted above, in <u>Baldwin-United</u>, the Second Circuit affirmed the issuance of an injunction that contained a carve-out for proceedings seeking injunctive relief for alleged unlawful business practices "or which seek[] to exercise in any way all other state law enforcement and regulatory powers."  770 F.2d at 342.

$83.5 million of Primary Fund assets be set aside for the Expense Fund.[54]  The Expense Fund

may also include proceeds from an insurance policy covering RMCI, the Primary Fund, and the

Independent Trustees.[55]  The Trustees expect that the management company and distributor will

seek $35 million in fees and expenses.  (Nov. 9, 2009 Oral Arg. Tr. 12-13)  Indemnification

expenses are very difficult to estimate at this point, but are likely to be substantial given the

litigation already pending against the Defendants and the possibility of additional lawsuits

against the Defendants concerning Non-Indemnifiable Conduct.  See Nov. 9, 2009 Oral Arg. Tr.

10-13.  Any monies remaining in the Expense Fund after the Court has determined the

appropriate amount to be paid out as management fees and expenses and indemnification

expenses will be distributed to shareholders on a pro rata basis.

        The Order accompanying this Opinion provides a mechanism for reviewing

claims by the Primary Fund's adviser and distributor for management fees and expenses.  Claims

for past fees and expenses must be presented within 30 days of entry of the accompanying Order

or they will be barred.  The assigned monitor or magistrate judge will review claims for

---

[54]  The recommendation that the Expense Fund be set at $83.5 million represents a compromise among the proposals made by the Commission, the Independent Trustees, and the Defendants. The Commission initially proposed that the Expense Fund be set at $75 million.  (SEC Aug. 21 Br. 23; App. ¶ 4)  The Independent Trustees proposed a $90 million Expense Fund (Sept. 23, 2009 Oral Arg. Tr. 30), while the Defendants argued that $100 million should be set aside.  (Def. Oct. 6, 2009 Ltr. 6)  The parties then reached an agreement that $83.5 million was an appropriate amount to set aside for inclusion in the Expense Fund.  (SEC Oct. 13, 2009 Ltr. 1-2; Def. Oct. 9, 2009 Ltr. 1)

[55]  RMCI, the Fund, and the Independent Trustees agree that the proceeds of this policy will be held in an account belonging to these parties pending a determination as to whether the policy proceeds should be transferred to the Expense Fund.  See SEC Oct. 13, 2009 Ltr. 1-2; Def. Oct. 9, 2009 Ltr. 1.  If the parties are unable to agree within 14 days after the accompanying Order is entered as to allocation of the proceeds, any insured may request that the monitor or magistrate judge assigned to this matter submit a report and recommendation to the Court concerning this issue.  Once the Court has made a determination concerning the policy proceeds, any proceeds allocated to the Primary Fund shall be made a part of the Expense Fund and used before any other monies in the Expense Fund.

management fees and expenses and submit a report and recommendation to the Court, with copies served on the Commission and the Primary Fund's adviser and distributor.  The Court will determine the amounts appropriate and payable on such claims and then direct payment from the Expense Fund in such amounts.

In its application, the Commission requests that the Court include in its Order a provision requiring that all claims against any indemnitee of the Primary Fund for Non-Indemnifiable Conduct be brought within 45 days of entry of the Order or be barred.  This proposal – as with the proposal requiring plaintiffs to pay into court for pro rata distribution any recovery for Non-Indemnifiable Conduct – was not included in the Commission's original proposal but was added after the deadline for objections.  See Dkt. No.11, June 8, 2009 Order, App.; SEC Aug. 21 Br. App. 6.  Neither the Commission nor any other party (or claimant) has provided legal authority or factual support from the record justifying this modification, other than a statement that the provision is necessary so that "the Fund's remaining assets can be distributed quickly."  See SEC Aug. 21 Br. at 23.  This Court will not subject potential plaintiffs' right to sue Primary Fund indemnitees for Non-Indemnifiable Conduct to a 45-day bar date on the basis of this record.

Any Primary Fund indemnitee seeking indemnification from the Fund will have 45 days after entry of the accompanying Order to provide good faith estimates of his or its reasonable indemnification expenses based on claims already filed.  After reviewing these claims, the monitor or magistrate judge will submit a report and recommendation to the Court, with copies served on the Commission and any such indemnitee, setting forth which claims he or she believes should be honored and what he or she estimates will be the Primary Fund's indemnification expenses.  The monitor or magistrate judge will also set forth whether the claims

deemed payable and appropriate – as well as future anticipated claims – dictate that the amount

set aside in the Expense Fund should be modified.  The Court shall determine whether the

Expense Fund should be modified and shall adjust the Expense Fund accordingly.  The Court

will also instruct the monitor or magistrate judge to pay all valid indemnification claims out of

the Expense Fund.  Going forward, any Fund indemnitee must provide the monitor or magistrate

judge with good faith estimates of his or its reasonable Indemnification Expenses with regard to

any newly filed claims for Non-Indemnifiable Conduct within 15 days after the filing of such

claims.

      To the extent that funds remain in the Expense Fund after the Court has

determined the amounts to be paid as indemnification expenses and management fees and

expenses, the monitor or magistrate judge shall seek the Court's approval to distribute, as

practicable, remaining funds in the Expense Fund to the shareholders on a <u>pro rata</u> basis.

## VI. THIS CASE WILL BE REFERRED TO A MONITOR OR MAGISTRATE JUDGE TO OVERSEE THE PRO RATA DISTRIBUTION AND CARRY OUT THE OTHER DUTIES SPECIFIED IN THE ACCOMPANYING ORDER

      The Commission's application seeks the appointment of a monitor to undertake a

number of responsibilities, including: (1) liquidation and distribution of the Primary Fund's

assets; (2) "investigation of grounds to claw back payouts by the Primary Fund at any time after

8:00 a.m. on September 15, 2008 in excess of amounts to be paid" in the <u>pro rat</u>a distribution; (3)

ensuring that investors who bought Primary Fund shares after 3:00 p.m. on September 16, 2009

receive no more than what they paid per share in the <u>pro rata</u> distribution; (4) investigation of the

circumstances surrounding certain fund transfers after 8:00 a.m. on September 15, 2008, by

Primary Fund shareholders to other Funds advised by RMCI; and (5) review of any claims by the

Primary Fund's adviser or distributor for management fees and expenses and any claims by

indemnitees for indemnification expenses.  (SEC Aug. 21 Br. App. 1-2)

   In proposing that these duties be assigned to a court-appointed monitor, the Commission cites cases in which courts have appointed receivers as part of plans providing equitable relief.  See, e.g., Byers, 2009 WL 2185491, at *1; SEC v. Shiv, 379 F. Supp. 2d 609 (S.D.N.Y. 2005); Credit Bancorp, Ltd., 290 F.3d 80.  Courts have also appointed monitors to oversee defendants' operations and protect the interests of investors.  See e.g., SEC v. WorldCom, Inc., No. 02 Civ. 4963 (JSR), 2002 U.S. Dist. LEXIS 14201, 2002 WL 1788032 (S.D.N.Y. Aug. 2, 2002); SEC v. Trabulse, 526 F. Supp. 2d 1008, 1019 (N.D. Cal. 2007); SEC v. Alanar, Inc., No. 1:05-cv-1102 (JDT) (TAB), 2007 U.S. Dist. LEXIS 63949, 2007 WL 2479318, at *1-2 (S.D. Ind. Aug. 28, 2007).

   Selection of an outside monitor has proven problematic in this case.  Certain individuals recommended by the Commission have suffered from conflicts of interest, reflecting the fact that the Fund was used by many large corporations for cash management.  The duties which the Commission wishes to assign to a monitor will also likely continue for a prolonged and indefinite period of time, which has presented an issue for certain individuals considered by the Court.  While the Court has been informed that a pro rata distribution of the remaining assets of the Primary Fund could be conducted expeditiously – given the Primary Fund's five prior distributions over the past year – other duties of the proposed monitor could continue long after the principal pro rata distribution has occurred.[56]  For example, the Commission has proposed that the monitor have a continuing role in overseeing payments from the Expense Fund for indemnification expenses and management fees and expenses.  Moreover, in the event that the Commission is successful in obtaining disgorgement or other financial penalties against the

---

[56]  It is the Court's expectation that the vast bulk of the remaining Primary Fund assets will be distributed to investors within 60 days of entry of the accompanying Order.

Defendants, the Commission has proposed that the monitor oversee a pro rata distribution to shareholders of any funds thereby obtained.  In sum, the duties of the proposed monitor could span a number of years.

The appointment of a monitor would also result in additional expense borne by shareholders, an important consideration given that the Primary Fund is in liquidation.  The Primary Fund's remaining assets are more appropriately returned to investors than used to pay the fees and expenses of a court-appointed monitor.

As noted above, in a November 5, 2009 Order, this Court gave notice that it was considering referring to a magistrate judge the duties that would have been assigned to a monitor under the Commission's proposal.  On November 9, 2009, this Court held a hearing to allow any interested parties to comment on this approach.  None of the parties objected to the referral of the monitor's duties to a magistrate judge.  (Nov. 9, 2009 Oral Arg. Tr. 4)  The Commission proposed, however, that the Court name the magistrate judge a special master pursuant to Federal Rule of Civil Procedure 53(h).  (SEC Nov. 6 Ltr; Nov. 9, 2009 Oral Arg. Tr. 5-6)  At the November 9 hearing, the Independent Trustees and investors TD Ameritrade, IBM, Lazard Frères & Co., LLC; Lazard Group, LLC and Qualcomm, Inc expressed support for this proposal.  (Nov. 9, 2009 Oral Arg. Tr. 6-9)  Rule 53 governs the appointment of special masters, providing the circumstances under which a court may appoint a special master and outlining the authority that may be delegated to a special master.  Fed. R. Civ. P. 53.  Rule 53(h) specifically envisions the appointment of a magistrate judge as a special master.  Fed. R. Civ. P. 53(h).

This Court has not yet determined whether the duties set forth in the accompanying Order will be assigned to an outside monitor or a magistrate judge, and whether the special master provisions of Rule 53 should be invoked.  The Court will decide these issues

as expeditiously as possible.  The Court will address below, however, whether the monitor or magistrate judge assigned to this matter will investigate potential "claw back" claims against investors who successfully redeemed at a $1.00 NAV on September 15, 2008, and possible claims against shareholders who successfully transferred their shares to other Reserve funds.

> ### A. The Monitor or Assigned Magistrate Judge Will Not Be Required to Investigate Potential "Claw Back" Claims or to Investigate Certain Inter-Fund Transfers

In response to criticism from certain investors, the Commission now recommends that the monitor be assigned two investigative responsibilities:  (1) "investigation of grounds to claw back payouts by the Primary Fund at any time after 8:00 a.m. on September 15, 2008 in excess of amounts to be paid" in the pro rata distribution; and (2) "investigation of the circumstances surrounding the transfers after 8:00 a.m. on September 15, 2008 by Primary Fund shareholders to other Funds advised by RMCI."  (SEC Aug. 21 Br. App. 1-2)  Neither of these responsibilities was included in the Commission's original application.  See June 8, 2009 Order App.  The Court believes that assigning these tasks to the monitor or magistrate judge will merely distract from the core duties necessary to afford equitable relief in this case:  overseeing the pro rata distribution, and resolving the thorny issues regarding management fees and expenses and indemnification expenses.  Accordingly, the accompanying Order will not provide for the assignment of either of these investigative responsibilities.

A number of investors made submissions to the Court advocating for a so-called "claw back" provision, arguing that allowing those whose shares were redeemed at $1.00 on September 15 to keep their full $1.00 per share redemption is not fair to similarly situated investors who were not able to successfully redeem and who will now receive a smaller, pro rata distribution.  See Russell Investment Co. Br. 15-16; Unpaid Timely Redeemer Group Br. 17-18;

Verisign Br. 9-10.  In response, the Commission proposed that this Court order that "[t]he

Monitor shall investigate grounds to claw back payouts by the Primary Fund" from those who

successfully redeemed on September 15 and recommend whether those claims should be

pursued.  The Commission's proposed order also envisions the Court appointing the monitor as a

receiver to pursue such claims on a contingency fee basis.  (SEC Oct. 13, 2009 Proposed Order)

         This Court heard oral argument concerning the issue of potential "claw back"

claims at the September 23, 2009 hearing, and solicited additional briefing on the subject after

the hearing.  As noted above (see p. 17 supra), the briefing was split, with some submissions

favoring the Commission's "claw back" provision and others opposed, including that of the

Massachusetts Secretary of State.

         After reviewing the submissions and considering the arguments made at the

September 23, 2009 hearing, the Court concludes that there is no compelling legal authority

supporting the Commission's "claw back" proposal.  Many of the investors who support such a

"claw back" provision cite SEC v. Cavanaugh, 155 F.3d 129 (2d Cir. 1998).  See, e.g., Deutsche

Bank Oct. 6 Br. 4; Unpaid Timely Redeemers Group Oct. 6 Br. 4-5.  In Cavanaugh, the Second

Circuit spoke to a court's ability to "order equitable relief against a person who is not accused of

wrongdoing in a securities enforcement action," but who has "has received ill-gotten funds" and

"does not have a legitimate claim to those funds."  Id. at 136.

         The rule set forth in Cavanaugh, however, does not support a "claw back"

provision here because investors whose redemption requests were honored on September 15,

2008 did not "receive[] ill-gotten funds" to which they did "not have a legitimate claim."  See id.

To the contrary, those investors invested $1.00 per share of their money in the Primary Fund and

received exactly that in return.  They had a legitimate claim to the funds they invested, just as the

investors whose redemption requests were not honored have a legitimate claim to the assets

remaining in the Primary Fund, necessitating the equitable relief discussed herein.

Several of the investors who favor a "claw back" provision justify the application

of Cavanaugh here by drawing an analogy between this case and SEC v. Andrescu, 117 Fed.

Appx. 160 (2d Cir. 2004), an unpublished summary order.  See, e.g., E*Trade Entities Oct. 6 Br.

5; Unpaid Timely Redeemers Group Oct. 6 Br. 5-6.  In Andrescu, one of the defendants accused

of participating in a fraudulent scheme had given some of the proceeds from the scheme to his

parents.  Andrescu, 117 Fed. Appx. at 161.  The parents claimed that the proceeds were given to

them in partial repayment of a loan made to their son.  Id.  The Second Circuit upheld the district

court's decision requiring the parents to disgorge the funds, citing Cavanaugh and pointing out

that they had "no valid claim" to the money.  Id.

Andrescu is clearly distinguishable from the instant case.  The funds distributed to

Andrescu's parents were the proceeds of fraud – indisputably "ill-gotten" gains.  Id.  As a result,

the parents had "no valid claim" to the money.  Id.  The funds paid to investors who redeemed on

September 15, 2008, were not the proceeds of fraud, however.  Instead, those funds represented

the return of monies the shareholders had originally invested in the Primary Fund.  Thus, the

investors had a "valid claim" to the funds.

Neither Cavanaugh nor Andrescu provides an adequate legal basis for a "claw

back" provision, and none of the investors who support such a provision have provided any

additional legal authority that might justify it.  This Court will not charge the monitor or

magistrate judge with investigating potential "claw back" claims where it is not clear that there is

legal authority supporting such claims.  The monitor or magistrate judge will be charged with a

complex and important set of core duties, including overseeing the pro rata distribution of

Primary Fund assets and reviewing claims for management fees and expenses and indemnification expenses.  The monitor or magistrate judge's time is better spent focused on these critical issues, rather than on an exploration of whether there is a legal basis for "claw back" claims.[57]

This Court will also not charge the monitor or magistrate judge with responsibility for investigating "the circumstances surrounding the transfers after 8:00 a.m. on September 15, 2008 by Primary Fund shareholders to other Funds advised by RMCI," as proposed by the Commission.  See SEC Aug. 21 Br. App. 1-2.  This type of investigation is more appropriately conducted by the Commission itself.  To ask the monitor or magistrate judge to pursue such an open-ended and amorphous investigation would only serve to distract from the important duties with which he or she will be charged as part of carrying out the equitable relief outlined in this opinion.

## VII.     NOTICE OF THIS OPINION AND THE ACCOMPANYING ORDER WILL BE GIVEN TO ALL PRIMARY FUND SHAREHOLDERS

The relief provided for in the accompanying Order will facilitate the liquidation of the Primary Fund and the distribution of the Fund's remaining assets; it also bears on the rights of the Primary Fund's shareholders and of those who seek to bring claims against the Fund and its indemnitees.  Accordingly, this Court has provided for notice of this Opinion and the accompanying Order to be given to all shareholders and other interested parties.  Specifically, the Order provides that within 10 days of its entry, (1) the Commission shall post a copy of this

---

[57]  The Court's resolution of this issue does not, of course, prevent the Commission or any interested investor from seeking recovery from shareholders whose September 15, 2008 redemptions were honored.  Indeed, some investors have identified legal theories under which such claims might be brought as part of other actions.  See, e.g., Deutsche Bank Oct. 6 Br. 5; Unpaid Timely Redeemers Group Oct. 6 Br. 8-15.

Memorandum Opinion and the accompanying Order on its web site and serve by overnight mail

copies of these documents on all parties in In Re: The Reserve Fund Securities and Derivative

Litigation, 09 MD 2011, and all those who have submitted objections or amicus briefs herein;

and (2) the Primary Fund shall post a copy of this Memorandum Opinion and the accompanying

Order on its web site and shall mail a copy of this Opinion and the accompanying Order to all

record owners of shares in the Primary Fund as of September 15, 16, 17, or 18, 2008.

## CONCLUSION

For the reasons set forth above, this Court will enter an order providing for, inter

alia, a pro rata distribution of the remaining assets of the Primary Fund; an injunction barring all

claims against (1) Primary Fund assets, including shareholder claims against the Primary Fund;

and (2) any of the Defendants and any of the Defendants' officers, directors, trustees,

representatives, agents or employees to the extent that such claims are subject to indemnification

by the Primary Fund; and the appointment of a monitor or magistrate judge to oversee the

distribution of Primary Fund assets and to review any claims by the Primary Fund's adviser or

distributor for management fees and expenses and any claims by indemnitees for indemnification

expenses, among other duties.

Dated:  New York, New York
        November 25, 2009

                            SO ORDERED.

                            _Paul G. Gardephe_

                            Paul G. Gardephe
                            United States District Judge