UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re THE RESERVE FUND SECURITIES AND DERIVATIVE LITIGATION | 09 MD. 2011 (PGG) |
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>RESERVE MANAGEMENT COMPANY, INC., RESRV PARTNERS, INC., BRUCE BENT SR., and BRUCE BENT II,<br><br>Defendants,<br>and<br><br>THE RESERVE PRIMARY FUND,<br><br>Relief Defendant. | **ECF CASE**<br><br>09 Civ. 4346 (PGG)<br><br>**MEMORANDUM OPINION AND ORDER** |

PAUL G. GARDEPHE, U.S.D.J.:

This action arises from the unprecedented collapse of the Reserve Primary Fund, a money market fund that, as of September 14, 2008, held debt securities issued by Lehman Bros. Holdings, Inc. ("Lehman") with a face value of $785 million, amid total assets under management of $62.5 billion. After Lehman announced on September 14 that it would file a bankruptcy petition, a run on the Fund ensued. Over the next two days, the Fund received redemption requests totaling approximately $40 billion. On September 16, 2008, the Fund announced that it had "broken the buck" – i.e., its per-share net asset value ("NAV") had fallen below $0.995 – and officially suspended redemptions to investors.

The drop in the NAV of the Primary Fund, and the suspension of redemptions, led to the filing of numerous class and individual actions, most of which have been consolidated

before this Court.  See In re the Reserve Fund Securities and Derivative Litigation, 09 MD 2011.

The Securities and Exchange Commission filed this action on May 5, 2009, against Defendants Reserve Management Company, Inc. ("RMCI"), Resrv Partners, Inc., Bruce Bent Sr., and Bruce Bent II (collectively, "Defendants").  The Complaint also names the Reserve Primary Fund as Relief Defendant.[1]

Defendants move to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6).  For the reasons set forth below, Defendants' motion to dismiss is DENIED.

## BACKGROUND

RMCI, which operates under the name "The Reserve," is a privately held corporation which provides "investment advisory services to five registered, open-end, investment companies set up as trusts, offering a total of 22 open-end investment portfolios," collectively known as the Reserve Funds.  (Compl. ¶ 19)  Resrv Partners serves as distributor for all of the Reserve Funds.  (Compl. ¶ 20)  The Reserve Primary Fund – a money market fund – is the "flagship" of the Reserve Funds.  (Compl. ¶¶ 3, 31)

Bruce Bent Sr. is the Chairman of RMCI and Chairman, President, Treasurer and Trustee of the Primary Fund.  (Compl. ¶ 21)  Bruce Bent II, his son, is Vice Chairman and President of RMCI and the Co-Chief Executive Officer, Senior Vice President and Assistant Treasurer of the Primary Fund.  (Compl. ¶¶ 22, 27)

Founded in 1971, the Primary Fund has historically invested in conservative assets selected for safety and liquidity.  (Compl. ¶ 34)  In 2007 and 2008, however, the Fund

---

[1] Only the Eighth Claim for Relief names the Reserve Primary Fund.  That claim is addressed in this Court's November 25, 2009 Memorandum Opinion and Order.  SEC v. Reserve Mgmt. Co. Inc., et al, No. 09 Civ. 4346 (PGG), --- F.Supp.2d ----, 2009 WL 4249128 (S.D.N.Y. Nov. 25, 2009).  (Dkt. Nos. 201, 202)

allegedly began to invest in higher risk commercial paper issued by financial institutions, including Lehman, for the purpose of generating a higher return.  (Compl. ¶ 35)

On Monday, September 15, 2008, Lehman filed its bankruptcy petition.  (Compl. ¶¶ 3, 51)  Because of the Primary Fund's holdings in Lehman securities, the Fund was immediately "besieged by shareholders seeking to redeem their shares."  (Compl. ¶ 3)  At 10:10 a.m. on September 15, State Street Bank and Trust Company, the Primary Fund's custodial bank – having processed $10 billion in redemptions – stopped funding redemption requests and suspended the Fund's overdraft privileges.  (Compl. ¶ 61)  On September 16, 2008, RMCI issued a press release announcing that the Fund had reduced its valuation of its Lehman holdings to zero as of 4:00 p.m. on September 16, 2008, which caused the Primary Fund's NAV to drop to $0.97 per share.  (Compl. ¶ 121)  The Primary Fund had thus "broken the buck," a "catastrophic development for a money market fund and its shareholders."[2]  See Compl. ¶ 37.   On September 29, 2008, RMCI "disclosed that the Primary Fund's Board of Trustees had voted to liquidate the Fund and distribute its assets to shareholders."  (Compl. ¶ 123)

The Commission alleges that while the Fund was collapsing on September 15 and 16, 2008, the Defendants "engaged in a systematic campaign to deceive the investing public into believing that the Primary Fund . . . was safe and secure despite its substantial Lehman holdings."  (Compl. ¶ 1)  Defendants are alleged to have "violated the antifraud provisions of the federal securities laws" by engaging in a "campaign of misinformation" designed to "persuade

---

[2]  RMCI has since conceded that the Primary Fund "broke the buck" during the morning of September 16, 2008.  In a November 26, 2008 press release, RMCI stated that the Primary Fund's NAV had dropped below $1.00 as of 11:00 a.m. on September 16.  (Compl. ¶ 120)  The November 26 press release explains that "an administrative error in computing the Fund's NAV" caused the mistake.  Id.

investors to refrain from redeeming shares, and to induce new purchases of shares" in the Primary Fund.  (Compl. ¶¶ 4-6)

        The Primary Fund's Board of Trustees began meeting to address the effects of the Lehman bankruptcy on the Fund at 9:30 a.m. on September 15, 2008.  At that meeting, Defendants Bent Sr. and Bent II, along with RMCI's chief investment officer ("CIO"), reported that there was "no valid market for Lehman paper," but that bids were in the range of 45 to 80 cents on the dollar.  (Compl. ¶ 57)  These statements were made despite "market data available to RMCI on the morning of September 15, which was shared with the Bents but not the Board," suggesting that "Lehman debt would not trade any higher than between $0.30 and $0.40" on the dollar.  Id.  The Complaint alleges that Bent Sr. also recommended that the Board value the Lehman holdings at par, despite conceding "that he would not authorize RMCI to purchase the Lehman debt at par value."  (Compl. ¶ 58)  The Trustees ultimately settled on a valuation of 80% of par.  Id.

        The Board met again at 1:00 p.m. on September 15.  The Complaint alleges that RMCI and the Bents made several additional misstatements and omissions to the Board at this meeting including:  (1) failing to inform the Board that State Street had suspended the Fund's overdraft privileges such that redemptions were no longer being paid; (2) understating the level of redemptions facing the Primary Fund; (3) failing to disclose that the Yield Plus and International Liquidity Funds, two other Reserve Funds holding Lehman debt, had broken the buck on the morning of September 15; and (4) failing to disclose that RMCI and Bent II had taken steps to avoid disclosure of the fact that the Yield Plus and International Liquidity Funds had broken the buck.  (Compl. ¶¶ 62, 75)

At the 1:00 p.m. meeting, the Defendants introduced the idea of RMCI entering into a credit agreement to support the Fund's $1.00 NAV.  The Complaint states that "persistent questions posed by the rating agencies and shareholders," as well as actions taken by another money market fund to protect its $1.00 NAV, "exerted immense pressure on RMCI and the Bents to publicly reassure shareholders that RMCI would in fact protect the $1.00 NAV of the Primary Fund."  (Compl. ¶ 70)  When the Board of Trustees convened at 1:00 p.m. on September 15, Bent II is alleged to have "informed the Trustees that RMCI intended to implement a credit support agreement to protect the $1.00 NAV of the Primary Fund" and to "seek immediate relief from the Commission to implement the credit support agreement."  (Compl. ¶ 71)  The Complaint indicates that outside counsel for the Independent Trustees asked whether RMCI had the financial resources to enter into such a support agreement.  (Compl. ¶ 72)  Bent Sr. is alleged to have reassured the Independent Trustees that RMCI would be able to provide sufficient capital.  Id.

The Complaint alleges that at the 1:00 p.m. Board meeting, and throughout the day on September 15, Defendants failed to inform the Board not just of several crucial developments, but also of their "exceedingly grim assessment of the situation."  (Compl. ¶ 101)  For example, the Complaint alleges that by mid-afternoon "senior RMCI personnel, including the chief financial officer and CIO, had acknowledged that State Street's suspension of overdraft privileges (which occurred at approximately 10:10 a.m.) was the 'kiss of death' for the Primary Fund, and that the Fund was 'screwed' unless 'something magical happens.'"  Id.  Nevertheless, the Board was not informed that State Street had suspended the Fund's overdraft privileges until the morning of September 16.  (Compl. ¶ 116)

Shortly after the 1:00 p.m. Board meeting, Bent II sent an e-mail to RMCI's Director of Sales and Marketing, with cc's to RMCI's General Counsel, COO, and Bent Sr. (Compl. ¶ 77)  The e-mail stated that RMCI "intend[s] to protect the NAV on the Primary Fund to whatever degree is required.  We have spoken with the SEC and are waiting [for] their final approval which we expect to have in a few hours.  You may communicate this to clients on an as needed basis . . . [] if you want something on the website I need to see language for approval first, thanks."  Id.  The Complaint alleges that this e-mail was "materially misleading" in that RMCI and the Bents did not intend to protect the Primary Fund's NAV "to whatever degree [was] required" and "had not yet arrived at any decision concerning whether and to what extent [they] would support the Fund. . . ."  (Compl. ¶¶ 78-79)  Moreover, RMCI had not submitted a written request to the Commission seeking approval for a credit support agreement, and no such request was ever submitted.  (Compl. ¶ 80)

Bent II also placed calls to rating agencies Moody's and Standard & Poor's and assured them that RMCI would be entering into a credit support agreement to preserve the $1.00 NAV of the Primary Fund.  (Compl. ¶ 81)

As a result of Bent II's e-mail, the sales team – which included Resrv Partners sales personnel – told Primary Fund shareholders about RMCI's planned credit support agreement.  (Compl. ¶ 84)  The Complaint alleges that some members of the sales team indicated that RMCI and the Bents would "definitively" "step in and support" the Reserve Funds and would take "whatever steps that are needed to support the NAV of the funds."  Id.  One salesperson is alleged to have told an investor that "we have a backstop and are going to ensure that the fund does not break a buck."  Id.  The Complaint also alleges that these representations

concerning a credit support agreement were designed to encourage prospective investors to purchase shares in the Primary Fund.  (Compl. ¶ 85)

Bent II's e-mail is also alleged to have led RMCI marketing personnel to issue a shareholder communication entitled "The Reserve Insights."  This communication, which was reviewed before distribution by Bent II, Bent Sr., and RMCI's sales and marketing teams among others (Compl. ¶¶ 89-91), is alleged to contain the following false statements:  (1) that RMCI intended to enter into a credit support agreement to support the Primary Fund's $1.00 NAV; (2) that RMCI was submitting appropriate documentation to the Commission to ensure the implementation of the credit support agreement; (3) that the support agreement would "ensure the integrity of the $1.00 NAV"; and (4) that the Lehman holdings would not have a "material impact" on the Fund or a "negative impact[]" on the Fund's NAV because the holdings would "mature at par value."  (Compl. ¶ 92)

"The Reserve Insights" release was sent to numerous Primary Fund investors, as well as to Standard & Poor's and Moody's.  (Compl. ¶¶ 93-96)  The communication was later posted on RMCI's website and, on September 16, was e-mailed to Crane Data, a web site covering developments in the money market industry.  (Compl. ¶ 113)  E-mails written by RMCI's Director of Sales, as well as by RMCI's CIO, indicate that this communication slowed the rate of redemptions from the Primary Fund and delayed adverse action by the rating agencies. (Compl. ¶¶ 86-87, 96-97, 110)

The Complaint alleges that despite Defendants' assurances that a credit support agreement would be put in place, the Bents "never asked to review or execute" the draft documentation, nor did they submit any such documentation to the Commission for approval. (Compl. ¶¶ 98-99)

In addition to disseminating allegedly misleading information about a credit support agreement, the Complaint alleges that Defendants misled investors and rating agencies as to the true state of affairs at the Fund throughout the day on September 15.  The Complaint claims that RMCI and Resrv Partners sales personnel "falsely assured investors via telephone communications and email that the Primary Fund was not experiencing any liquidity problems and that any delay in transmitting money was caused by operational or technical delays at State Street," despite knowing that State Street had suspended the Fund's overdraft privileges, resulting in redemptions not being paid.  (Compl. ¶ 102)

The Complaint also alleges that RMCI falsely informed Moody's during the afternoon of September 15 "that redemptions appeared to have 'stopped'" and that RMCI had been able to generate sufficient liquidity to fund outstanding redemption requests by selling assets.  (Compl. ¶ 103)  This message was reiterated by Bent II in another communication with Moody's later that afternoon.  (Compl. ¶ 104)

Later that day, Bent II is alleged to have authorized RMCI marketing personnel to offer further comfort to investors via the Wall Street Journal, by telling the paper that RMCI intended to "protect the NAV on the funds to whatever degree is required," despite the fact that this "protection has not been needed."  (Compl. ¶ 109)

Despite giving these assurances, the Complaint alleges that Bent II had concluded "as early as midday on September 15 that RMCI should pursue an immediate sale of RMCI and the Reserve Funds to a third party."  (Compl. ¶ 105)  Indeed, the Complaint contends that RMCI retained two investment banks for this purpose.  Id.  On the morning of September 16, Bent II is alleged to have instructed the investment banks to inform potential buyers that they would not be required to protect the Primary Fund's $1.00 NAV.  (Compl. ¶ 106)

The Board of Trustees met again at 10:00 a.m. on September 16. (Compl. ¶ 114)

At that time, Bent II revealed that RMCI had not entered into a credit support agreement.

(Compl. ¶ 115) He also informed the Board that redemption requests had reached approximately

$24.6 billion, of which only approximately $10.7 billion had been paid. (Compl. ¶ 116) Bent II

further disclosed that State Street had suspended the Fund's overdraft privileges the previous

morning. Id. The Independent Trustees then ended the Board meeting and convened their own

executive session. (Compl. ¶ 117) According to the Complaint, the minutes of the Independent

Trustees' meeting indicate that the Independent Trustees were "shocked" by the information they

had received, given that they had been told the previous afternoon that redemptions were only $5

billion and that RMCI had sufficient capital to support a $1.00 NAV. Id. Later that day, the

Primary Fund announced it had broken the buck.[3]

Based on the conduct outlined above, the Complaint claims that (1) Defendants

violated and aided and abetted violations of Section 10(b) of the Exchange Act and Rule 10b-5

(Compl. ¶¶ 127-130); (2) Bent Sr. and Bent II violated Section 20(a) of the Exchange Act

(Compl. ¶¶ 131-133); (3) RMCI, Resrv Partners and Bent II violated Section 17(a) of the

Securities Act (Compl. ¶¶ 134-136); (4) RMCI, Bent Sr. and Bent II violated Sections 206(1)

and (2) of the Advisers Act (Compl. ¶¶ 137-139); (5) RMCI, Bent Sr. and Bent II violated

Section 206(4) of the Advisers Act and Rule 206(4)-8 (Compl. ¶¶ 140-142); (6) Bent Sr. and

Bent II aided and abetted violations of Section 206(1) and (2) of the Advisers Act (Compl. ¶¶

143-145); and (7) Bent Sr. and Bent II aided and abetted violations of Section 206(4) of the

Advisers Act and Rule 206(4)-8. (Compl. ¶¶ 146-148)

---

[3]  The subsequent liquidation of the Primary Fund's assets, including the distribution ordered
pursuant to the Complaint's eighth claim for relief, is discussed in SEC v. Reserve Mgmt. Co.
Inc., et al, No. 09 Civ. 4346 (PGG), --- F.Supp.2d ----, 2009 WL 4249128 (S.D.N.Y. Nov. 25,
2009).  (Dkt. Nos. 201, 202).

## DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "In considering a motion to dismiss . . .  the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff."  Id. (citing Fernandez v. Chertoff, 41 F.3d 45, 51 (2d Cir. 2006)).  "When determining the sufficiency of plaintiffs' claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in plaintiffs' . . . complaint, . . . to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."  Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).

## I.    THE COMPLAINT SATISFIES THE STANDARDS FOR PLEADING FRAUD SET FORTH IN FEDERAL RULE OF CIVIL PROCEDURE 9(b)

Federal Rule of Civil Procedure 9(b) requires that a party alleging fraud "state with particularity the circumstances constituting fraud. . . . Malice, intent, knowledge, and other conditions of a person's mind[, however,] may be alleged generally."  Fed. R. Civ. P. 9(b).

### A.    The Complaint Adequately Pleads Scienter

Rule 9(b) represents a "relaxation" of the specificity requirement in pleading the scienter element of fraud claims, requiring that fraudulent intent need only be "alleged generally."  See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994); Fed. R. Civ. P. 9(b).  The Second Circuit has made clear, however, that this "relaxation . . . 'must not be

mistaken for license to base claims of fraud on speculation and conclusory allegations.'"  Id. (quoting O'Brien v. Nat'l Prop. Analysts Partners, 396 F.2d 674, 676 (2d Cir. 1991)). Accordingly, the Second Circuit has long required plaintiffs making fraud claims to "allege facts that give rise to a strong inference of fraudulent intent."  Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000); see also Shields, 25 F.3d at 1128.

Defendants argue that the Commission must meet the heightened pleading standard for scienter set forth in the Private Securities Litigation Reform Act ("PSLRA") and elaborated upon by the Supreme Court in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007).  (Def. Br. 13-14)  The PSLRA adopts the "strong inference" standard set by the Second Circuit, requiring the plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  In Tellabs, however, the Supreme Court clarified that the "strong inference" required under the PSLRA exists only where "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  551 U.S. at 322, 324.

The PSLRA applies only to private actions, not to actions filed by the Commission.  15 U.S.C. § 78u-4(a)(1) ("The provisions of this subsection shall apply in each private action arising under this chapter."); see also SEC v. Dunn, 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008) ("Of course, by its terms, the PSLRA does not apply to this SEC enforcement action.").  Defendants argue nonetheless that the Tellabs interpretation of the "strong inference" standard "informs the Second Circuit's 'strong inference' requirement under Rule 9(b)."  (Def. Br. 13)

The Second Circuit, however, "has yet to decide <u>Tellabs</u>' effect on the requirements for pleading scienter in actions governed by Rule 9(b) but not governed by the PSLRA." <u>Dunn</u>, 587 F. Supp. 2d at 501.  Those courts in this Circuit that have directly addressed the issue have declined to apply the PSLRA's "strong inference" standard to Commission enforcement actions, and that is the approach this Court will adopt.  <u>See</u>, <u>e.g.</u>, <u>SEC v. Pentagon Capital Mgmt. PLC</u>, 612 F. Supp. 2d 241, 263-64 (S.D.N.Y. 2009) (declining to apply PSLRA's "strong inference" standard to SEC enforcement action); <u>Dunn</u>, 587 F. Supp. 2d at 501 (same).

As the <u>Dunn</u> court stated:

> [a]ny argument that Congress intended to apply the [PSLRA's standard] to SEC enforcement actions ignores the statute's plain language. . . . Indeed, as the Supreme Court explained, Congress designed the PSLRA specifically to address the perceived abuses of <u>private</u> securities litigation.  <u>See</u> <u>Tellabs</u>, 127 S.Ct. at 2508.  Extending its "heightened standard" to SEC enforcement actions, a context not found by Congress to harbor such abuses, does violence to that intent:  had Congress wanted the PSLRA to restrain the SEC's ability to plead securities fraud, it could have said so easily.

<u>Id.</u> (emphasis in original); <u>see also</u> <u>SEC v. Tambone</u>, 550 F.3d 106, 119 (1st Cir. 2008) ("[T]he additional scrutiny applied to allegations of scienter in private securities fraud complaints is unwarranted in this case. . . . The SEC need only allege scienter generally."); <u>SEC v. Berry</u>, 580 F. Supp.2d 911, 920-21 (N.D. Cal. 2008).  The approach adopted in <u>Dunn</u> is, as the court there stated, consistent with both the plain language of the statute and its statutory purpose.[4]

---

[4]  Defendants acknowledge that the Second Circuit has yet to decide this issue, but cite two district court decisions in support of their argument that the PSLRA scienter standard set forth in <u>Tellabs</u> applies to SEC enforcement actions.  (Def. Br. 13 n. 7)  Neither decision directly addresses, however, whether it is appropriate to apply the PSLRA standard to Commission enforcement actions.  Instead, both decisions apply the PSLRA standard without discussion.  <u>SEC v. Boling</u>, 2007 WL 2059744, at *4 n.1 (D.D.C. July 13, 2007); <u>SEC v. North Shore Asset Mgmt.</u>, No. 05 Civ. 2192 (WHP), 2008 WL 1968299, at *7 (S.D.N.Y. May 5, 2008).

Under Rule 9(b), a "strong inference" of fraud "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Novak, 216 F.3d at 307.

### 1.     The Complaint Adequately Alleges that Defendants Had Motive and Opportunity to Commit Fraud

Defendants do not contest that they had an opportunity to commit fraud,[5] but contend that the Complaint does not adequately plead that they had a motive to commit fraud. (Def. Br. 11-13)

Motive to commit fraud entails "'concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'" Novak, 216 F.3d at 307 (quoting Shields, 25 F.3d at 1130). Plaintiffs may not rely on "motives possessed by virtually all corporate insiders," but instead must allege "that defendants benefitted in some concrete and personal way from the purported fraud." Novak, 216 F.3d at 307-08. Thus, in alleging motive, "'a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold.'" Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001) (quoting Shields, 25 F.3d at 1130). Similarly, "the desire for the corporation to appear profitable," as well as "the desire to keep stock prices high to increase officer compensation," are "insufficient motives." Kalnit, 264 F.3d at 139.

Defendants argue that the Complaint's allegations establish only that they intended to preserve the Primary Fund, which is a "natural, pro-investor desire[]" that all

---

[5]  Courts in this district have "'often assume[d] that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired.'" In re PXRE Group, Ltd., 600 F. Supp. 2d 510, 529-30 (S.D.N.Y. 2009) (quoting Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006)).

corporate officers and directors of an entity share (Def. Br. 11-12; see Novak, 216 F.3d at 307-08), and that "[t]he only credible explanation for [their] conduct is that they did not believe on September 15 that the Fund was destined to collapse."  (Def. Br. 13)  The Complaint, however, alleges more than a desire on the Defendants' part to preserve the Primary Fund.

It is undisputed, for example, that the Bents had "significant holdings" in the Primary Fund.  (Def. Br. 12)  Moreover, RMCI and Resrv Partners – which the Bents own and control – act as the investment adviser and distributor of the Fund, respectively, and are paid fees for their services.  See Compl. ¶¶ 19, 20.  Accordingly, the Bents have a direct, personal financial stake in the Fund and in these entities and a motive to maximize not only their personal financial investment but also their entities' management fees.  The Bents also have an enormous reputational stake in the Primary Fund.  Bent Sr. founded RMCI and its flagship, the Primary Fund, more than thirty-five years ago (Compl. ¶¶ 19, 21, 26, 34); he "is the public face" of RMCI and its funds; and his family, including Bent II, control the Reserve Funds and their associated entities.  (Compl. ¶¶ 19, 21-23, 26)  Accordingly, Defendants' personal stake in the success of the Primary Fund goes far beyond that held by typical officers and directors.[6]

---

[6]  Defendants claim that the Complaint must be dismissed because the Commission has not alleged that they "benefited from the alleged fraud" by, for example, selling their holdings in the Primary Fund before its collapse.  (Def. Br. 12)  In Fecht v. Northern Telecom Ltd., 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000), the court noted that "[t]he absence of stock sales by insiders, or any other evidence of pecuniary gain by company insiders at shareholders' expense, is inconsistent with an intent to defraud shareholders."  In that case, however, the court held that "the individual defendants had nothing to gain" from the alleged fraud.  Id.  Here, the Complaint sets forth Defendants' direct, personal financial stake in the success of the Primary Fund, and it is clear that the Bents, as well as RMCI and Resrv Partners, had much to gain from the survival of the Fund even if that objective was accomplished through fraud.  Moreover, motive allegations need only set forth "'concrete benefits that could be realized by" the alleged fraud; the concrete benefits need not actually have been realized for a complaint to survive.  See Kalnit, 264 F.3d at 139 (quoting Novak, 216 F.3d at 307).

Several courts in this district have found that a desire to generate additional fee income may provide a sufficient motive to commit fraud, particularly where the defendant possesses a personal stake in the business and the fee income.  For example, in Heller v. Goldin Restructuring Fund, 590 F. Supp. 2d 603, 620-21 (S.D.N.Y. 2008), the court found sufficient motive where the defendants "possessed the unique incentive, as managers of a struggling, privately-owned investment fund in which they possessed a personal financial stake," to attempt to maximize not only their "personal financial investment" but also their "potential receipt of management fees."[7]  Id.  Similarly, in Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, 446 F. Supp. 2d 163 (S.D.N.Y. 2006), the court held that "[u]nlike a motive to increase stock prices, shared by all corporate insiders, a motive to generate increased fees based on inflated NAV figures would be 'a concrete and personal benefit to the individual defendants'" – who served as the administrators of the funds in question – "'resulting from the fraud.'" 446 F. Supp. 2d at 171, 187 (quoting Kalnit, 264 F.3d at 139)  Likewise, in In re Global Crossing, Ltd. Securities Litigation, 322 F. Supp. 2d 319, 345-46 (S.D.N.Y. 2004), the court found that the defendant auditing company's motive to increase the size of its consulting business – which generated much higher fees than the firm's auditing business – was "sufficiently concrete to survive a motion to dismiss."

Finally, the Defendants' alleged "confidence that they could preserve the Fund," and alleged belief that the Fund would not collapse (Def. Br. 13), does not require dismissal of the Complaint.  Although a desire to preserve the Fund is – obviously – not necessarily

---

[7]  Courts in this district are "divided on whether the receipt of fees alone is enough to satisfy the 'motive' requirement."  Heller, 590 F. Supp. 2d at 621.  See, e.g., Steed Finance LDC v. LASER Advisers, 258 F. Supp. 2d 272, 278 (S.D.N.Y. 2003) (court found insufficient motive where plaintiff's sole theory was that better fund performance – accomplished by fraud – led to higher fees).  Here, as noted above, there are fees plus a personal financial stake in the Fund, the management company, and the distributor.

fraudulent, the Complaint alleges that the actions Defendants took to prevent the collapse of the Fund were fraudulent, and were committed to avoid the financial and reputational harm they would suffer if such an event occurred.  Even assuming that the Defendants believed that their actions would succeed in forestalling the collapse of the Fund, such a finding would not negate fraudulent intent as a matter of law.[8]

### 2.    The Complaint Adequately Alleges Conscious Misbehavior or Recklessness

Even if the Commission had not alleged facts demonstrating motive and opportunity to commit fraud, Rule 9(b)'s scienter requirement is satisfied where a complaint contains factual allegations "'that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"  Kalnit, 264 F.3d at 138-39 (quoting Acito v. Imcera Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995)).  Plaintiffs proceeding under the "conscious misbehavior or recklessness" theory must allege reckless conduct that is "at the least . . . highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  Kalnit, 264 F.3d at 142 (quoting Honeyman v. Hoty, 220 F.3d 36, 39 (2d Cir. 2000)).

---

[8]  Defendants also argue that they "sought input and approval from all relevant sources, including the SEC itself, rather than acting secretly or on their own instincts or opinions," and that these actions "severely undercut[] the generic assertions of fraudulent intent. . . ."  (Def. Br. 10-11)  The cases Defendants cite in support of this proposition, however, indicate that consultation with counsel is one factor, or "possible evidence," that might be taken into account in evaluating whether those accused of fraud acted in good faith.  See SEC v. Snyder, 292 Fed. Appx. 391, 406 (5th Cir. 2008); Howard v. SEC, 376 F.3d 1136, 1147-48 (D.C. Cir. 2004).  The Second Circuit has held that where a defendant alleges that it acted in good faith and on advice of counsel, that defense generally presents a "triable issue" of fact.  Leberman v. John Blair & Co., 880 F.2d 1555, 1560 (2d Cir. 1989).  Accordingly, while Defendants may have sought input from outsiders, such acts are not dispositive and merely constitute a factor to consider in determining fraudulent intent.

While this is a "highly fact-based inquiry," securities fraud claims "typically" survive motions to dismiss where a plaintiff has "'specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.'" Kalnit, 264 F.3d at 142 (quoting Novak, 216 F.3d at 308). A failure "to check information [defendants'] had a duty to monitor" may also give rise to a strong inference of recklessness. Novak, 216 F.3d at 311; see also Nathel v. Siegal, 592 F. Supp. 2d 452, 464 (S.D.N.Y. 2008). Under such circumstances, "defendants knew or, more importantly should have known that they were misrepresenting material facts related to the corporation." Kalnit, 264 F.3d at 142.

Where, as here, "information contrary to the alleged misrepresentations is alleged to have been known by defendants at the time misrepresentations were made, the falsity and scienter requirements are essentially combined." In re Revlon, Inc. Sec. Litig., No. 99 Civ. 10192 (SHS), 2001 WL 293820, at *7 (S.D.N.Y. March 27, 2001) (citing Rothman v. Gregor, 220 F.3d 81, 89-90 (2d Cir. 2000)). As discussed below, the Commission has adequately pleaded that Defendants "knew or, more importantly should have known that they were misrepresenting material facts." Kalnit, 264 F.3d at 142 (citations omitted). Accordingly, the Commission has alleged "strong circumstantial evidence of conscious misbehavior or recklessness." Id. at 138-39 (citations omitted).

**B.     The Complaint Alleges Actionable Misstatements and Omissions**

**1.     Redemption Activity and Fund Liquidity**

The Complaint alleges that Defendants made a variety of false statements regarding the flood of redemptions that the Primary Fund experienced on September 15 and 16, 2008, and the liquidity crisis caused by those redemptions. These false statements were allegedly made by RMCI and Resrv Partners personnel, as well as by Bent II, to investors and to

rating agencies, and involved assurances that the Fund had sufficient liquidity to satisfy

redemption requests.   (Compl. ¶¶ 102-104)  The Complaint also alleges false statements and

omissions made by RMCI personnel, including Bent Sr. and Bent II, to the Board concerning the

level of redemption activity and Defendants' own concerns and plans for the Fund.[9]  (Compl. ¶¶

53, 60, 62, 75, 105, 116, 117)  Defendants claim that these allegations are insufficiently pleaded

because the Complaint does not allege that any of the Defendants had accurate information about

redemption activity and the resulting liquidity crisis during the relevant time period.  (Def. Br.

14-15)

Once a plaintiff has adequately alleged that a defendant made false or misleading

statements about the core operations of a company, however, an inference arises

> that the defendant knew or should have known the statements were
> false when made.  Indeed, if facts that contradict a high-level
> officer's public statements were available when the statements
> were made, it is reasonable to conclude that the speaker had
> intimate knowledge of those facts or should have known of them.
> Accordingly, if a plaintiff can plead that a defendant made false or
> misleading statements when contradictory facts of critical
> importance to the company either were apparent, or should have
> been apparent, an inference arises that high-level officers and
> directors had knowledge of those facts by virtue of their positions
> with the company.

In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp.2d 474, 489 (S.D.N.Y. 2004)

(citing Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989)); see also In re Alstom SA Sec. Litig.,

406 F. Supp.2d 433, 460 n. 20 (S.D.N.Y. 2005).

---

[9]  Defendants do not dispute that if such statements were made, or such information was
withheld, these statements would be false or misleading.  The Complaint alleges that there was a
liquidity crisis at the Reserve Fund, as State Street had suspended the Fund's overdraft privileges
and ceased to pay redemptions as of 10:10 a.m. on September 15, 2008.  (Compl. ¶ 101)  The
Complaint also claims that details about this liquidity crisis – which was of crucial importance to
the survival of the Fund – were not disclosed to the Board on September 15, 2008.  (Compl. ¶¶
53, 60, 62, 75, 105, 116, 117)

The Fund's liquidity crisis and corresponding inability to satisfy redemption requests went to the Fund's "core operations" and were of critical importance to the Fund, its investment adviser, RMCI, and management distributor, Resrv Partners.  As a money market fund, the Primary Fund was required to maintain a certain level of liquidity.  Moreover, the payment of redemption requests shortly after they were submitted was the Primary Fund's "ordinary course" of practice.  (Compl. ¶¶ 31-32)

Accurate information concerning the level of redemptions and the Fund's resulting liquidity crisis – information that contradicts or undermines Defendants' assurances as outlined in the Complaint – was available on September 15 and was "apparent, or should have been apparent" to the Bents and other senior RMCI and Resrv Partners officers at the time the alleged false statements and omissions took place.

For example, the Complaint alleges not only that the Primary Fund had $785 million in Lehman paper when that firm announced that it would file a bankruptcy petition, but that rating agencies began expressing concern about the Fund's liquidity in the wake of the Lehman filing "in the early morning on September 15."  (Compl.  ¶¶ 3, 63-65)  These developments, coupled with the tremendous disruption caused by the flood of redemption requests and State Street's decision to suspend the Fund's overdraft privileges and halt redemptions at 10:10 a.m., were sufficiently serious that it is reasonable to infer that the Bents, RMCI, and Resrv Partners personnel were aware or should have been aware of them.  (Compl. ¶ 101)  Taken together, these allegations give rise to a "strong inference" that Defendants acted with "conscious misbehavior or recklessness" in making the false statements or omissions alleged in the Complaint concerning the Fund's redemption activity and resulting liquidity.

19

Defendants also argue that the omissions alleged in the Complaint – including the failure to disclose to the Board at any time on September 15 the true level of redemptions and State Street's decision to cease funding redemptions – are not actionable because the relevant information was disclosed the following day, at the Board's 10:00 a.m. meeting.[10]  (Def. Br. 21-22)  Citing SEC v. Texas Gulf Sulphur Company, 401 F.2d 833, 851 (2d Cir. 1968), Defendants assert that "the timing of disclosure is a matter for the business judgment of the corporate officers entrusted with the management of the corporation within the affirmative disclosure requirements promulgated by the exchanges and by the SEC."

Although Defendants may argue, as the case progresses, that their delay in disclosing this information to the Board was a matter of business judgment, that issue cannot be resolved now, on a motion to dismiss.  Acito v. IMCERA Group, 47 F.3d 47 (2d Cir. 1995), cited by Defendants, is not to the contrary.  In that case, the Court stated that "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud."  47 F.3d at 53.  In Acito, however, the Court found that the disclosure of information in a later report was, at worst, "a matter of mismanagement" and thus was not actionable.  Id.  Here, the information the Defendants allegedly withheld was "catastrophic" with respect to the future of the Fund.  In sum, the Complaint alleges with sufficient particularity that Defendants consciously or recklessly failed to disclose critical information concerning the Fund's condition at a time when the Fund was in an accelerating death spiral.  This is sufficient to state a claim.

---

[10] Defendants also argue that the Board was given accurate information concerning the level of redemption requests on September 15.  (Def. Br. 6-7)  The Complaint alleges, however, that the Board was told during the afternoon of September 15 that redemptions totaled $5 billion when in fact redemptions had exceeded $10 billion by 10:00 that morning.  (Compl. ¶¶ 61, 117)  In short, material issues of fact exist as to what the Board was told about redemption levels and when that information was communicated.

2.        **Credit Support Agreement**

The Complaint alleges that Defendants made several false statements regarding their plans to enter into a credit support agreement that would preserve the Primary Fund's $1.00 NAV.  These include statements made by Bent II in the e-mail he sent to subordinates after the 1:00 p.m. Board meeting on September 15, and subsequent statements Defendants' sales personnel made to shareholders and potential investors.  (Compl. ¶¶ 77-80, 84, 85)  Bent II's e-mail is also alleged to have led to the creation and dissemination of the "The Reserve Insights" release, which reported that RMCI intended to enter into a credit support agreement and outlined the steps being taken to do so.  (Compl. ¶ 92-96, 113)  The communication also asserted that the planned credit support agreement would "ensure the integrity of a $1.00 NAV."  Id.  Defendants are alleged to have made similar representations to rating agencies and to the press.  (Compl. ¶¶ 81, 109)

The Complaint further alleges that – despite Defendants' assurances that a credit support agreement would be put in place – the Bents "never asked to review or execute" the draft documentation, nor did they submit any documentation to the Commission for approval.  (Compl. ¶¶ 98-99)

Citing In re Duane Reade Inc. Securities Litigation, No. 02 Civ. 6478 (NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003), Defendants argue that their statements of intent to enter into a credit support agreement are insufficient to support the alleged fraud claims.  (Def. Br. 17-19)  In Duane Reade, the court noted that "[n]ot all statements which in retrospect are inaccurate constitute material misstatements.  A company's statements of hope, opinion, or belief about its future performance or general market conditions are not actionable under the securities laws."  Id. at *4.  The court went on to state, however, that "'[a]n opinion may . . . be actionable

. . . if it is without basis in fact . . . [or if] the speakers were aware of any facts undermining the accuracy of these statements.'"  Id. (quoting In re Int'l Bus. Mach. Corporate Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998) (deletions in the original).  Moreover, "'[a] representation certified as true . . . when knowledge there is none, a reckless misstatement, or an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth, are all sufficient upon which to base liability.'"  CMNY Capital, L.P. v. Deloitte & Touche, 821 F. Supp. 152, 165 (S.D.N.Y. 1993) (quoting Rolf v. Blyth, Eastman Dillon & Co., Inc., 570 F.2d 38, 47-48 (2d Cir. 1978).

Here, the Complaint alleges that those who assured investors, rating agencies, and the Board that RMCI would enter into a credit support agreement to support the Fund's $1.00 NAV were aware that these statements were false.  For example, the Complaint alleges that while Bent II was giving such assurances, he stated in a September 14 e-mail that additional lines of credit were "not an option" for the Primary Fund.  (Compl. ¶ 47)  Defendants assert that this e-mail refers only to the fact that the Fund did not have existing lines of credit in place on September 14 (Def. Br. 18), but the meaning of this e-mail presents a factual question that cannot be resolved on a motion to dismiss.

The Complaint also alleges that Defendants repeatedly stated an unqualified intention to support the Primary Fund's $1.00 NAV even though (1) "RMCI and the Bents had not yet arrived at any decision whether and to what extent RMCI would support the Primary Fund"; and (2) RMCI and the Bents "never intended to support the Fund in a manner that would have a remotely meaningful impact on the Fund's NAV."  See, e.g., Compl. ¶¶ 72-74, 92-95.

Defendants contend that the Complaint is insufficient because it does not allege that the statements about RMCI's intent to enter into a credit support agreement were false when

made.  In particular, they argue that they cannot be held accountable for failing to foresee the level of support that would be needed in a "doomsday scenario."  (Def. Br. 20)  In short, Defendants appear to be claiming that they were truthful in stating their intention to enter into a credit support agreement, but only at a level that assumed "an 80% valuation of Lehman, [and only] so long as redemptions stayed within a certain range."  (Def. Br. 20 n.11)  The Complaint asserts, however, that Defendants' reservations were not shared with investors and rating agencies, and that Defendants instead promised unqualified support for the Fund's $1.00 NAV.

Although "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future," this is only true "up to a point."  Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004).  Here, the "doomsday" scenario Defendants claim they could not have been expected to foresee had already arrived when they made the statements at issue. Indeed, all of the statements about the credit support agreement alleged in the Complaint were made after Lehman announced that it would file a bankruptcy petition, after the Fund experienced $10 billion in redemption requests, and after State Street suspended the Fund's overdraft privileges and stopped processing redemption requests.  Given the events that occurred on the morning of September 15, it is not tenable for Defendants to argue that they could not have foreseen a scenario in which Lehman paper declined to a value below 80% of par or redemptions reached unprecedented levels.  Indeed, the Complaint alleges that the value of Lehman paper was well below 80% of par, and redemptions had already exceeded $10 billion, before Defendants first stated their intention to enter into a credit support agreement.  (Compl. ¶¶ 57, 61-62)  Given these facts, there is a strong inference that Defendants acted with conscious

misbehavior or recklessness in stating their intention to enter into a credit support agreement that would preserve the $1.00 NAV.[11]

Defendants also argue that their statements about a potential credit support agreement are not actionable because they disclosed the fact that they had not entered into such an agreement "early in the morning on September 16," and the timing of disclosure is subject to the business judgment rule.  (Def. Br. 20)  This argument fails for the same reasons set forth above in connection with Defendants' alleged statements and omissions regarding redemptions and the Fund's liquidity.  See supra p. 20.

Finally, Defendants argue that the Bents cannot be held liable for statements (1) made by the sales team that the Bents would "definitively" enter into a credit support agreement and that the Fund thus had "a backstop" (Compl. ¶ 84); and (2) in "The Reserve Insights" release that the credit support agreement would "ensure the integrity of a $1.00 NAV."  (Compl. ¶ 92(c)).  Although RMCI and Resrv Partners' responsibility for these claims does not appear to be in dispute, the Bents argue that they cannot be found liable for these statements because they are more definitive than statements allegedly made by the Bents directly.  (Def. Br. 20-21)

This argument is disingenuous.  Bent II's e-mail following the 1:00 p.m. Board meeting stated that RMCI "intend[ed] to protect the NAV on the Primary fund to whatever degree is required" and indicated that RMCI was awaiting the SEC's "final approval" to enter into a credit support agreement.  (Compl. ¶ 77)  This e-mail – which was sent to RMCI's

---

[11]  With respect to Bent II's assertion, in his September 15 e-mail, that he was awaiting the Commission's "final approval" of a credit support agreement, Defendants point to an e-mail sent by RMCI's General Counsel a short time later – to the same recipients – stating that RMCI would "submit a form of the agreement to the SEC this afternoon."  (Def. Br. 19-20; Martin Decl. Ex. A)  Even assuming that the General Counsel's e-mail mitigates the impact of Bent II's earlier e-mail, Defendants do not explain why the statements Bent II made were not false and why this allegation is insufficiently pled and warrants dismissal.

Directors of Sales and Marketing, as well as to RMCI's General Counsel, COO, and to Bent Sr. – also stated that the information it contained could be communicated to clients.  (Compl. ¶¶ 77-78)  The e-mail was then used to draft "The Reserve Insights" release, which both Bent II and Bent Sr. approved prior to distribution.  (Compl. ¶¶ 88-92)

While the Bents may have "'used another actor to deliver the message,'" they may still be liable.  Gabriel Capital, L.P. v. NatWest Fin., Inc., 94 F. Supp. 2d 491, 509 (S.D.N.Y. 2000) (quoting In re Kidder Peabody Sec. Litig., 10 F. Supp. 2d 398, 407 (S.D.N.Y. 1998)); see also Seippel v. Sidley, Austin, Brown & Wood, LLP, 399 F. Supp. 2d 283, 295 n.60 (S.D.N.Y. 2005).  Here, Bent II's e-mail message – on which Bent Sr. was copied and the substance of which he approved in connection with "The Reserve Insights" release– is substantially similar to the statements made by the sales force.  Indeed, the statements attributed to the sales force are no more definitive than Bent II's claim that RMCI "intend[ed] to protect the NAV on  the Primary fund to whatever degree is required."  See Compl. ¶ 77 (emphasis added).  Accordingly, the Bents cannot disclaim liability for these statements.

### 3.        Post-Bankruptcy Value of the Lehman Holdings

Defendants contend that the Complaint's allegations concerning their statements to the Board about the post-bankruptcy value of the Fund's Lehman holdings do not state a claim because they set forth only "non-actionable statements of opinion."  (Def. Br. 16-17)  The two statements at issue are:  the representation by Bent Sr., Bent II and RMCI's CIO at the 9:30 a.m. Board meeting on September 15 that bids for Lehman were between "45 to 80" cents on the dollar, and Bent Sr.'s initial recommendation to the Board at that same meeting that the Lehman debt be valued at par, despite his admission later in the meeting that he would not authorize RMCI to purchase Lehman debt at par.  (Compl. ¶¶ 57-58)

Where the trading in a security is thin, valuing that security "may be considerably more a statement of opinion than a report of an objectively determinable fact."  <u>Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC</u>, 479 F. Supp. 2d 349, 362 (S.D.N.Y. 2007).  "The sine qua non of a securities fraud claim based on false opinion is that defendants deliberately misrepresented a truly held opinion."  <u>Podany v. Robertson Stephens, Inc.</u>, 318 F. Supp. 2d 146, 153-154 (S.D.N.Y. 2004).  "It is not sufficient to allege . . . that it would have been possible to reach a different opinion than that reached by defendant based on information available to defendant at the time, or even that the defendant's opinion was unreasonable."  <u>Id.</u> at 154.

Here, the Complaint acknowledges that Defendants told the Board that there was "no valid market" for Lehman paper and stated that the estimates they offered were "being thrown out there" despite the lack of trading.  (Compl. ¶ 57)  Indeed, the Board adjourned the first scheduled meeting on September 15 because of difficulties in valuing the Lehman debt, and asked RMCI to gather additional market information.  (Compl. ¶ 56)  Accepting the allegations of the Complaint as true, it seems clear that the Board was aware that Defendants were offering opinions as to the value of the Lehman debt at the 9:30 a.m. meeting.  The Complaint does not allege that Defendants deliberately misrepresented their opinions as to valuation.  The closest the Complaint comes to making such a charge is the statement that Bent Sr. initially recommended that the Lehman paper be valued at par but later conceded that he would not authorize RMCI to purchase Lehman debt at par.  (Compl. ¶ 58)  Given the chaos and uncertainty caused by Lehman's bankruptcy, and the number of factors at play in arriving at a valuation of the Lehman holdings, these statements by Bent Sr. are insufficient to support a fraud claim.  Indeed, the Commission does not argue to the contrary in its opposition to Defendants' motion to dismiss.  Accordingly, the Commission may not rely on these statements in proving its fraud claims.

## C.      **The Complaint Adequately Alleges Materiality**

The Complaint's claims for relief require proof that the alleged misstatements or omissions were material.  A complaint may not be dismissed on this ground, however, unless the alleged misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  Ganino v. Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000) (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)).

Defendants argue that the alleged misstatements regarding the Bents' intent to enter into a credit support agreement "are demonstrably non-material given the events of the day."  (Def. Br. 24-25)  In particular, Defendants contend that assuming "that a reasonable person would attribute significance to a generic statement that individuals of limited means intended to enter into a credit support agreement to protect the Fund, when the scope of such assistance was not yet clear," requires one "to put aside common sense."  (Def. Br. 25)  This argument is frivolous.  It is obvious that a reasonable investor might have viewed as important Defendants' September 15 statements concerning a credit support agreement that would preserve the Primary Fund's $1.00 NAV.  It is equally obvious that Defendants made these statements precisely because they believed that they would have some impact on investors.  A number of the statements at issue were unqualified and unequivocal, and they were made by people intimately involved in the Fund's operations.  Thus, it would be perfectly reasonable for an investor to take seriously the claims about a forthcoming credit support agreement.  Indeed, the Complaint alleges that the Defendants' assurances regarding a potential credit support agreement had an impact on investors, because the rate of redemptions declined after these statements were

issued.  (Compl. ¶¶ 86-87, 96-97, 110)  This is more than sufficient to establish for pleading

purposes that the claimed false statements were material.  See Ganino, 228 F.3d at 162.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED.  The Clerk

of the Court is directed to terminate the motion.  (Docket No. 122)

Dated:  New York, New York
      February 24, 2010

SO ORDERED.

Paul G. Gardephe
United States District Judge