USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re THE RESERVE FUND SECURITIES AND DERIVATIVE LITIGATION | 09 MD. 2011 (PGG) |
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>RESERVE MANAGEMENT COMPANY, INC., RESRV PARTNERS, INC., BRUCE BENT SR., and BRUCE BENT II,<br><br>Defendants,<br><br>and<br><br>THE RESERVE PRIMARY FUND,<br><br>Relief Defendant. | ECF CASE<br><br>**MEMORANDUM OPINION & ORDER**<br><br>09 Civ. 4346 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

        The Commission seeks an order compelling Defendants to produce approximately sixty emails between Bruce Bent II and his wife, Rebecca Bent, exchanged on September 15 and 16, 2008 (the "Bent emails"). Defendants contend that these emails are protected by the marital privilege. (Oct. 22, 2010 Joint Ltr. at 7) In a November 29, 2010 Order – familiarity with which is presumed – this Court reserved decision concerning the production of these emails and directed "the Commission and Defendants to make submissions . . . addressing this issue in greater detail and citing supporting legal authority." (Nov. 29, 2010 Order at 17) The parties have provided additional briefing, and the issue is ripe for resolution.

**BACKGROUND**

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense," and that "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). "This obviously broad rule is liberally construed," Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357, 1367 (2d Cir. 1991) (citing Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)), and "[i]n general, limitations on discovery are imposed only where the requested discovery is 'sought in bad faith, to harass or oppress the party subject to it, when it is irrelevant, or when the examination is on matters protected by a recognized privilege.'" Melendez v. Greiner, 01 Civ. 07888 (SAS) (DF) 2003 U.S. Dist. LEXIS 19084, at *3-4 (S.D.N.Y. Oct. 23, 2003) (quoting In re Six Grand Jury Witnesses, 979 F.2d 939, 943 (2d Cir. 1992)).

The Commission contends that it is entitled to discovery of the Bent emails because (1) Bent II had no reasonable expectation of privacy in email transmitted over Reserve Management Company, Inc. ("RMCI") email system; and (2) Defendants inadvertently produced some of the Bent emails, and thereby waived the marital privilege as to all such emails. (Jan. 12, 2011 SEC Ltr. at 4)  Defendants contend that the Bent emails are protected by the marital communications privilege and that there has been no waiver. (Dec. 6, 2010 Def. Br.; Jan. 14, 2011 Def. Ltr. at 2-3)[1]

---

[1] In opposing the Commission's motion to compel, Defendants – while remarking at the close of one submission that the subject emails shed little light on the issues in this case (Jan. 14, 2011 Def. Ltr. 4 and 4 n.2) – have relied primarily on the argument that the emails are protected by the marital communications privilege. See, e.g., Dec. 6, 2010 Def. Supp. Br. at 2 ("Because Mr.

2

**I.      THE MARITAL COMMUNICATIONS PRIVILEGE**

The law recognizes two types of marital privilege. The first is referred to as the "adverse spousal testimony" privilege and permits an individual to refuse to testify adversely against his or her spouse. See Trammel v. United States, 445 U.S. 40, 53 (1980). "This privilege rests on the notion that a husband and wife should be able to trust each other completely, and that marriage is a sanctuary. The privilege is described as being 'broadly aimed at protecting marital harmony.'" United States v. Premises Known as 281 Syosset Woodbury Rd., Woodbury, N.Y., 71 F.3d 1067, 1070 (2d Cir. 1995) (quoting In re Grand Jury Subpoena United States, 755 F.2d 1022, 1027 (2d Cir. 1985), vacated on other grounds sub nom United States v. Koecher, 475 U.S. 133 (1986)).

The second type of marital privilege, referred to as the "marital communications privilege," protects private and confidential communications between spouses from disclosure. See Blau v. United States, 340 U.S. 332, 333 (1951); Premises Known as 281 Syosset Woodbury Rd., Woodbury, N.Y., 71 F.3d at 1070. It provides that "[c]ommunications between the spouses, privately made, are generally assumed to have been intended to be confidential, and hence they are privileged. . . ." Wolfle v. United States, 291 U.S. 7, 14 (1934). The marital communications privilege is at issue here.

There are three prerequisites for assertion of the marital communications privilege:

> (1) a valid marriage at the time of the communication, United States v. Lustig, 555 F.2d 737, 747-48 (9th Cir. 1977) (privilege claim denied in part because common law marriage of defendant is not recognized as valid under state law), cert. denied, 434 U.S. 926 (1978); (2) the privilege "applies only to utterances or expressions intended by one spouse to convey a message to the other," id. at 748;

---

Bent expected, both objectively and subjectively, that his private communications with his wife would remain confidential, they are protected by the marital privilege."))

and (3) the communication must have been made in confidence, which is presumed, Pereira v. United States, 347 U.S. 1, 6 (1954).

United States v. Premises Known as 281 Syosset Woodbury Rd., 862 F. Supp. 847, 853-54 (E.D.N.Y. 1994).

"The basis of the immunity given to communications between husband and wife is the protection of marital confidences, regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails. . . ." Wolfle, 291 U.S. at 14. "The confidential communications privilege . . . provides assurance that all private statements between spouses – aptly called the 'best solace of human existence,' – will be forever free from public exposure." In re Witness Before Grand Jury, 791 F.2d 234, 237 (2d Cir. 1986) (quoting Trammel, 445 U.S. at 51) (internal quotations omitted).

The marital communications privilege, however, like other evidentiary privileges, deprives "fact-finders of potentially useful information." United States v. Etkin, No. 07-CR-913 (KMK), 2008 WL 482281, at *2 (S.D.N.Y. Feb. 20, 2008) (citing In re Witness Before the Grand Jury, 791 F.2d at 237); see Trammel, 445 U.S. at 50-51 (1980) ("Testimonial exclusionary rules and privileges contravene the fundamental principle that 'the public . . . has a right to every man's evidence.'" (quoting United States v. Bryan, 339 U.S. 323, 331 (1950))); United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO, 119 F.3d 210, 214 (2d Cir. 1997) (an evidentiary privilege must be "strictly confined within the narrowest possible limits consistent with the logic of its principle" (internal quotations omitted)). "As such, [a privilege] must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the

normally predominant principle of utilizing all rational means for ascertaining truth.'" Trammel, 445 U.S. at 50 (citations omitted).

"'The party asserting an evidentiary privilege, such as the marital communications privilege, bears the burden of establishing all of the essential elements involved.'" United States v. Acker, 52 F.3d 509, 514-15 (4th Cir. 1995) (quoting United States v. White, 950 F.2d 426, 430 (7th Cir. 1991)); Mercator Corp. v. U.S. of Am. (In re Grand Jury Subpoenas Dated March 19, 2002 & August 2, 2002), 318 F.3d 379, 384 (2d Cir. 2003) ("It is, moreover, well established that the party invoking a privilege bears the burden of establishing its applicability to the case at hand." (citations omitted)); Morganroth & Morganroth v. DeLorean, 123 F.3d 374, 383 (6th Cir. 1997) ("As the trial judge correctly held, the person asserting the marital privilege has the burden of proving that a communication is a marital communication."); United States v. Mardis, No. 08-20021, 2011 WL 90314, at *9 (W.D. Tenn. Jan. 11, 2011) ("'[T]he person asserting the marital privilege has the burden of proving that a communication is a marital communication.'" (quoting Morganroth & Morganroth v. DeLorean, 123 F.3d 374, 383 (6th Cir. 1997)); see also Chevron Corp. v. Donziger, No. 11 Civ. 0691(LAK), 2011 WL 1747046, at *13 (S.D.N.Y. May 9, 2011) ("As the party asserting privilege, the [plaintiffs] had the burden of establishing it."); Seyler v. T-Systems N. Am., Inc., 2011 WL 196920, at *1 (S.D.N.Y. Jan. 21, 2011) ("The party claiming the [attorney-client] privilege bears the burden of establishing it." (citations omitted)).

Here, the parties do not dispute that there was a "valid marriage" and that the emails were "utterances or expressions intended by one spouse to convey a message to the other." See Premises Known as 281 Syosset Woodbury Rd., 862 F. Supp. at 854. Accordingly,

5

only the third prerequisite for assertion of the marital communication privilege is at issue: whether the Bent email communications "were made in confidence." Id.

## II.     RMCI'S EMAIL POLICY

In September 2008, Bent II was the Vice Chairman, President, and part-owner of RMCI. (Cmplt. ¶¶ 22, 19) The emails in question were exchanged by Bent II and his wife on September 15 and 16, 2008 – the crucial two-day period following Lehman Brothers' September 14, 2008 bankruptcy announcement, during which a run on the Reserve Primary Fund ensued, leading to the Fund's collapse and this litigation. The emails were transmitted by Bent II using an RMCI computer and were stored on RMCI's server. (Jan. 12, 2011 SEC Ltr. at 4; Dec. 6, 2010 Def. Supp. Br. at 2; Oct. 22, 2010 Joint Ltr., Ex. E) It is undisputed that in September 2008, RMCI had in place a written "Email Policy" and that Bent II was aware of that policy. (Oct. 22, 2010 Joint Ltr., Ex. E; Dec, 6, 2010 Def. Supp. Br. 11)

The stated purpose of RMCI's email policy is to "promot[e] the use of e-mail as an efficient communication tool" and "to prevent unauthorized or inadvertent disclosure of sensitive company information via a forwarded or redirected email." (Oct. 22, 2010 Joint Ltr., Ex. E) To that end, the policy states that "Employees must exercise extreme caution when forwarding any email from inside the Reserve to any other email account. The email address you are forwarding to must be valid and verified. . . . Sensitive information . . . will not be forwarded via any means, unless that email is critical to business and is encrypted. . . ." (Id.) The policy also states that "Employees may use only the e-mail system provided by Reserve to communicate with clients and the public. Use of outside Internet service providers or Websites providing e-mail accounts while on Reserve's premises is prohibited." (Id.)

RMCI's email policy makes clear that RMCI's email system should be used only for business purposes: "Employees should limit their use of the e-mail resources to official business. . . ." To the extent that personal messages nonetheless appear in an employee's inbox, the policy directs them to delete such communications: "Employees should also remove personal and transitory messages from personal inboxes on a regular basis. . . ." (Id.)

RMCI's email policy also warns employees that their email communications are saved and are subject to disclosure, whether those communications are directed to clients or to the public at large:

> Employees are reminded that client/public e-mail communications received by and sent from Reserve are automatically saved regardless of content. Since these communications, like written materials, may be subject to disclosure to regulatory agencies or the courts, you should carefully consider the content of any message you intend to transmit. . . .

(Id.)

The policy further states that while employee email will not be routinely monitored by RMCI, the company reserves the right to access employee email:

> The e-mail system administrator will not routinely monitor employee's e-mail and will take reasonable precautions to protect the privacy of e-mail. However, the company reserves the right to access an employee's e-mail for a legitimate business reason, such as the need to access information when an employee is absent for an extended period of time, to diagnose and resolve technical problems involving system hardware, software or communications, or to investigate possible misuse of e-mail when a reasonable suspicion of abuse exists or in conjunction with an approved investigation.

(Id.)

**DISCUSSION**

I.  **REASONABLE EXPECTATION OF PRIVACY IN
    EMAILS SENT OVER AN EMPLOYER'S EMAIL SYSTEM**

   A.  **Applicable Law**

Although communications between spouses are presumed to be confidential, see In re Witness Before Grand Jury, 791 F.2d at 239 (citing Blau v. United States, 340 U.S. at 333), "wherever a communication, because of its nature or the circumstances under which it was made, was obviously not intended to be confidential, it is not a privileged communication. And, when made in the presence of a third party, such communications are usually regarded as not privileged because not made in confidence." Wolfle, 291 U.S. at 14. "There can [be] no confidential communication where the spouses are on actual or constructive notice that their communications may be overheard, read, or otherwise monitored by third parties." Etkin, 2008 WL 482281, at *3 n.5 (citing United States v. Griffin, 440 F.3d 1138 (9th Cir. 2006); United States v. Madoch, 149 F.3d 596 (7th Cir. 1998); United States v. Harrelson, 754 F.2d 1153 (5th Cir. 1985)). "Each case should be given an individualized look to see if the party requesting the protection of . . . privilege was reasonable in [his] actions." Convertino v. U.S. Dep't of Justice, 674 F. Supp. 2d 97, 110 (D.D.C. 2009) (citing Curto v. Med. World Commc'ns, Inc., No. 03-CV-6327 (DRH)(MLO), 2006 WL 1318387, at *6 (E.D.N.Y. May 15, 2006)); see also O'Connor v. Ortega, 480 U.S. 709, 718 (1987) ("Given the great variety of work environments[,] . . . the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis.").

To determine whether Bent II had a reasonable expectation of privacy in the emails he sent to his wife over RMCI's server, the Court must consider whether he was on actual or constructive notice that these communications could be "read[] or otherwise monitored by

third parties." See In re Asia Global Crossing, Ltd., 322 B.R. 247, 258-59 (Bankr. S.D.N.Y. 2005) ("[T]he question of privilege comes down to whether the intent to communicate in confidence was objectively reasonable. . . . Accordingly, the objective reasonableness of that intent will depend on the company's e-mail policies regarding use and monitoring, its access to the e-mail system, and the notice provided to the employees.").

In In re Asia Global Crossing, Ltd., the court set forth a four-factor test – which has been widely adopted[2] – regarding the "reasonable expectation of privacy" determination in the context of email transmitted over and maintained on a company server:

> (1) does the corporation maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or e-mail, (3) do third parties have a right of access to the computer or e-mails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?

In re Asia Global Crossing, Ltd., 322 B.R. at 257.[3]

Because an employer's announced policies regarding the confidentiality and handling of email and other electronically stored information on company computers and servers

---

[2] See, e.g., In re Royce Homes, LP, No. 09-32467-H4-7, 2011 WL 873428, at *23 (Bankr. S.D. Tex. Mar. 11, 2011) ("This Court adopts the Asia Global four-factor balancing test to determine whether Speer waived any privilege he may have had in his personal e-mails transmitted via the Debtor's computer and e-mail servers."); United States v. Nagle, No. 1:09-CR-384, 2010 WL 3896200, at *4 (M.D. Pa. Sept. 30, 2010); Convertino v. U.S. Dep't of Justice, 674 F. Supp. 2d 97, 110 (D.D.C. 2009); United States v. Hatfield, No. 06-CR-0550 (JS), 2009 WL 3806300, at *14 (E.D.N.Y. Nov. 13, 2009); Leor Exploration & Prod. LLC v. Aguiar, No. 09-60136-CIV, 09-60683-CIV (JJO), 2009 WL 3097207, at *4 (S.D. Fla. Sept. 23, 2009); Brown-Criscuolo v. Wolfe, 601 F. Supp. 2d 441, 449 (D. Conn. 2009); Sprenger v. Rector & Bd. of Visitors of Va. Tech, No. 7:07cv502, 2008 WL 2465236, at *4 (W.D. Va. June 17, 2008); Geer v. Gilman Corp., No. 3:06 CV 889(JBA), 2007 WL 1423752, at *3 (D. Conn. Feb. 12, 2007); Curto v. Med. World Commc'ns, Inc., No. 03-CV-6327 (DRH)(MLO), 2006 WL 1318387, at *7 (E.D.N.Y. May 15, 2006); Gates v. Wheeler, No. A09-2355, 2010 WL 4721331, at *6 (Minn. Ct. App. Nov. 23, 2010); Scott v. Beth Israel Med. Ctr. Inc., 17 Misc.3d 934, 940 (N.Y. Sup. Ct. 2007).

[3] Here, the parties have analyzed the reasonable expectation of privacy issue under Asia Global Crossing's four-part test. (See Dec. 6, 2010 SEC Ltr. at 2-5; Dec. 6, 2010 Def. Supp. Br. 6-12)

are critically important in determining whether an employee has a reasonable expectation of privacy in such materials, the cases in this area tend to be highly fact-specific and the outcomes are largely determined by the particular policy language adopted by the employer.  See, e.g., Leventhal v. Knapek, 266 F.3d 64, 73-74 (2d Cir. 2001) (State agency employee found to have reasonable expectation of privacy in personal computer files stored on his work computer where agency (1) had no policy regarding the confidentiality of personal email or other electronically stored information maintained on agency computers; (2) "did not prohibit the mere storage of personal materials in [agency] computer[s]"; (3) did not have a "general practice of routinely conducting searches of office computers"; and (4) had not "placed [the employee] on notice that he should have no expectation of privacy in the contents of his office computer"); Muick v. Glenayre Elecs., 280 F.3d 741, 743 (7th Cir. 2002) ("[the employee] had no right of privacy in the computer that [the employer] had lent him for use in the workplace. . . . [Where an employer has] announced [a policy saying] that it could inspect the laptops that it furnished for the use of its employees, . . . this destroyed any reasonable expectation of privacy that [the employee] might have had and so scotches his claim."); Miller v. Blattner, 676 F. Supp. 2d 485, 497 (E.D. La. 2009) ("Where, as here, an employer has a rule prohibiting personal computer use and a published policy that emails on Allpax's computers were the property of Allpax, an employee cannot reasonably expect privacy in their prohibited communications."); Etkin, 2008 WL 482281, at *4 ("employees do not have a reasonable expectation of privacy in the contents of their work computers when their employers communicate to them via a flash-screen warning a policy under which the employer may monitor or inspect the computers at any time" (citations omitted)); Sims v. Lakeside School, No. C06-1412(RSM), 2007 WL 2745367, *1 (W.D. Wash. Sept. 20, 2007) ("where an employer indicates that it can inspect laptops that it furnished for use

10

of its employees, the employee does not have a reasonable expectation of privacy over the employer-furnished laptop" (citations omitted)); Thygeson v. U.S. Bancorp, No. CV-03-467-ST, 2004 WL 2066746, at *1 (D. Or. Sept. 15, 2004) ("[W]hen, as here, an employer accesses its own computer network and has an explicit policy banning personal use of office computers and permitting monitoring, an employee has no reasonable expectation of privacy."); Kelleher v. City of Reading, No. CIV.A.01-3386, 2002 WL 1067442, *8 (E.D. Pa. May 29, 2002) (because employer's email system was to be used solely for official city business, employee had no reasonable expectation of privacy in email sent over employer's email system).

### B. Application of Asia Global Crossing's Four-Part Test

#### 1. RMCI's Policy Regarding Personal Use

Under Asia Global Crossing's four-part test for determining whether an employee has a reasonable expectation of privacy in email stored on a company system, the first issue is whether "the corporation maintain[s] a policy banning personal or other objectionable use." See In re Asia Global Crossing, Ltd., 322 B.R. at 257. Here, RMCI's email policy clearly bans personal use of RMCI's email system:

> Employees should limit their use of the e-mail resources to official business . . . . Employees should . . . remove personal and transitory messages from personal inboxes on a regular basis. . . .

(Oct. 22, 2010 Joint Ltr., Ex. E (emphasis added))

Defendants' argument (Dec. 6, 2010 Def. Supp Br. at 8-9) that "should" – as used in RMCI's email policy – is precatory or aspirational is not persuasive. The dictionary tells us that "should" is "[u]sed to express duty or obligation." Webster's II New College Dictionary 1022 (2001); accord Webster's New Universal Unabridged Dictionary 1679 (2d ed. 1983) ("should" is "used to express . . . obligation, duty, propriety, necessity. . . ."); see also Bord v. Rubin, No. 97 Civ. 6401 (MBM), 1998 WL 420777, at *4 (S.D.N.Y. July 27, 1998)

11

("Grammatically speaking, 'should' is the past tense of 'shall' and therefore is defined as a verb meant 'to express duty or obligation.'" (citing Webster's II New Riverside University Dictionary 1078 (1984))); cf. United States v. Anderson, 798 F.2d 919, 924 (7th Cir. 1986) ("The common interpretation of the word 'should' is 'shall' and thus a straight-forward construction of [the code of ethics] reveals that it imposes a mandatory rule of conduct upon a judge.").

While "should" "has various shades of meaning" and "does not automatically denote . . . a mandatory . . . direction," and while "the meaning depends on the context in which the words are found," Bord, 1998 WL 420777, at *4 (citing McDonnell Douglas Corp. v. Islamic Republic of Iran, 758 F.2d 341, 347 (8th Cir. 1985) (noting that "[the] verb 'should' has various shades of meaning")), there is nothing in RMCI's email policy suggesting that "should" was intended to be precatory or aspirational.

Defendants' contention that the policy's direction that employees "remove personal . . . messages from personal inboxes on a regular basis" (Oct. 22, 2010 Joint Ltr., Ex. E) somehow authorizes employees – in contravention of the policy's preceding sentence – to use the RMCI system for personal emails (Dec. 6, 2010 Def. Supp. Br. at 8) is not convincing. While this provision acknowledges the possibility that employees may receive personal email from outsiders over RMCI's system, it does not undermine the mandatory nature of the preceding sentence. Indeed, it reaffirms the prohibition on personal use by instructing employees to regularly delete any personal messages they receive from their inboxes.

Defendants argue, however, that RMCI tacitly allowed employees "to send personal emails [over RMCI's system] and did not intervene,"[4] and that courts have considered

---

[4] Defendants have attempted to demonstrate RMCI's implementation of its email policy through the declaration of Asim Tewary, who formerly worked in RMCI's IT department. The Tewary declaration is of limited probative value, however, because Tewary did not begin work at RMCI

12

not only an employer's written policy but "how an employer applies or enforces its email policy."  (Dec. 6, 2010 Def. Supp. Br. at 9)  Defendants rely on <u>DeGeer v. Gillis</u>, No. 09 C 6974, 2010 WL 3732132 (N.D. Ill. Sept. 17, 2010), <u>Curto v. Med. World Commc'ns, Inc.</u>, No. 03-CV-6327 (DRH)(MLO), 2006 WL 1318387 (E.D.N.Y. May 15, 2006), and <u>United States v. Long</u>, 64 M.J. 57 (C.A.A.F. 2006), for the proposition that how an employer "applies" or "enforces" its email policy is a factor in determining whether an employee has a reasonable expectation of privacy in email transmitted over a company system.  None of these cases suggests that RMCI's clear prohibition against personal use of its email system should be ignored.

<u>DeGeer v. Gillis</u>, No. 09 C 6974, 2010 WL 3732132 (N.D. Ill. Sept. 17, 2010) provides no support for Defendants' arguments.  In that case, the court considered whether plaintiff "waived the attorney-client privilege by communicating with his counsel over his work email address and on his [company-]supplied laptop."  Noting that "the record does not contain [the company's] computer usage policy" and that the court could not "determine whether [the company] prohibited employees from using their company computers to conduct personal legal matters," and stating that "[t]here is no evidence with respect to whether DeGeer personally knew about a [company] computer usage policy," the court found no waiver.  <u>Id.</u>  Here, of course, there is evidence both that RMCI prohibited personal use and that Bent II was aware of this policy.

In <u>Curto v. Med. World Commc'ns, Inc.</u>, No. 03-CV-6327 (DRH)(MLO), 2006 WL 1318387 (E.D.N.Y. May 15, 2006), plaintiff's employer's email policy provided that "[e]mployees should not have an expectation of privacy in anything they create, store, send, or receive on the computer system.  The computer system belongs to the company and may be used

---

until September 10, 2008 – three business days before the Lehman Brothers' bankruptcy and the the collapse of the Primary Fund.  (Tewary Decl., ¶ 1, Dkt. No. 352)

only for business purposes." Plaintiff – who worked at home – was issued laptop computers by her employer. The "laptops were not connected to [the company's] computer server and were not located in [the company's] offices. Id. at *5. Plaintiff's employment was terminated, and before returning both laptops, plaintiff deleted all personal files, including communications to counsel. Id. at *1. After she filed a lawsuit against her employer, the company did a forensic analysis of the laptops, and recovered emails between plaintiff and her counsel that had been sent by plaintiff "through her personal AOL account[,] which did not go through [her employer's] servers." Id. at *3. The court held that the attorney-client privilege had not been waived as to these communications. Id. at *1.

Curto likewise provides little guidance here. That case turns on the question of whether plaintiff's inadvertent disclosure of attorney-client communications resulted in a waiver. Id. at *2-3. In finding that the privilege had not been waived, the court ruled that plaintiff – in deleting her personal files from the laptops – had taken reasonable steps to ensure the confidentiality of her attorney-client communications. Id. at *3, 5. Given that the laptops issued to plaintiff were not connected to her employer's computer system, it was not even clear in Curto that the employer's email policy applied. Finally, the Curto court was careful to say that its "holding is limited to the question of whether an employee's personal use of a company-owned computer in her home waives any applicable attorney-client privilege or work product immunity that may attach to the employee's computer files and/or e-mails. It does not purport to address an employee's right to privacy in an office computer in general." Id. at *8 (emphasis added). Here, there is no question that RMCI's email policy applies and no dispute that Bent II sent the emails in question over his work email account and over RMCI's email system.

The Curto court did not address the cases holding that an employee has no expectation of privacy in workplace computer files where the employer explicitly informs the employee that no expectation of privacy exists, finding that all of these cases arose under the Fourth Amendment or common law, and not in the context of determining waiver of the attorney-client privilege.  Id. at *5.  To the extent that Curto suggests that the reasonable expectation of privacy cases are not relevant to a determination of whether the prerequisites for assertion of an evidentiary privilege exist, the case will not be followed here

Finally, Defendants cite to United States v. Long, 64 M.J. 57 (C.A.A.F. 2006), a case from the U.S. Court of Appeals for the Armed Forces that is likewise not on point.  The defendant in Long sought to suppress inculpatory emails she sent over the military's email servers.  Her emails were retrieved by a network administrator at the request of law enforcement officers searching for evidence of Long's misconduct.  Id. at 59.  In concluding that defendant had a reasonable expectation of privacy concerning her emails, the court relied on the fact that the defendant "was authorized to use the government computer for personal use."  Id. at 65; see also id. at 64 (noting that network administrator testified that "using the network to send personal e-mails . . . was considered authorized [use]").  Here, of course, RMCI's policy explicitly states that "[e]mployees should limit their use of [RMCI's] e-mail resources to official business. . . ."  (Oct. 22, 2010 Joint Ltr., Ex. E)

In sum, because RMCI's email policy bans personal use of the RMCI email system, this factor weighs in favor of finding that Bent II had no reasonable expectation of privacy in the emails he sent to his wife over that system on September 15 and 16, 2008.  Where an employer's policy bans personal use of the employer's email system, courts frequently find that employees have no reasonable expectation of privacy in email transmitted over that system.

15

See, e.g., Miller, 676 F. Supp. 2d at 497 ("[where] an employer has a rule prohibiting personal computer use . . . employee[s] cannot reasonably expect privacy in their prohibited communications"); Long v. Marubeni America Corp., No. 05 Civ. 639 (GEL)(KNF), 2006 WL 2998671, at *1, 3 (S.D.N.Y. Oct. 19, 2006) (no attorney-client privilege or work product protection for emails exchanged over employer's email system where employer's policy prohibited personal use of email system); Thygeson v. U.S. Bancorp, No. CV-03-467-ST, 2004 WL 2066746, at *1 (D. Or. Sept. 15, 2004) (where employee handbook states that "personal computers . . . including e-mail . . . are intended for Company business only. . . . [and] e-mail is the exclusive property of [the Company] and is not intended for personal use," no reasonable expectation of privacy in email sent over employer's email system); Kelleher v. City of Reading, 2002 WL 1067442, *8 (E.D. Pa. 2002) (because employer's email system was to be used solely for official city business, employee had no reasonable expectation of privacy in email sent over employer's email system); Scott v. Beth Israel Med. Ctr. Inc., 17 Misc.3d 934, 940 (N.Y. Sup. Ct. 2007) (email sent over employer's email system not subject to attorney-client privilege where employer's policy states that email system "should be used for business purposes only").

### 2. Routine Monitoring of Employee Email

The second Asia Global Crossing factor is whether the employer monitors employee email. RMCI's email policy provides that the company will not "routinely monitor employee's e-mail and will take reasonable precautions to protect the privacy of e-mail." However, in its policy, RMCI "reserves the right to access an employee's e-mail for a legitimate business reason . . . or in conjunction with an approved investigation." (Oct. 22, 2010 Joint Ltr., Ex. E)

Where an employer reserves the right to access or inspect an employee's email or work computer, courts often find that the employee has no reasonable expectation of privacy. See Scott, 17 Misc.3d at 940 (Finding that "[t]he second [Global Crossing] requirement [was] satisfied because [the company's] policy allows for monitoring. Although [the company] acknowledge[d] that it did not monitor [the employee's] e-mail, it retain[ed] the right to do so in the e-mail policy," which notified employees that the employer "reserves the right to access and disclose [information on its computers] at any time without prior notice."); see also Muick v. Glenayre Elecs., 280 F.3d 741, 743 (7th Cir. 2002) ("[the employer] had announced that it could inspect the laptops that it furnished for the use of its employees, and this destroyed any reasonable expectation of privacy that [the employee] might have had and so scotches his claim"); United States v. Angevine, 281 F.3d 1130, 1135 (10th Cir. 2002) (no reasonable expectation of privacy where employer "reserve[d] the right to inspect electronic mail usage by any person at any time without prior notice"); Thygeson, 2004 WL 2066746, at *20 (no reasonable expectation of privacy in computer files and email where employer had reserved right to monitor computer files and email); Garrity v. John Hancock Mutual Life Ins. Co., No. Civ. A. 00–12143, 2002 WL 974676, at *1-2 (D. Mass. May 7, 2002) (no reasonable expectation of privacy where employer email policy states that "[i]t is not company policy to intentionally inspect E-mail usage" but warns that "there may be business or legal situations that necessitate company review of E-mail messages and other documents" and "management reserves the right to access all E-mail files").

Because RMCI expressly reserved the right to access and monitor its employees' emails, the second Asia Global Crossing factor weighs against finding a reasonable expectation of privacy.

### 3. Third Parties' Right of Access to Emails

The third Asia Global Crossing factor requires courts to consider whether, under the employer's email policy, third parties have a right of access to the employee's emails. Here, RMCI's policy explicitly warns employees that their email communications will be automatically saved and are subject to review by RMCI and disclosure to third parties:

> Employees are reminded that client/public e-mail communications received by and sent from Reserve are automatically saved regardless of content. Since these communications, like written materials, may be subject to disclosure to regulatory agencies or the courts, you should carefully consider the content of any message you intend to transmit. . . .

(Oct. 22, 2010 Joint Ltr., Ex. E (emphasis added))[5]

This provision provides clear notice to RMCI employees that their communications over RMCI's email system may be disclosed to regulators and to the courts. In the heavily regulated industry in which RMCI operates – in which companies are required by law to preserve email communications for later use by regulators or other interested parties – it is not reasonable for those using a company's email system to believe that their emails sent over that system are private. See Garrity, 2002 WL 974676, at *1-2; Angevine, 281 F.3d at 1135.

### 4. Notice to Employees of Employer's Email Policy

There is no issue here as to the final Asia Global Crossing factor: whether the employee was aware of the employer's email policy. Here, Defendants concede that "Mr. Bent was aware of the company's e-mail policy." (Dec. 6, 2010 Def. Supp. Br. at 11)

---

[5] RMCI's policy of automatically saving all email communications reflects its obligation under Rule 204-2(a)(7) of the Investment Advisers Act, 17 C.F.R. § 275.204-2(a)(7), to retain "written communications" relating to "(i) any recommendation made or proposed to be made and any advice given or proposed to be given, (ii) any receipt, disbursement or delivery of funds or securities, or (iii) the placing or execution of any order to purchase or sell any security." RMCI's policy indicates that it did not segregate emails for preservation under this rule, but instead chose to preserve all email sent over its system.

\*     \*     \*     \*

Application of the four <u>Asia Global Crossing</u> factors here indicates that Bent II did not have a reasonable expectation of privacy in emails he sent or received over RMCI's email system: RMCI banned personal use of its email system; RMCI reserved its right to access employee email; RMCI warned employees that email sent over RMCI's system might be subject to disclosure to regulators and the courts; and Bent II was aware of RMCI's email policy.

Because Bent II had no reasonable expectation of privacy in emails he sent over RMCI's system, they were not sent "in confidence" and are not protected by the marital communications privilege.[6] <u>United States v. Premises Known as 281 Syosset Woodbury Rd.</u>, 862 F. Supp. at 853 (citing <u>Pereira v. United States</u>, 347 U.S. at 6).

---

[6] Bent II's spouse, Rebecca Bent, has made a submission objecting to disclosure of the subject emails. (Jan. 14, 2011 Rebecca Bent Ltr. at 2) Citing <u>Beller v. United States</u>, 221 F.R.D. 679, 688 (D.N.M. 2003) and <u>Premises Known as 281 Syosset Woodbury Rd.</u>, 862 F. Supp. at 853, Mrs. Bent contends that either spouse may "block the testimony of the other regarding confidential marital communications," and notes that she has not waived any of her rights concerning the emails. (Jan. 14, 2011 Rebecca Bent Ltr. at 2 (citations and internal quotations removed); Jan. 13, 2011 Rebecca Bent Decl., ¶ 1) Mrs. Bent's arguments misapprehend the nature of this Court's inquiry.

The motion before the Court does not involve testimony from one spouse concerning a confidential marital communication with the other. Moreover, the issue is not whether Bent II can waive marital privilege on behalf of his spouse. Instead, the issue is whether the emails exchanged by Bent II and Mrs. Bent were ever – in the eyes of the law – confidential. As noted above, for a party to assert the marital communications privilege, "the communication must have been made in confidence." <u>Premises Known as 281 Syosset Woodbury Rd.</u>, 862 F. Supp. at 853-54 (citing <u>Pereira</u>, 347 U.S. at 6). For the reasons stated above, given RMCI's email policy, personal email sent over that system is not confidential and cannot be said to have been sent "in confidence." Accordingly, the emails are not subject to the marital communications privilege, whether that privilege is asserted by the husband or the wife.

## CONCLUSION

For the reasons stated above, the Commission's request for an order compelling Defendants to produce emails exchanged between Bent II and his wife on September 15 and 16, 2008 is GRANTED.

Dated: New York, New York
       May 23, 2011

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge