| | USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #: _____<br>DATE FILED: 10/8/12 |
|---|---|
| UNITED STATES DISTRICT COURT FOR THE<br>SOUTHERN DISTRICT OF NEW YORK | |
| In re THE RESERVE FUND SECURITIES AND DERIVATIVE LITIGATION | 09 MD. 2011 (PGG) |
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>RESERVE MANAGEMENT COMPANY, INC., RESRV PARTNERS, INC., BRUCE BENT SR., and BRUCE BENT II,<br><br>Defendants,<br><br>and<br><br>THE RESERVE PRIMARY FUND,<br><br>Relief Defendant. | **ECF CASE**<br><br>**ORDER**<br><br>09 Civ. 4346 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

       In its motion in limine No. 1, the Commission seeks an order permitting it to introduce Defendants' communications with certain Primary Fund investors who did not purchase additional Fund shares on September 15 and 16, 2008. (SEC MIL No. 1 Br. 1; Dkt. No. 465) At issue is testimony from three Fund investors – Eduardo Lalo Torres, Anthony Alvino, and Steve Haussler – as well as recorded telephone calls and emails between Resrv Partners personnel and Fund investors or prospective Fund investors on September 15 and 16, 2008.[1] (SEC MIL No. 1 Br. at 1 n. 2)

---

[1] While the Commission has provided discs containing approximately sixty tape-recorded calls with non-purchaser Fund investors, it has not provided transcripts. See SEC MIL No. 1 Br., Appx. A. Accordingly, this Order is designed to provide guidance as to the standards under which communications with non-purchaser Fund investors will be admitted. It does not resolve

The Commission argues that Defendants' communications with these investors on September 15 and 16, 2008 are relevant to its Section 17(a) and Section 10(b) fraud claims, because the statements were made to investors in connection with the offer, sale or purchase of a security. The Commission offers these communications to show "(1) that statements were made to investors, (2) what those statements were, (3) how investors (and Reserve salespeople) interpreted those statements, and (4) that investors (and Reserve salespeople) attached importance to the statements." (SEC MIL No. 1 Br. at 1) The Commission argues, in particular, that this evidence is relevant to the issue of materiality.

Defendants argue that statements made to investors who merely held onto their Fund shares on September 15 and 16, 2008 – but did not purchase additional shares – cannot serve as the basis for a claim under either Section 17(a), or Section 10(b) and Rule 10b-5, and that introduction of this evidence will only confuse the jury. (Def. MIL No. 1 Opp. Br. at 1-2)

As to its Investment Advisers Act claims, the Commission argues that the communications at issue – which were made by Resrv Partners ("Partners") personnel – are relevant because they were made at the direction of RMCI and the Bents. Defendants argue that any statements made by Partners personnel are irrelevant to the Advisers Act claims because Partners is not an investment adviser within the meaning of the Act.

I.  **ADMISSIBILITY OF STATEMENTS TO NON-PURCHASERS IN CONNECTION WITH SECTION 17(a) AND SECTION 10(b) CLAIMS**

Defendants argue that statements to non-purchasers are irrelevant to (1) the SEC's Section 17(a) claims – because they were not made "in the offer or sale of any securities," 15

---

the admissibility of any specific call listed in Appendix A to the Commission's brief. This Order likewise does not resolve the admissibility of testimony from Torres, Alvino, or Haussler. The precise contours of the testimony the SEC proposes to elicit from these witnesses is not clear from the Commission's submissions.

U.S.C. § 77q(a); and (2) the Commission's Section 10(b) and Rule 10b-5 claims, because they were not made "in connection with the purchase and sale of any security." 15 U.S.C. § 78j(b). "The elements of a claim under Section 17(a)(1) are 'essentially the same' as the elements of a claim under Section 10(b) and Rule 10b-5." SEC v. Kelly, 765 F. Supp. 2d 301, 319 (S.D.N.Y. 2011) (quoting SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999)).

In resolving the question of whether statements to non-purchasers are relevant under the circumstances here, the Court's analysis has been informed by the following:

(1) The Fund had an effective registration statement in place (PX 261) and thus there was an ongoing offer of Fund shares. It is also undisputed that at least 62 individual, non-automated purchases of Primary Fund shares took place on September 15 and 16, 2008, totaling more than $1.5 billion in Fund shares. (DX 387-1, at 24).

(2) There is evidence from which a jury could find that the statements Defendants were disseminating through Partners – which functioned as RMCI's sales force – were designed not only to convince investors to hold their Fund shares, but also to convince investors to buy additional Fund shares. See, e.g., PX 112 (Bent II September 15, 2008 email to managers of sales force)("try and get the institutional folks back in").

(3) There is evidence that Defendants were widely disseminating to the public statements that the Commission asserts were false and misleading, including certain statements in the September 15, 2008 Reserve Insights marketing piece. (PX 49) The Insights press release states that "[t]he Reserve is committed to a $1.00 NAV for its Primary Fund" and that "Reserve Management Company, Inc. (RMCI) intends to enter into support agreements with the Primary Fund to support the value of Lehman credit held in the Fund. . . . We have discussed with the SEC that our intent is to mitigate any decline in value of the Lehman debt so that it will not result in a decrease to the NAV of the Fund. . . . [O]ur support agreements ensure the integrity of a $1.00 NAV." (Id.) The Commission asserts that these and other statements in Insights were false and were disseminated both in writing and verbally by Partners, RMCI's sales force.

Finally, as discussed below, Defendants' argument that non-purchasers are not permitted to testify as to the materiality of alleged false or misleading statements is not supported by the case law, in which courts have repeatedly permitted non-purchasers – particularly stock analysts – to testify concerning this issue.

A. **Section 17(a) Liability**

The Commission asserts that statements made to Primary Fund investors who did not purchase or sell shares on September 15 and 16, 2008 are relevant to its claim under Section 17(a)(1) of the Securities Act, because they were made "in the offer or sale" of a security.

Section 17(a)(1) provides that it is "unlawful for any person in the offer or sale of any securities . . . to employ any device, scheme, or artifice to defraud." 15 U.S.C. § 77q(a)(1); SEC v. Kelly, 817 F.Supp.2d 340, 345 (S.D.N.Y. 2011). "'Section 17(a) of the Securities Act is a general prohibition against fraud in the offer or sale of securities, using the mails or the instruments of interstate commerce.'" SEC v. Tzolov, No. 08 Civ. 7699(SAS), 2011 WL 308274, at *2 (S.D.N.Y., Jan. 26, 2011) (quoting SEC v. McCaskey, No. 98 Civ. 6153, 2001 WL 1029053, at *4 (S.D.N.Y. Sept. 6, 2001)).

Because Section 17(a) applies to "offer[s] or sale[s,]" 15 U.S.C. § 77q(a), "actual sales [are] not essential" for a Section 17(a) claim. SEC. v. Goldman Sachs & Co., 790 F.Supp.2d 147, 164 (S.D.N.Y. 2011) (citing SEC v. Am. Commodity Exch., Inc., 546 F.2d 1361, 1366 (10th Cir. 1976)); see also SEC v. Tambone, 550 F.3d 106, 122 (1st Cir. 2008) (noting that "because section 17(a) applies to both sales and offers to sell securities, the SEC need not base its claim of liability on any completed transaction at all"). The Securities Act defines "offers" to include "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." 15 U.S.C. § 77b(a)(3); SEC v. Cavanagh, 1 F.Supp.2d 337, 368 (S.D.N.Y. 1998). Section 17(a) establishes broad anti-fraud prohibitions that are not limited to actual sellers of securities and can apply to persons "who neither passed title nor solicited offers on behalf of securities issuers or sellers." SEC. v. Badian, 06 Civ. 2621(LTS) (DFE), 2008 WL 3914872, *6 (S.D.N.Y. Aug. 22, 2008).

4

The breadth of Section 17(a) is apparent from the Supreme Court's decision in United States v. Naftalin, 441 U.S. 768 (1979). In that case, the Court stated that Section 17(a) is "intended to cover any fraudulent scheme in an offer or sale of securities, whether in the course of an initial distribution or in the course of ordinary market trading." Id. at 778. The Court found that the statutory phrase, "in the offer or sale of any securities," was intended to be "define[d] broadly" and is "expansive enough to encompass the entire selling process, including the seller/agent transaction." Id. at 773.

Indeed, in Naftalin, the defendant was convicted of fraud under Section 17(a) in connection with fraudulent short sales placed with brokers. Defendant's conduct caused injury to the brokers but not to investors directly. The Supreme Court held that the fraud need not have been perpetrated on an actual or potential investor to constitute a violation of Section 17(a)(1), however. Id.; see also SEC. v. Czarnik, No. 10 Civ. 745(PKC), 2010 WL 4860678, at *4 (S.D.N.Y. Nov. 29, 2010) (finding that lawyer's misrepresentations, "contained in documents disseminated only to the Issuers' transfer agents and [which] were not made directly available to the investing public," were nonetheless actionable under Section 17(a) and Rule 10b-5). In sum, in Naftalin, liability was imposed under Section 17(a) even though defendant's fraudulent conduct never reached investors.

Defendants argue, however, that the communications at issue here – which were concededly made to Fund investors – were intended to induce those investors to hold the Primary Fund shares they already owned, and were not designed to convince them to purchase additional Primary Fund shares. Accordingly, Defendants argue, the statements were not made "in the offer or sale" of securities, and therefore are not relevant to the Commission's Section 17(a) claim.

5

While it is doubtless true that not every communication between a fund's sales force and an existing investor – made while a registration statement is in effect – constitutes a statement made "in the offer or sale" of securities, to the extent that the evidence at issue in the Commission's motion in limine No. 1 involves statements by Defendants of the same nature as those set forth in the Reserve Insights marketing piece discussed above, the statutory language "in the offer or sale" of securities is broad enough to include such statements.  A reasonable jury could understand those statements to convey that RMCI was "committed to a $1.00 NAV for its Primary Fund," that RMIC intended to "enter into a support agreement" to preserve the $1.00 NAV, and that accordingly the Lehman bankruptcy would have no substantive effect on the Primary Fund.  A reasonable jury could also find that these representations were made to influence investors.  Finally, such statements can fairly be viewed as both urging a Primary Fund investor to hold onto Fund shares already owned, and to purchase more.  And, of course, Primary Fund shares were available for sale; indeed, $1.5 billion of Fund shares were purchased on September 15 and 16, 2008.

Accordingly, the fact that the statements that are the subject of motion in limine No. 1 were made to Fund investors who did not purchase additional shares does not mean that these statements are not actionable under Section 17(a).  Statements of the sort set forth in the Insights piece are actionable under Section 17(a).  To the extent that the statements that are the subject of the Commission's motion differ from the statements made in the Insights piece, admissibility will be determined at trial.[2]

---

[2] Defendants' reliance on Schwartz v. Duckett, No. 88 CIV. 5395 (MBM), 1989 WL 16054, at *2 (S.D.N.Y. Feb. 21, 1989) is misplaced.  That case was brought by a private plaintiff who purchased three units in a limited partnership that was formed to acquire and develop three shopping centers in Georgia.  Id. at *1.  The court found that the alleged omission was not actionable under Section 17(a) because that "omission occurred months after the initial and

6

B.     **Section 10(b) and Rule 10b-5 Liability**

The parties' arguments under Section 10(b) and Rule 10b-5 largely mirror those made under Section 17(a). The Commission argues that the statements at issue were made "in connection with" the purchase or sale of a security. Defendants contend that these statements are irrelevant to the Commission's Section 10(b) and Rule 10b-5 claims because they were made to investors who did not make a purchase, and therefore cannot be said to have been made "in connection with" the purchase or sale of a security.

Section 10(b) creates civil liability for those who "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated by the SEC under the authority of Section 10(b), imposes liability on those who "employ any device, scheme, or artifice to defraud"; "make any untrue statement of a material fact or [ ] omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"; or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. To establish liability under Section 10(b) of the Exchange Act, the Commission must show that "in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device." Van Cook v. SEC., 653 F.3d 130, 138 (2d Cir. 2011) (citing SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996)).

---

revised offering of South Georgia partnership interests." Id. at *2. Therefore, in Duckett – unlike here – there was no ongoing offer of securities.

1.       **"In Connection With" Requirement**

The Supreme Court has espoused a broad definition of the "in connection with" requirement, holding that "it is enough that the fraud alleged 'coincide' with a securities transaction – whether by the plaintiff or by someone else." Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 85 (2006) (citing United States v. O'Hagan, 521 U.S. 642, 651 (1997)). "The requisite showing, in other words, is 'deception "in connection with the purchase or sale of any security," not deception of an identifiable purchaser or seller.'" Id. (quoting O'Hagan, 521 U.S. at 658). The Supreme Court has explained that in enforcement actions brought by the Commission, the "in connection with" requirement "should be 'construed "not technically and restrictively, but flexibly to effectuate its remedial purposes."'" SEC v. Zandford, 535 U.S. 813, 819 (2002) (quoting Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 151 (1972) (quoting SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195 (1963))); see also id. ("In its role enforcing the Act, the SEC has consistently adopted a broad reading of the phrase 'in connection with the purchase or sale of any security.'").

In Zandford, the Court found that a broker's fraudulent scheme, in which he sold securities in a client's account and used the proceeds for himself, coincided with the sale of securities and therefore satisfied the "in connection with" requirement of Section 10(b). Id. at 825. The requirement in Section 10(b) that the fraudulent conduct be "in connection with" the purchase or sale of any security has thus been liberally construed. See, e.g., id. at 819-20. It has routinely been held to include prospectus information that is pertinent to a security and "related to its value and investment characteristics." SEC v. Escala Group, Inc., No. 09 Civ. 2646(DLC), 2009 WL 2365548, at *12 (S.D.N.Y. 2009).

It is likewise clear, however, that under Section 10(b) "the requirement of fraud in connection with the purchase or sale of a security is not satisfied by an allegation that plaintiffs were induced fraudulently not to sell their securities." Abrahamson v. Fleschner, 568 F.2d 862, 868 (2d Cir. 1977); see also SEC v. Northshore Asset Mgmt., No. 05 Civ. 2192(WHP), 2008 WL 1968299, at *8 (S.D.N.Y. May 5, 2008) (same).

While a private plaintiff bringing a Rule 10b-5 action must be a buyer or seller in order to have standing[3], in an action brought by the SEC, the nexus between the fraud and a purchase or sale may be satisfied so long as "someone buy[s] or sell[s] the security during the period of allegedly fraudulent conduct." 8 Louis Loss & Joel Seligman, Securities Regulation 3721 (3d ed. 2004) (emphasis omitted). Because the parties agree that purchases were made on September 15 and 16 – at least 62 of which were not automated – there is no question that the Commission has standing to bring this action. Defendants argue, however, that statements "made to existing investors who [did] not thereafter purchase additional securities" – as opposed to statements made in publicly filed documents that are widely available – cannot provide a basis for liability under Section 10(b) and Rule 10b-5. (Def. MIL 1 Opp. Br. at 13)

In support of this argument, Defendants rely on SEC v. Mannion, 789 F. Supp. 2d 1321, 1332 (N.D. Ga. 2011) (Def. MIL 1 Opp. Br. at 13), a Rule 10b-5 case in which the court considered statements made to an investor who made a purchase, but refused to consider statements made to non-purchasers. In Mannion, defendants were principals and co-owners of PEF Advisors, which was the general partner of, and investment adviser to, a "feeder" hedge

---

[3] "'It is axiomatic that in order to have standing, a 10b-5 plaintiff in a private damages action must have been either a purchaser or seller of the securities that form the basis of the [ ] deceptive conduct.'" Scottrade, Inc. v. BroCo Investments, Inc., 774 F. Supp. 2d 573, 577 (S.D.N.Y. 2011) (quoting In re Van der Moolen Holding N.V. Sec. Litig., 405 F. Supp. 2d 388, 404 (S.D.N.Y. 2005)).

9

fund. Mannion, 789 F. Supp. 2d at 1325. The Commission's claims were based on alleged misrepresentations in a letter defendants sent to fund investors about the value of the fund's investment in World Health Alternatives Inc., along with misleading monthly NAV statements provided to fund investors and potential new investors. Id. at 1326-28.

Defendants sent the letter after "revelations of financial irregularities at [World Health]." Id. at 1326. Similar to the allegations here, the Commission alleged in Mannion that defendants feared that "reporting the Fund's substantial losses on its World Health investments would cause investors to withdraw their investment in the Fund." Id. According to the SEC, the defendants thus decided to misrepresent – in their letter to investors – the value of the fund's investment in World Health, and not to disclose that (1) World Health had defaulted on a $6 million loan from the fund; and (2) defendants had sold their personal holdings in World Health. Id. at 1327. The monthly NAV statements likewise did not take account of the fund's losses in its World Health investment. Id. at 1328. After receiving the fraudulent NAV statements, one new investor made a $3 million investment in the fund. Id.

The Commission argued that "the 'in connection with' requirement [was] satisfied by showing that Defendants made 'assertions . . . in a manner reasonably calculated to influence the investing public.'" Id. at 1331 (citing SEC v. Huff, 758 F. Supp. 2d 1288, 1353 (S.D. Fla. 2010)). "Under this theory, the alleged misrepresentation need only be a 'public dissemination in a document . . . on which an investor would presumably rely,' in which case the SEC only needs to prove the means of dissemination and the materiality of the alleged misrepresentation." Id. (citing Huff, 758 F. Supp. 2d at 1353 (quoting SEC v. Rana Research, Inc., 8 F.3d 1358, 1362 (9th Cir.1993))).

The court rejected this argument:

10

> The rule urged by the SEC – that showing that alleged misrepresentations were reasonably calculated to influence the investing public satisfies the "in connection with" requirement – does not apply in this case. The Complaint does not allege that the [letter sent to investors and the fraudulent NAV statements] were publicly disseminated or that there was a public market for limited partnership stakes in the Fund. Nor is this a case where substantial trading activity occurred during the alleged misrepresentations, which might support the reasonable inference that the misrepresentations affected the purchase or sale of interests in the Fund. In this case, according to the Complaint, there was only one transaction.

Id. at 1332. The court therefore found that the nexus was met only as to the one purchaser who had made an investment in the fund after receiving the fraudulent NAV statements. Id.

Mannion is easily distinguished on its facts. Here, the SEC has alleged that the statements made to non-purchaser Fund investors were essentially the same statements being publicly disseminated. Moreover, there was a "public market for [Primary Fund shares]," and "substantial trading activity occurred during the alleged misrepresentations." Id. Given these critical differences, Mannion does not counsel that the statements made to non-purchaser Fund investors here are non-actionable under Rule 10b-5. Such a ruling would also be inconsistent with the flexibility of the "in connection with" requirement. See, e.g., Zandford, 535 U.S. at 819 (the in connection with requirement "should be 'construed "not technically and restrictively, but flexibly to effectuate its remedial purposes."'") (citations omitted).

### 2. Materiality

Even if statements to non-purchasers were not regarded as satisfying the "in connection with" requirement, it would be appropriate to permit non-purchaser Fund investors to testify as to the materiality of statements that mirror those in the Insights marketing piece.

Defendants have cited no law for the proposition that the materiality of a statement for purposes of Rule 10b-5 may only be addressed by someone who has made a purchase based on that statement. To the contrary, courts routinely permit non-purchasers to

11

testify as to materiality. See, e.g., United States v. Ferguson, 676 F.3d 260, 274 n.10 (2d Cir. 2012) ("Two stock analysts and an AIG investor-relations manager testified about the importance of loss reserve information to investors and analysts."); United States v. Hatfield, 724 F. Supp. 2d 321, 325-26 (E.D.N.Y. 2010) (analyst testified that "he would have considered it important to know that [Defendant] set TAP's prices, because this presented a 'conflict' that might impact whether shareholders 'are getting the best decisions – the best decision making possible from management.'")  Given that "[t]he question of materiality . . . is an objective one," TSC Indus., Inc. v. Northway, 426 U.S. 438, 445 (1976); see also Basic v. Levinson, 485 U.S. 224, 231-232 (1988) (holding misrepresentation or omission is material when a reasonable investor would have considered it significant in making investment decisions), Defendants have provided no basis on which to preclude non-purchaser investors from testifying as to materiality.[4]

Statements to non-purchaser Fund investors of the sort set forth in the Insights piece are actionable under Section 10(b) and Rule 10b-5. To the extent that the statements that are the subject of the Commission's motion differ from the statements made in the Insights piece, admissibility will have to be determined at trial.

II.  RESRV PARTNERS' STATEMENTS TO INVESTORS ARE
     ATTRIBUTABLE TO RMCI AND THE BENTS FOR PURPOSES
     OF THE COMMISSION'S INVESTMENT ADVISERS ACT CLAIMS

Section 206(4) of the Advisers Act prohibits investment advisers from

> engag[ing] in any act, practice, or course of business which is fraudulent,
> deceptive, or manipulative. The Commission shall, for the purposes of this
> paragraph (4) by rules and regulations define, and prescribe means reasonably

---

[4] These witnesses will not be permitted to testify as to how other investors evaluated the statements at issue. (See Def. MIL No. 1 Opp. Br. at 18-19). Defendants' arguments regarding the small sample size go to the weight of such testimony and not to its admissibility. (See Def. MIL No. 1 Opp. Br. at 20).

>designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.

15 U.S.C. § 80b-6(4). SEC Rule 206(4)-8 provides:

>(a) Prohibition. It shall constitute a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of section 206(4) of the Act (15 U.S.C. 80b-6(4)) for any investment adviser to a pooled investment vehicle to:
>
>>(1) Make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; or
>>
>>(2) Otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

17 C.F.R. § 275.206(4)-8(a). There is no "in connection with" requirement under the Advisers Act. Abrahamson, 568 F.2d at 877. However, a party can only be primarily liable under the Advisers Act if he, she, or it is an "investment adviser" as defined in Section 202(a)(11).

The statements at issue on this motion were made by the Reserve's sales force, which was housed in Resrv Partners. (PX 147(I)) Defendants argue that statements made by Partners employees cannot be admitted as against RMCI and the Bents for purposes of the Advisers Act claims because: (1) the Commission's theory that Partners was an agent of RMCI and the Bents is not pleaded in the Complaint, and (2) Partners employees were not employees of RMCI – the investment adviser – and therefore the statements of these employees cannot be attributed to RMCI or to the Bents. (Def. MIL No. 1 Opp. Br. at 7-12)

As to Defendants' first argument, the Complaint alleges sufficient facts to plead an agency relationship. The Complaint alleges that the Bents "own[] and control[]" RMCI; that "Partners is the distributor for the funds managed by RMCI"; and that "[t]he Bents collectively own and control Reserv Partners." (Cmplt. ¶¶ 19-20) The Complaint further alleges that "[a]s

13

Bent II intended, the sales team – including sales personnel associated with [] Partners . . . communicated  . . . with multiple Primary Fund shareholders to falsely assure them that RMCI and the Bents were protecting the $1.00 per share NAV of the Primary Fund." (Id. ¶ 84)  The Complaint also states that Partners was responsible for the public distribution of the Insights marketing piece, which had been prepared by RMCI marketing personnel and reviewed by the Bents prior to distribution.  Id. ¶¶ 88-93, 102.

In connection with their second argument, Defendants contend that holding RMCI and the Bents liable for statements made by Partners would violate Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296 (2011).  In Janus – a Rule 10b-5 action – the shareholders of parent company Janus Capital Group ("JCG") sued wholly owned subsidiary Janus Capital Management ("JCM"), a mutual fund investment advisor, for alleged misstatements made in fund prospectuses.  The prospectuses were filed with the Commission by the Janus Investment Fund, a separate legal entity owned by mutual fund investors that had no assets apart from those owned by fund investors.  The Investment Fund had the same officers as JCM, but had an independent board of trustees.

The question for the Court was whether JCM had "made" the allegedly misleading statements in the prospectuses under Rule 10b-5, given its role as investment adviser to the fund.  The Supreme Court held that JCM was not liable under Rule 10b-5, because a defendant only "makes" a statement for purposes of a private Rule 10b-5 action if the defendant "is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  Janus, 131 S.Ct. at 2302.  "[I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by – and only by – the party to whom it is attributed."  Id. at 2305.

14

As an initial matter, it is far from clear that <u>Janus</u> applies to a claim under the Investment Advisers Act. <u>Janus</u> addresses the scope of private actions under Rule 10b-5, and, in particular, language in that rule providing that it is unlawful to "<u>make</u> any untrue statement of a material fact . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5; <u>Janus</u>, 131 S. Ct. at 2299 (emphasis added). The Court's discussion draws on private Rule 10b-5 case law, such as <u>Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164 (1994), in which the Court held that Rule 10b-5's private right of action does not extend to suits against aiders and abettors. The Court's "holding was [also] limited to 'accord [ ] with the narrow scope that [courts] must give the implied private right of action' under Rule 10b-5 to private plaintiffs[,] in contrast to the Commission." <u>SEC v. Pentagon Capital Mgmt. PLC</u>, 844 F. Supp. 2d 377, 422 (S.D.N.Y. 2012) (quoting <u>Janus</u>, 131 S.Ct. at 2303).[5] Finally, in ruling that Janus Investment Fund was the "maker" of the statements in its prospectuses, the Court noted that "[o]nly Janus Investment Fund – not JCM – bears the statutory obligation to file the prospectuses with the SEC." <u>Janus</u>, 131 S. Ct. at 2304 (citing 15 U.S.C. §§ 77e(b)(2), 80a-8(b), 80a-29(a)-(b); 17 CFR § 230.497).

The factual circumstances here are entirely different. Partners had no statutory obligation to make the statements to investors that are at issue here.[6] And the issue before the

---

[5] These factors have led one court in this District to hold that <u>Janus</u> does not apply to enforcement actions brought by the Commission. See <u>Pentagon Capital Mgmt.</u>, 844 F. Supp. 2d at 422 ("Defendants have put forth no persuasive reason why <u>Janus</u> should be read to reach enforcement actions brought by the SEC").

[6] Defendants argue that Partners had a statutory obligation to "communicate purchases and sales with the Fund's shareholders" (Def. MIL No. 1 Opp. Br. at 9 (citing 15 U.S.C. § 78o(a)(1)). But 15 U.S.C. § 78o(a)(1) imposes a registration duty, not a duty to communicate with Fund shareholders. <u>See</u> 15 U.S.C. § 78o(a)(1) ("It shall be unlawful for any broker or dealer . . . to make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of any security . . . <u>unless such broker or dealer is registered</u> in accordance with subsection (b) of this section.") (emphasis

Court is whether, under Rule 206(4)-8(a)(1), a management company can be held liable for statements made by its sales force in a context in which the management company dictated what the sales force would say.

Courts have generally not applied Janus to Section 17(a) causes of action, noting the Janus court's focus on the word "make" in Rule 10b-5 – language that is not part of Section 17(a). See, e.g., SEC v. Stoker, No. 11 Civ. 7388(JSR), 2012 WL 2017736, at *8 (S.D.N.Y. June 6, 2012) ("[T]he Court concludes that Janus implicitly suggests that Section 17(a)(2) should be read differently from, and more broadly than, Section 10(b)."); Pentagon Capital Mgmt., 844 F. Supp. 2d at 422 ("Janus [does not] apply to SEC enforcement actions brought pursuant to Section 17(a) of the Securities Act."); SEC v. Sentinel Mgmt. Group, Inc., No. 07 C 4684, 2012 WL 1079961, at *14 (N.D. Ill. Mar. 30, 2012) ("[T]he Supreme Court largely based its holding on the definition of the word 'make,' which is present in Rule 10b–5 but not so in Section 17(a)."); SEC v. Mercury Interactive, LLC, No. 5:07-CV-02822-WHA, 2011 WL 5871020, at *3 (N.D. Cal. Nov. 22, 2011) ("This Court agrees with those decisions that have concluded that Janus may not be extended to statutes lacking the very language that Janus construed."); SEC. v. Daifotis, No. C 11-00137 WHA, 2011 WL 3295139, at *5 (N.D. Cal. Aug. 1, 2011) ("Importantly, the word 'make,' which was the very thing the Supreme Court was interpreting in Janus, is absent from the operative language of Section 17(a)."); but see SEC v. Kelly, 817 F. Supp. 2d 340, 345 (S.D.N.Y. 2011) (applying Janus to Section 17(a) claim).

Defendants have not cited, and this Court's research has not disclosed, any case in which a court has applied Janus to claims under the Investment Advisers Act. Unlike Section 17(a), however, Rule 206(4)-8(a)(1) does use the term "make." That provision provides that it is

---

added)  Accordingly – as to the statements at issue here – Partners did not have a statutory duty analogous to the Janus Investment Fund's duty to file prospectuses.

unlawful for an investment adviser to "[m]ake any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle."[7]  17 C.F.R. § 275.206(4)-8(a)(1).

Assuming, arguendo, that Janus applies to an action brought by the Commission under Rule 206(4)-8(a)(1), and that "make" in that rule should be interpreted as it was in Janus for purposes of a private action under Rule 10b-5, such findings would not require this Court to rule that RMCI and the Bents cannot be held liable under the Advisers Act for statements made by Resrv Partners employees.  While "in the ordinary case" attributing statements made by a broker-dealer to an investment adviser might be inappropriate, this is not an "ordinary case."  A reasonable jury could find here that the Bents had complete control over both RMCI and Partners, and that RMCI and the Bents exercised complete control over the statements made by Partners.  Indeed, a jury could reasonably find that the public statements made by Partners had been crafted by RMCI and the Bents and were issued at their direction.  The facts in this case are therefore analogous to those in Daifotis, 2012 WL 2132389, at *7-8.  In that case, the court considered Janus but found that where "an executive who [i]ndisputably exercised authority over his own non-casual statements with the intent and reasonable expectation that such statement would be relayed to the investing public, [he] should be deemed to be the person who 'made' the statements to the investing public."  Id. at *8.  See also Pentagon Capital Mgmt. 844 F. Supp. 2d 423 (finding primary liability under Section 17(a) where "Defendants sought out late trading through TW & Co.[, the broker-dealer], directed TW & Co.'s personnel to place late trades on

---

[7] The SEC states in an Oct. 5, 2012 letter that it is relying on subsections (1) and (2) of Rule 206(4)-8(a). (SEC Oct. 5, 2012 Ltr. at 2 n.3)  It is, however, subsection 1 that addresses the use of false statements.

their behalf in awareness of TW & Co.'s false time stamps, and indeed provided TW & Co. with detailed instructions for how and when to do so").

Accordingly, the statements of Resrv Partners employees are admissible against the Bents and RMCI in connection with the Commission's Investment Advisers Act claims under Section 206(4) and Rule 206(4)-8(a)(1).

## CONCLUSION

The Commission's motion in limine No. 1 is granted to the extent set forth in this Order. The Clerk of the Court is directed to terminate the motion (Dkt. No. 465).

Dated: New York, New York
       October 8, 2012

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge